# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, CITIZENS FOR PENNSYLVANIA'S FUTURE, ENVIRONMENTAL DEFENSE FUND, and SIERRA CLUB, <br><br> Petitioners <br><br> v. <br><br> U.S. DEPARTMENT OF ENERGY, and CHRIS WRIGHT, in his official capacity as Secretary of Energy, <br><br> Respondents. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 25-<u>1194</u> |

## PETITION FOR REVIEW

Natural Resources Defense Council, Citizens for Pennsylvania's Future ("PennFuture"), Environmental Defense Fund, and Sierra Club petition the Court for review of the Department of Energy's and Secretary of Energy Christopher Wright's (collectively, "DOE") Order No. 202-25-4 dated May 30, 2025 at 5:03 PM Eastern Daylight Time (the "Order") (Exhibit A), and any amendment, modification, or renewal of that Order, as well as any denials of petitions for rehearing. Public Interest Organizations petition under section 313 of the Federal Power Act, 16

1

U.S.C. § 825*l*(b), and section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and D.C. Circuit Rule 15(a). On June 27, 2025, Public Interest Organizations timely moved to intervene and sought rehearing of the Order (Exhibit B). DOE issued a Notice of Denial of Rehearing By Operation of Law and Providing for Further Consideration on August 1, 2025 (Exhibit C).

The prerequisites for judicial review of this petition have been met. As stated in DOE's Notice of Denial, Public Interest Organizations timely requested rehearing of the Order, and DOE denied the rehearing request. Ex. C. 16 U.S.C. § 825*l*(a). Public Interest Organizations' petition is filed within sixty days after the denial of rehearing. *Id.* § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are parties aggrieved by the Order, and venue is proper. *Id.* § 825*l*(a)–(b).

Dated: September 26, 2025

[continued for signatures]

Respectfully Submitted,

/s/ Caroline Reiser[1]
Caroline Reiser (DC Cir. 62319)
Simi Bhat
Karen Chen
Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
creiser@nrdc.org
sbhat@nrdc.org
kchen@nrdc.org
gmccabe@nrdc.org
(202) 717-8341

/s/Tomás Carbonell
Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tekelly@edf.org
tcarbonell@edf.org
(202) 387-3500

/s/Danielle C. Fidler
Danielle Fidler (Bar No. 62486)
Francis W. Sturges, Jr. (Bar No. 64964)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
dfidler@catf.us
fsturges@catf.us
(617) 624-0234
*Counsel for Citizens for Pennsylvania's Future*

---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Sierra Club Environmental Law Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
(415) 977-5646

## RULE 26.1 DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Natural Resources Defense Council states that it is a non-profit environmental organization. NRDC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Citizens for Pennsylvania's Future ("PennFuture") is a non-profit organization that works to aid the transition to a clean energy economy in Pennsylvania and beyond; to protect our air, water, and land; and to empower citizens to build sustainable communities for future generations. PennFuture has no parent corporation and no publicly held corporation has a 10% or greater ownership interest in PennFuture.

Environmental Defense Fund states that it is a 501(c)(3) non-profit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of law, policy, science, and economics. Environmental Defense Fund has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies and no publicly held company has a 10% or greater ownership interest in Sierra Club.

Respectfully Submitted,

*/s/ Caroline Reiser[1]*
Caroline Reiser (DC Cir. 62319)
Simi Bhat
Karen Chen
Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
creiser@nrdc.org
sbhat@nrdc.org
kchen@nrdc.org
gmccabe@nrdc.org
(202) 717-8341

*/s/Tomás Carbonell*
Tomás Carbonell (DC Cir. 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tekelly@edf.org
tcarbonell@edf.org
(202) 387-3500

---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

*/s/Danielle C. Fidler*
Danielle Fidler (Bar No. 62486)
Francis W. Sturges, Jr. (Bar No. 64964)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
dfidler@catf.us
fsturges@catf.us
(617) 624-0234
*Counsel for Citizens for Pennsylvania's Future*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Sierra Club Environmental Law Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
(415) 977-5646

# CERTIFICATE OF COMPLIANCE WITH TYPE-FACE AND TYPE-STYLE REQUIREMENTS

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2507 in Times New Roman, Size 14.

Dated: Sept. 26, 2025                          Respectfully submitted,

*/s/ Caroline Reiser*
Caroline Reiser

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statements** and all attachments with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have on this 26th day of September, 2025, caused copies of the foregoing to be served via certified priority mail, return receipt requested, upon the Department of Energy and Secretary Chris Wright at:

> U.S. Department of
> Energy 1000
> Independence Ave.,
> SW Washington, DC
> 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also served a copy of the foregoing on all parties to the proceeding before the DOE, as well as PJM Interconnection, LLC, and Constellation Energy Generation, LLC, via first-class certified mail and via electronic mail.

| | |
|---|---|
| David S. Lapp<br>  People's Counsel<br>William F. Fields<br>  Deputy People's Counsel<br>Philip L. Sussler<br>  Senior Assistant People's Counsel<br>MARYLAND PEOPLE'S COUNSEL<br>Office of People's Counsel<br>6 St. Paul Street, Suite 2102<br>Baltimore, Maryland 21202<br>(410) 767-8150<br>William.fields@maryland.gov<br>Philip.sussler@maryland.gov | Brian O. Lipman<br>  Director Division of Rate Counsel<br>Emily Lam, Esq.<br>T. David Wand, Esq.<br>Robert Glover, Esq.<br>NEW JERSEY DIVISION OF RATE<br>COUNSEL<br>New Jersey Division of Rate Counsel<br>140 East Front Street, 4th Floor<br>P.O. Box 003<br>Trenton, NJ 08625<br>(609) 984-1460<br>elam@rpa.nj.gov<br>dwand@rpa.nj.gov<br>blipman@rpa.nj.gov<br>rglover@rpa.nj.gov |
| David Crumplar (Bar ID No. 5876)<br>  Deputy Attorney General<br>ATTORNEY FOR THE DELAWARE<br>DIVISION OF THE PUBLIC<br>ADVOCATE<br>8820 N. French St., 6th Floor<br>Wilmington, DE 19801<br>(302) 577-8400<br>david.crumplar@delaware.gov | Jason E. James<br>  Assistant Attorney General<br>Kimberly Janas<br>  Counsel to the Attorney General<br>ILLINOIS OFFICE OF THE<br>ATTORNEY GENERAL<br>Office of the Illinois Attorney General<br>201 W. Pointe Drive, Suite 7<br>Bellville, IL 62226<br>(217) 843-0322<br>jason.james@ilag.gov |
| Eric DeBellis<br>  General Counsel Illinois Citizens<br>Utility Board<br>ILLINOIS CITIZENS UTILITY<br>BOARD<br>309 West Washington Street Suite 800<br>Chicago, IL 60606<br>edebellis@citizensutilityboard.org | Tyson Slocum<br>Public Citizen, Inc.<br>215 Pennsylvania Ave SE<br>Washington, DC 20003<br>(202) 454-5191<br>tslocum@citizen.org |

| Michael E. Bryson<br>  Senior Vice President, Operations<br>PJM Interconnection, L.L.C.<br>2750 Monroe Boulevard<br>Audubon, PA 19403<br>(610) 666-4659<br>Michael.Bryson@pjm.com | Carrie Hill Allen<br>  Sr. Vice President & Deputy General Counsel<br>Constellation Energy Generation, LLC<br>250 Massachusetts Ave. NW, Suite 760 Washington, D.C. 20001<br>carrie.allen@constellation.com |

Dated: Sept. 26, 2025

Respectfully submitted,

*/s/ Caroline Reiser*
Caroline Reiser

# Exhibit A

**Order No. 202-25-4**

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA), 16 U.S.C. § 824a(c), and section 301(b) of the Department of Energy Organization Act, 42 U.S.C. § 7151(b), and for the reasons set forth below, I hereby determine that an emergency exists in portions of the electricity grid operated by PJM Interconnection (PJM) due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes, and that issuance of this Order will meet the emergency and serve the public interest.

*Emergency Situation*

PJM has recently stated its system faces "growing resource adequacy concern" due to load growth, the retirement of dispatchable resources, and other factors.[1] Upcoming retirements, including the planned retirement of Unit 3 and Unit 4 of the Eddystone Generating Station in Eddystone, Pennsylvania, will exacerbate these resource adequacy issues.

PJM indicates that resource constraints could exist within the service territory under peak load conditions, stating that "available generation capacity may fall short of required reserves in an extreme planning scenario."[2] In its February 2023 assessment "*Energy Transition in PJM: Resource Retirements, Replacements & Risks,*" PJM highlights the increasing risk of reliability risk in the coming years due to the "potential timing mismatch between resource retirements, load growth and the pace of new generation entry" under "low new entry" scenarios for renewable generation.[3]

In December 2024, PJM filed revisions with the Federal Energy Regulatory Commission (FERC) to Part VII of its Open Access Transmission Tariff, known as the Reliability Resource Initiative (RRI), to address near-term resource adequacy concerns. In a February 2025 order, FERC accepted the revisions and found "the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry."[4] In March 2025 congressional testimony, PJM found "a growing resource adequacy concern" due to a combination of load growth, the retirement of dispatchable resources, and other factors.[5] Through 2030, PJM anticipates reliability risk from increasing electricity demand, generator retirement outpacing new resource construction, and characteristics of resources in PJM's interconnection queue.[6]

---

[1] https://www.pjm.com/-/media/DotCom/library/reports-notices/testimony/2025/20250325-asthana-testimony-us-house-subcommittee-on-energy.pdf

[2] https://insidelines.pjm.com/pjm-summer-outlook-2025-adequate-resources-available-for-summer-amid-growing-risk/

[3] https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx

[4] https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250211-3120

[5] https://www.pjm.com/-/media/DotCom/library/reports-notices/testimony/2025/20250325-asthana-testimony-us-house-subcommittee-on-energy.pdf

[6] Ibid.

Constellation Energy owns the Eddystone Generating Station, which includes Unit 3 and Unit 4, each of which has a nameplate capacity of 380 MW. Units 3 and 4 have a planned retirement date of May 31, 2025. The retirement of these units would further decrease available dispatchable generation within PJM's service territory.

Pursuant to Executive Order 14262, *Strengthening the Reliability and Security of the United States Electric Grid* (EO 14262), DOE is developing a methodology to identify current and anticipated reserve margins for all regions of the bulk-power system regulated by the Federal Energy Regulatory Commission. EO 14262 requires this methodology to be published by July 7, 2025, and be used to establish a protocol to identify which generation resources within a region are critical to system reliability and prevent identified generation resources from leaving the bulk-power system. DOE plans to use this methodology to further evaluate Eddystone Units 3 and 4.

## *ORDER*

Given the emergency nature of resource adequacy concerns, the declared state of national energy emergency, the responsibility of PJM to ensure maximum reliability on its system, and the ability of PJM to identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, operational availability and economic dispatch of the aforementioned Eddystone Units 3 and 4 (Eddystone Units) is necessary to best meet the emergency and serve the public interest for purposes of FPA section 202(c). This determination is based on, among other things:

- The emergency nature of the potential load stress due to aforementioned resource adequacy concerns, and the potential loss of power to homes and local businesses in the areas that may be affected by curtailments, presenting a risk to public health and safety.
- The potential shortage of electric energy, shortage of facilities for the generation of electric energy, and other causes in the region support the need for the Eddystone Units to contribute to system reliability.
- PJM's responsibility to ensure maximum reliability on its system, and, with the authority granted in this Order, its ability to identify and dispatch generation, including the Eddystone Units, necessary to meet the load demands.

This Order is limited in duration to align with the anticipated emergency circumstances. Because the additional generation may result in a conflict with environmental standards and requirements, I am authorizing only the necessary additional generation on the conditions contained in this Order, with reporting requirements as described below.

FPA section 202(c)(2) requires the Secretary of Energy to ensure that any 202(c) order that may result in a conflict with a requirement of any environmental law be limited to the "hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable," be consistent with any applicable environmental law and minimize any adverse

environmental impacts. To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters determined by PJM for reliability purposes.

Based on my determination of an emergency set forth above, I hereby order:

A.  From the time this Order is issued on May 30, 2025, PJM and Constellation Energy shall take all measures necessary to ensure that Eddystone Units are available to operate. For the duration of this order, PJM is directed to take every step to employ economic dispatch of the units to minimize cost to ratepayers. Following conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices. Constellation Energy is directed to comply with all orders from PJM related to the availability and dispatch of the Eddystone Units.

B.  To minimize adverse environmental impacts, this Order limits operation of dispatched units through the expiration of the Order. PJM shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Eddystone Units have operated in compliance with the allowances contained in this Order.

C.  All operation of the Eddystone Units must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D.  By June 15, 2025, PJM is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with the public interest. PJM shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E.  In addition, PJM and Constellation Energy are directed to file with the Federal Energy Regulatory Commission any tariff revisions or waivers necessary to effectuate this order. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F.  This Order shall not preclude the need for the Eddystone Units to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G.  This Order shall be effective upon its issuance, and shall expire at 5:03 PM EDT on August 28, 2025, with the exception of the reporting requirements in paragraph D.

H.  Issued in Simi Valley, California, at 5:03 PM Eastern Daylight Time on this 30th day of May 2025.


_____
Chris Wright
Secretary of Energy

# Exhibit B

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

|  |  |  |
|---|---|---|
| | ) | |
| Federal Power Act Section 202(c) | ) | Order No. 202-25-4 |
| Emergency Order: PJM Interconnection | ) | |
| And Constellation Energy | ) | |
| | ) | |

Motion to Intervene and Request for Rehearing of
Natural Resources Defense Council, Citizens for Pennsylvania's Future,
Environmental Defense Fund, Sierra Club and Public Citizen

I.  INTRODUCTION ................................................................................4

II.  STATEMENT OF ISSUES AND SPECIFICATION OF ERROR .....................7

III.  INTERVENORS' INTERESTS ...........................................................9

    A.  NATURAL RESOURCES DEFENSE COUNCIL ................................ 10

    B.  CITIZENS FOR PENNSYLVANIA'S FUTURE .................................. 11

    C.  ENVIRONMENTAL DEFENSE FUND ............................................. 12

    D.  SIERRA CLUB ............................................................................ 13

    E.  PUBLIC CITIZEN ....................................................................... 13

IV.  BACKGROUND ............................................................................14

    A.  CONSTELLATION ENERGY GROUP AND THE EDDYSTONE
        PLANT ....................................................................................... 14

    B.  HOW PJM ENSURES RESOURCE ADEQUACY AND
        RELIABILITY ............................................................................ 17

    C.  DOE'S MAY 30, 2025 202(C) ORDER AND PJM'S JUNE 13
        LETTER ..................................................................................... 25

V.  REQUEST FOR REHEARING ..........................................................28

    A.  THE ORDER EXCEEDS THE DEPARTMENT'S AUTHORITY
        BECAUSE IT HAS NOT, AND CANNOT, DEMONSTRATE AN
        UNEXPECTED EMERGENCY UNDER SECTION 202(C)
        NECESSITATING CONTINUED OPERATION OF EDDYSTONE. ... 28

B.     SECTION 202(C) ONLY AUTHORIZES THE DEPARTMENT TO RESPOND TO SPECIFIC, IMMINENT, UNEXPECTED, AND TEMPORARY EVENTS, NOT TO MANDATE GENERATION BASED ON LONGER-TERM RELIABILITY CONCERNS. ................ 30

     1.     Section 202's Text and Structure Establish that Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response. ................... 30

     2.     Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms that Section 202(c) Cannot be Expanded to Impose Requirements Related to Long-Term Reliability. ................................................................................. 34

     3.     Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response. ................... 36

     4.     Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises. ...................................... 38

     5.     The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Long-Term Resource Adequacy. ................................................................ 40

C.     THERE IS NO FACTUAL BASIS SUPPORTING THE DEPARTMENT'S ORDER. ................................................ 42

     1.     The Energy Emergency Executive Order does not provide a valid basis under Section 202(c). ................................... 43

     2.     The Department Failed to Produce Evidence of an Emergency. ............................................................... 45

     3.     PJM Has Sufficient Capacity Resources for Summer 2025 Without Eddystone. ................................................ 56

     4.     The Order Is Based on a False Premise and Violates the Department's Duties Under the Administrative Procedure Act. ................................................................ 61

D.     THE ORDER WILL UNDERMINE COMPETITIVE MARKETS TO THE DETRIMENT OF CONSUMERS AND RELIABILITY. ............... 63

     1.     Competitive Markets Have a Long History of Success. ............ 63

2.      Command and Control Orders Run Counter to Federal Power Act Requirements and Fundamental Market Principles........... 66

E.      EVEN IF THERE WERE A SHORT-TERM NEED—THERE IS NOT— THE ORDER DOES NOT COMPLY WITH THE STATUTORY COMMAND TO SET TERMS THAT BEST MEET THE EMERGENCY AND SERVE THE PUBLIC INTEREST. ............................................... 71

1.      Section 202(c)(1) Only Authorizes the Department to Require Generation that Best Meets the Emergency and Serves the Public Interest. ........................................................................ 71

2.      The Order Does not Contain a Reasoned Basis that Eddystone Best Meets the Claimed Emergency and Serves the Public Interest....................................................................................... 74

F.      BECAUSE THE ORDER IS AMBIGUOUS, IT FAILS TO PROVIDE FAIR NOTICE TO THE PUBLIC AND REGULATED ENTITIES AND CONFLICTS WITH LIMITATIONS ON THE DEPARTMENT'S AUTHORITY .................................................................................. 76

G.      THE ORDER FAILS TO PROVIDE THE CONDITIONS NECESSARY TO OVERRIDE ENVIRONMENTAL STANDARDS UNDER SECTION 202(C)(2). .............................................................................. 79

H.      THE ORDER AND THE DEPARTMENT'S CONTINUED CONDUCT ARE INCONSISTENT WITH DEPARTMENTAL PROCEDURE, DEPRIVING THE PUBLIC AND THE PUBLIC INTEREST ORGANIZATIONS OF FAIR NOTICE AND AN ADEQUATE RECORD. .................................................................................... 84

VI.    REQUEST FOR STAY ................................................................................85

A.      INTERVENORS ARE IRREPARABLY HARMED BY THE ORDER... 87

B.      A STAY WOULD NOT RESULT IN HARM TO ANY OTHER INTERESTED PARTIES. ....................................................... 88

C.      A STAY IS IN THE PUBLIC INTEREST ........................................... 89

VII.   CONCLUSION...........................................................................................89

## I.    INTRODUCTION

Pursuant to section 313 of the Federal Power Act ("the Act"), 16 U.S.C. § 825*l*, Natural Resources Defense Council, Citizens for Pennsylvania's Future, Environmental Defense Fund, Sierra Club, and Public Citizen (together "Public Interest Organizations") request that the Department of Energy ("Department" or "DOE") grant rehearing of Order No. 202-25-4 (May 30, 2025) (the "Order").[1]  Acting on its own motion and without providing notice, the Department issued the Order on May 30, 2025, pursuant to its emergency authority under section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c) ("Section 202(c)"), to instruct PJM Interconnection, LLC ("PJM") and Constellation Energy Corporation ("Constellation") to "take all measures necessary to ensure that" Units 3 and 4 of the Eddystone Generating Station, in Eddystone, Pennsylvania, ("Eddystone" or the "Eddystone Units"), remain "available to operate" until August 28, 2025, and further directed PJM to "take every step to employ economic dispatch" during that time period.  Ex. 1 at 3.  Prior to the Department's eleventh-hour intrusion, Constellation was preparing to retire these two oil- and gas-burning units on May 31, 2025, with PJM's approval.

The Department should grant rehearing and rescind this costly, harmful, unnecessary, and unlawful order.  There is no energy emergency in the PJM region as defined by Section 202(c).  The Eddystone Units were scheduled to deactivate only following analysis showing that this would not cause any transmission

---

[1] A copy of the Order is attached as Exhibit 1.

4

instability and that replacement economic capacity resources were available.  The result of the Department's overreach will be unnecessary costs imposed on already-overburdened ratepayers, needless pollution emitted into Pennsylvania and neighboring states, and unprecedented interference with regulation of grid resource adequacy, an area Congress reserved for other authorities.  16 U.S.C. § 824(b)(1).

The Order's emergency declaration cannot withstand even the mildest scrutiny.  On its face, the Order fails to identify conditions necessary to invoke Section 202(c)'s extraordinary powers, which are reserved for sudden, imminent, and unexpected energy shortages.[2]  The Order offers only selective quotes from PJM documents about potential future risks of shortages well outside the 90-day period covered by the Order.  In fact, the cited documents refute the Department's conclusory assertions.  Nor does the Order's reference to the "declared state of national energy emergency" cure the defect.  Ex. 1 at 2.  The vague, unsupported assertions in Executive Order ("EO") 14,156 *Declaring a National Energy Emergency* ("Energy Emergency EO")—belied by the U.S. Energy Information Administration's current data[3]—do not override Section 202(c), nor do they supply

---

[2] As the Department's own regulations emphasize, an "emergency," arises when there is an "unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities," due to weather, acts of God, "sudden" increases in demand, inability to obtain fuel, or a regulatory action prohibiting the use of certain facilities.  10 C.F.R. § 205.371.  The Department makes no pretense of identifying these conditions as the bases for the Order.

[3] Indeed, U.S. energy production and exports are currently at an all-time high:  Energy Info. Admin., U.S. primary energy production, consumption, and exports increased in 2024 (June 20, 2025), https://www.eia.gov/todayinenergy/detail.php?id=65524.

the specific information needed to support issuance of this Order or any other Section 202(c) order. The Order also refers to EO 14,262 (*Strengthening the Reliability and Security of the United States Electric Grid*) ("Grid EO"), but that order merely directs the Department to develop an as-yet unpublished methodology to analyze grid reliability to support future 202(c) orders, and can't be bootstrapped to supply a *post hoc* basis for this Order.

Even assuming there is an emergency under Section 202(c), the Order also fails to demonstrate that continued operation of the Eddystone Units is the action that "best meet[s] the emergency and serve[s] the public interest." 16 U.S.C. § 824a(c). The Order completely fails to address alternatives to continued operation of the Eddystone Units, including PJM's contracted demand reserve programs,[4] which ensure grid reliability at a lower cost even in the event of historically high demand peaks. Nor does the Order provide sufficiently clear instructions for Constellation and PJM, both as to plant operations and economic dispatch. And compounding these failures, the Order makes no effort to limit the environmental and public health harms that Eddystone imposes on the surrounding communities, despite explicit instruction from Congress to do so.

In short, the Order is an unlawful abuse of the Department's emergency authority and should be rescinded. The statutory bases for issuing an order under

---

[4] *See* PJM Interconnection, PJM Summer Outlook 2025: Adequate Resources Available for Summer Amid Growing Risk, Inside Lines (May 9, 2025), https://insidelines.pjm.com/pjm-summer-outlook-2025-adequate-resources-available-for-summer-amid-growing-risk/ (hereinafter "Summer Outlook 2025").

6

Section 202(c) are not present; and even if they were, the Order would still be unlawful because it fails to comply with the substantive requirements of Section 202(c), resulting in a twofold blow to PJM ratepayers: higher rates and more pollution with no net benefit received.  The Department is authorized only to use Section 202(c) for real emergencies, not to usurp authority for grid reliability planning and to prop up fossil fuel businesses.

## II.    STATEMENT OF ISSUES AND SPECIFICATION OF ERROR

The undersigned Public Interest Organizations move to intervene and request rehearing and a stay pursuant to section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure,[5] based upon the following errors and issues:

- The order exceeds the Department's authority because it has not, and cannot, demonstrate an unexpected emergency under Section 202(c) necessitating continued operation of Eddystone. 16 U.S.C. § 824a(c).

- Section 202(c) only authorizes the Department to respond to specific, imminent, unexpected, and temporary events, not to mandate generation based on longer-term reliability concerns. 16 U.S.C. § 824a(c); H.R. Rep. No. 114-357 § 61002 (2015); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610

---

[5] U.S. Dep't of Energy, DOE 202(c) Order Rehearing Procedures, https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (last visited June 18, 2025) (attached as Ex. 2) (hereinafter "DOE Rehearing Procedures"). This website was altered after June 18, 2025, and the procedures were removed. *Compare* https://web.archive.org/web/20250604093213/https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures with the current website. *See also* Ex. 3 (Email from Lot Cooke, U.S. Dep't of Energy to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 (December 28, 2005)) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's ("FERC")] Rules of Practice and Procedure, 18 CFR Part 385.").

(D.C. Cir. 1978); S. Rep. No. 74-621 (1935); 16 U.S.C. § 824a(a) & (b); *Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232 (8th Cir. 1970); 16 U.S.C. § 824o; 70 Fed. Reg. 53,117; S. Rep. No. 109-78 (2005); *Alcoa, Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009); 16 U.S.C. § 824o(c)-(d); 16 U.S.C. § 824o(a)(3); 16 U.S.C. § 824o(d)(2)-(4); 16 U.S.C. § 824o(e); 16 U.S.C. § 824o(i)-(j); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); 10 C.F.R. § 205.371; 10 C.F.R. § 205.375; 46 Fed. Reg. 39,984; *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349 (1941).

- There is no factual basis supporting the Department's Order. 16 U.S.C. § 824a(c); 10 C.F.R. § 205.371; *Biden v. Nebraska*, 600 U.S. 477 (2023); S. Rep. No. 94-1168 (1976); 1976 U.S.C.C.A.N. 2288; 16 U.S.C. § 824o-1; 16 U.S.C. § 809; 16 U.S.C. § 824a; 50 U.S.C. § 1631; Executive Order 14,156, Declaring a National Energy Emergency, 90 Fed. Reg. 8,433 (Jan, 20, 2025); 42 U.S.C. § 7172; 5 U.S.C. § 706(2)(A); 10 C.F.R. 205.375; *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016); *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891 (2020); Order Accepting Tariff Revisions Subject to Condition, 190 FERC ¶ 61,088 (2025); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Dept. of Com. v. New York*, 588 U.S. 752 (2019); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014); *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (1971).

- The Order will undermine competitive markets to the detriment of consumers and reliability. Executive Order 14,156, Declaring a National Energy Emergency, 90 Fed. Reg. 8,433 (Jan, 20, 2025); 16 U.S.C. § 824a(c); 16 U.S.C. § 824d; Order Terminating Rulemaking Proceeding, Initiating New Proceeding, And Establishing Additional Procedures, 162 FERC ¶ 61,012 (2018); Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996); Order No. 888-A, FERC Stats. & Regs. ¶ 31,048; Order No. 888-B, 81 FERC ¶ 61,248 (1997); Order No. 888-C, 82 FERC ¶ 61,046 (1998); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000); *New York v. FERC*, 535 U.S. 1 (2002); Order No. 890, FERC Stats. & Regs. ¶ 31,241 (1997); Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999); Order 787, 145 FERC ¶ 61,134 (2013); Order 809, 151 FERC ¶ 61,049 (2015); Centralized Capacity Markets in Regional Transmission Organizations and Independent System Operators, 149 FERC ¶ 61,145 (2014); Order Approving Extreme Cold Weather Reliability Standards EOP-011-3 and EOP-012-1 and Directing Modification of Reliability Standard EOP-012-1, 182 FERC ¶ 61094 (2023); Order Approving Extreme Cold Weather Reliability Standard EOP-012-2 and Directing Modification, 187 FERC ¶ 61,204 (2024); Order Accepting Tariff Revisions Subject to Condition, 186 FERC ¶ 61,080 (2024).

- Even if there were a short-term need—there is not—the Order does not comply with the statutory command to set terms that best meet the emergency and serve the public interest. 16 U.S.C. § 824a(c)(1); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976 (D.C. Cir. 2004); *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005); 10 C.F.R. § 205.370; 16 U.S.C. § 824a(c); 10 C.F.R. § 205.373; *Wabash Valley Power Ass'n*, 268 F.3d 1105 (D.C. Cir. 2001); *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86 (1962); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414 (1952); 46 Fed. Reg. 39,985.

- Because the order is ambiguous, it fails to provide fair notice to the public and regulated entities and conflicts with limitations on the Department's authority. *Fed. Commc'ns Comm'n v. Fox Telev. Stations, Inc.*, 567 U.S. 239 (2012); *Grayned v. City of Rockford*, 408 U.S. 104 (1972); 16 U.S.C. § 824a(c); *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359 (1998).

- The Order fails to provide the conditions necessary to override environmental standards under Section 202(c)(2). 16 U.S.C § 824a(c)(2); *City of New Orleans v. FERC*, 67 F.3d 947 (D.C. Cir. 1995); *Fla. Power & Light Co. v. FERC*, 88 F.3d 1239 (D.C. Cir. 1996); 68 Fed. Reg. 1660.

- The Order and the Department's continued conduct are inconsistent with departmental procedure, depriving the public and the Public Interest Organizations of fair Notice and an adequate record. *Morton v. Ruiz*, 415 U.S. 199 (1974); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519 (D.C. Cir. 1994); *United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240 (2d Cir. 1977).

## III.   INTERVENORS' INTERESTS

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of this proceeding.  Each party may therefore intervene in this proceeding.  DOE Rehearing Procedures; *see also* 18 C.F.R. § 385.214.

Each of the Public Interest Organizations also demonstrate a concrete injury arising from the Order that is redressable by a favorable outcome. Each organization is therefore aggrieved by the Order and may properly apply for rehearing. *See* 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112-13 (D.C. Cir. 2001); *NextEra Energy Res. v. ISO New Eng., Inc.*, 157 FERC ¶ 61,059, at P 5 (2016).

## A. Natural Resources Defense Council

Natural Resources Defense Council ("NRDC") is a national non-profit membership organization whose mission includes ensuring the rights of all people to clean air, clean water, and healthy communities. NRDC has a longstanding organizational commitment to protect the interests of its members and to reducing pollution caused by fossil fuel fired power plants such as Eddystone. NRDC works to achieve clean energy solutions that will lower consumer energy bills, meet greenhouse gas emission reduction goals, accelerate the use of energy efficiency and renewable energy, and ensure that clean energy is affordable and accessible to all.

NRDC and its members are aggrieved by the Order. Over 19,800 NRDC members reside in Pennsylvania, over 1,500 NRDC members reside in Delaware, over 9,600 NRDC members reside in Maryland, and 12,600 NRDC members reside in New Jersey. Of these, approximately 1,300 members reside within ten miles of the Eddystone Units. These NRDC members are harmed by the order to operate Eddystone beyond its planned retirement date because continued operation will subject NRDC members to air and water pollution in the areas where they live, work, and recreate. NRDC members are also exposed to the noise and visual

10

impacts of the plant's operation. The impact of the Order on the health, aesthetic, and recreational interests of NRDC members is compounded by the Order's failure to address the Federal Power Act's requirements for environmental protection that apply even in true emergencies (discussed in section V.G. below). In addition, NRDC members are ratepayers in the PJM region who will be subject to higher electric bills as a result of the Order. NRDC also operates an office in Washington D.C., which is in the PJM region. NRDC pays for the electricity used by its Washington D.C. office and will be subject to higher electric bills as a result of the Order. Moreover, NRDC has a sustainable operations plan with a goal of reducing net creation of greenhouse gas emissions derived from building operational activity to zero. NRDC and its members therefore have a strong interest in promoting actions that displace less cost-effective fossil generation with more cost-effective clean energy.

### B. Citizens for Pennsylvania's Future

Citizens for Pennsylvania's Future ("PennFuture") is a Pennsylvania-based statewide environmental organization dedicated to leading the transition to a clean energy economy in Pennsylvania and beyond. PennFuture has approximately 1,000 members across the state. PennFuture's mission is to protect our air, water, and land, and to empower citizens to build sustainable communities for future generations. One focus of PennFuture's work is to address the climate-warming pollution from Pennsylvania's power fleet. PennFuture also works to advance understanding and recognition of Pennsylvania's Environmental Rights Amendment, contained in Article 1, Section 27 of Pennsylvania's Constitution and

to ensure that Commonwealth entities meet their obligations under the Amendment as trustees of Pennsylvania's public natural resources. To promote affordable and clean energy, PennFuture advocates before government entities, including local, state, and federal agencies such as FERC, on issues related to electricity markets, policies affecting the clean energy transition, and just and reasonable rates. This proceeding raises issues which are important to the environmental, public health, and affordability interests that PennFuture seeks to advance.

### C. Environmental Defense Fund

The Environmental Defense Fund ("EDF") is a nonprofit membership organization with hundreds of thousands of members nationwide, including more than thirteen thousand members in Pennsylvania, whose mission is to build a vital Earth for everyone by preserving the natural systems on which all life depends. Guided by expertise in science, economics, law, and business partnerships, EDF seeks practical and lasting solutions to address environmental problems and protect human health, including in particular by addressing pollution from the power sector. On behalf of its members, EDF works with partners across the private and public sectors to engage in utility regulatory forums at the federal level and throughout the United States to advocate for policies that will create an affordable, reliable, and low pollution energy system. The Order harms EDF members because it will result in increased pollution that will impact the health of people and nature and because it will increase energy costs for EDF members throughout the PJM region.

12

### D. Sierra Club

Sierra Club and its members are aggrieved by the Order. Over 55,000 Sierra Club members reside in Pennsylvania and New Jersey; and over 4,000 of those members reside in one of the four counties most likely to be impacted by pollution from Eddystone. Sierra Club members are harmed by pollution produced by operating the Eddystone Units. The Order to operate the plant beyond its planned retirement date will subject Sierra Club members to additional air pollution in the areas where they live and recreate. The Order's impact on the health, aesthetic, and recreational interests of Sierra Club members is heightened by the Order's failure to address the Federal Power Act's requirements for environmental protection that apply even in true emergencies. In addition, Sierra Club operates multiple offices in the PJM region, and has well over 100,000 members living in the PJM region, all of whom will be subject to higher electric bills as a result of the Department's Order.

### E. Public Citizen

Established in 1971, Public Citizen is a national, not-for-profit, non-partisan, research and advocacy organization representing the interests of household consumers. Public Citizen has over 500,000 members and supporters across the United States, including in PJM and Pennsylvania. Public Citizen is active before FERC promoting just and reasonable rates, and supporting efforts for utilities to be accountable to the public interest. Public Citizen's interests in this proceeding are unique, and cannot be represented by any other party.

13

## IV.    BACKGROUND

### A. Constellation Energy Group and the Eddystone Plant

The Eddystone Generating Station is owned and operated by Constellation. It is a six-unit, 820 megawatt ("MW") power plant located along the banks of the Delaware River in Eddystone, Pennsylvania, just south of Philadelphia and in the PJM regional transmission organization ("RTO").[6] Units 3 and 4 are both 380 MW capacity steam boiler-turbine generator units that can run on either natural gas or distillate fuel oil. These units were installed between 1967 and 1970 and are "peakers," i.e., units that run only during periods of high demand. The plant also includes two smaller pairs of oil fueled peaking units—Units 10, 20, 30, and 40—which have a total combined capacity of 60 MW that were also installed between 1967 and 1970. Eddystone Units 1 and 2, which operated on coal, were both closed over ten years ago. As shown in Table 1 below, Eddystone Units 3 and 4 have each operated less than 1% of the time during the last four years. In Pennsylvania's restructured utility market, generation units like Eddystone are not committed to serve customers of a particular utility; rather, Constellation submitted offers into regional markets for services that Eddystone was eligible to provide and generated energy or provided other services when those offers were selected by the market mechanism.

---

[6] Constellation, Eddystone Generating Station, https://www.constellationenergy.com/our-company/locations/location-sites/eddystone-generating-station.html (last visited June 20, 2025).

14

| Table 1 | | | | | | |
|---|---|---|---|---|---|---|
| Capacity Factor | 2020 | 2021 | 2022 | 2023 | 2024 | Average |
| *Capacity Factor* | 0.18% | 0.25% | 0.27% | 0.40% | 0.92% | **0.40%** |

Sources: EIA, *Form EIA-923: Power Plant Operations Report, Net Generation Data for Eddystone Generating Station*, 2020–2023, https://www.eia.gov/electricity/data/eia923/ (accessed June 20, 2025); EPA, *CEMS Gross Load Data for Eddystone Generating Station*, 2020–2023, CAMPD, https://campd.epa.gov/ (accessed June 20, 2025) (2024 capacity factor estimated using average gross-to-net ratio from 2020–2023).

The Eddystone Units are located just outside of Chester, Pennsylvania, a community that faces one of the nation's worst cases of environmental racism.[7] Whenever it is operating, Eddystone contributes to the pollution impacting this community. On a yearly basis, Eddystone emits thousands of tons of criteria air pollutants, *see* Table 2, and large amounts of water pollutants.[8] And when Eddystone operates on oil rather than natural gas, it emits higher levels of both criteria pollutants and hazardous air pollutants.[9] These air pollutants are linked to

---

[7] *See* Chester Residents Concerned for Quality Living, https://chesterpaej.org/ (last visited June 26, 2025); University of Pennsylvania, Perelman School of Medicine, Center of Excellence in Environmental Toxicology, *Chester*, http://ceet.upenn.edu/community/target-communities/chester/ (last visited June 26, 2025).

[8] EPA, Pollutant Loading Report, https://echo.epa.gov/trends/loading-tool/reports/dmr-pollutant-loading?permit_id=PA0013714&year=2024 (last visited June 26, 2025) (including over 2 million pounds of total suspended solids, and over 25,000 pounds of ammonia, as well as 1,617 pounds of copper and 564 pounds of lead, in 2024 alone).

[9] Ex. 4 (Eddystone Title V Permit) at 28, 50 (noting sulfur content of oil and higher NOx emissions from oil-fired generation); 68 Fed. Reg. 1660,1678 (Jan. 13, 2003) (noting that switching from oil to natural gas "would reduce mercury, metallic [toxics], and inorganic" hazardous air pollutant emissions).

15

respiratory symptoms like asthma,[10] cancer, reproductive difficulties, and other health problems.[11]

| Table 2 | | | | | | |
|---|---|---|---|---|---|---|
| Annual Emissions | 2020 | 2021 | 2022 | 2023 | 2024 | Cumulative Emissions |
| CO2 (tons) | 11,167 | 14,943 | 18,636 | 28,332 | 58,566 | **131,644** |
| NOx (lbs) | 11,918 | 15,488 | 20,506 | 29,606 | 59,232 | **136,750** |
| SO2 (lbs) | 128 | 176 | 234 | 322 | 704 | **1,564** |
| Source: EPA, *Annual Emissions Data for Eddystone Generating Station*, 2020–2024, available at CAMPD, https://campd.epa.gov/ (accessed June 20, 2025). | | | | | | |

On December 1, 2023, Constellation notified PJM of its intent to deactivate Eddystone Units 3 and 4 effective May 31, 2025.[12] In that letter, Constellation explained that it was "retiring Eddystone Units 3 and 4 because continued operation of these units is expected to be uneconomic."[13] Such a notice triggers PJM's process under Section 113.2 of its Open Access Transmission Tariff to study whether the deactivation will cause any reliability violations. In February 2024, PJM sent a letter to Constellation indicating that it had completed its study and no

---

[10] EPA, Effects of NO2, Health Effects, https://www.epa.gov/no2-pollution/basic-information-about-no2#:~:text=Health%20effects,more%20about%20Visibility%20and%20Haze; https://www.epa.gov/so2-pollution/sulfur-dioxide-basics (last visited June 26, 2025).

[11] EPA, Health and Environmental Effects of Hazardous Air Pollutants, https://www.epa.gov/haps/health-and-environmental-effects-hazardous-air-pollutants (last visited June 26, 2025).

[12] Letter from Bryan Hanson, Constellation, to Michael Bryson, PJM (Dec. 1, 2023), https://www.pjm.com/-/media/DotCom/planning/gen-retire/deactivation-notices/eddystone-deactivation-letter.pdf.

[13] *Id.*

reliability violations had been identified; PJM granted permission to deactivate "on May 31, 2025, or sooner if desired."[14]

### B. How PJM Ensures Resource Adequacy and Reliability

PJM serves as the grid operator for a region that spans all or part of 13 states and the District of Columbia.[15]  PJM has established rules and processes for maintaining grid reliability that meet both industry standards and the requirements of the FERC certified Electric Reliability Organization—the North American Electric Reliability Corporation ("NERC")—including through ensuring resource adequacy.  Electric utilities and other load-serving entities that have joined PJM comply with those rules and participate in those processes to maintain regional reliability.  Many of the utilities in PJM own few or no generation assets and therefore rely substantially on PJM-run markets to procure both energy and other services that support the reliable operation of the grid.

PJM's primary tool to maintain resource adequacy throughout the region, including the state of Pennsylvania, is its Reliability Pricing Model ("RPM"), commonly known as its capacity market, which is designed to ensure there is enough energy supply on the system to meet demand, especially during high-risk

---

[14] Letter from Paul McGlynn, PJM, to Bryan Hanson, Constellation (Feb. 27, 2024), https://www.pjm.com/-/media/DotCom/planning/gen-retire/deactivation-notices/pjm-response-letter-eddystone.pdf.

[15] PJM, About PJM, https://www.pjm.com/about-pjm (last visited June 20, 2025).

periods.[16]  The capacity market does not pay for energy itself but pays resources for the promise to make a given quantity of energy available for sale at any time over the course of one year (the contracted "delivery year") upon demand of the grid operator.[17]  For each "delivery year," which begins June 1, PJM determines the region's "Reliability Requirement" and sub-regional reliability requirements for any "locational deliverability areas" that are transmission-constrained.[18]  PJM determines the Reliability Requirement based on a granular risk model of the system that reflects variability in consumer demand as well as the performance of all the supply resources on its system.  The determination of the Reliability Requirement includes a forecast of the peak load and the addition of a reserve margin to account for uncertainties, in order to meet the reliability standard set out in PJM's Reliability Assurance Agreement—i.e., a loss of load expectation ("LOLE")

---

[16] High risk periods are generally winter storms and hot summer days. *See Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659-61 (D.C. Cir. 2017); *see also* PJM, PJM Capacity Market: Promoting Future Reliability, https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/pjm-capacity-market-promoting-future-reliability-fact-sheet.pdf (Jan. 25, 2025).

[17] *See* PJM, Capacity Market (RPM) https://learn.pjm.com/three-priorities/buying-and-selling-energy/capacity-markets.aspx (last visited June 26, 2025); FERC, An Introductory Guide to Electricity Markets Regulated by the Federal Energy Regulatory Commission, https://www.ferc.gov/introductory-guide-electricity-markets-regulated-federal-energy-regulatory-commission#_ednref2 (last visited June 26, 2025).

[18] PJM, Manual 18: PJM Capacity Market, Revision 57, at 26 (July 26, 2023), https://www.pjm.com/-/media/DotCom/documents/manuals/archive/m18/m18v57-capacity-market-07-26-2023.pdf.

no greater than one occurrence in ten years.[19]  The systemwide Reliability

Requirement is the number of megawatts of capacity needed to ensure adequate

reserve margins during high-risk periods; Local Reliability Requirements for

constrained locational deliverability areas reflect the local capacity needed to

ensure adequate reserve margins during high risk periods, when accounting for

transmission constraints applicable to that area.  Using the same granular risk

model, PJM determines the capacity accreditation values for each supply resource

on its system—these values represent the amount of capacity, in "unforced capacity"

or "UCAP" terms that a resource may offer into the capacity market.  Since 2024,

PJM has determined these accreditation values using a marginal effective load

carrying capability ("ELCC") methodology, that assesses how much adding one

additional megawatt of a particular generation type to the system increases the

system's ability to serve consumer demand.[20]  A generator or demand response

resource's marginal ELCC value is expressed as a percentage—the unit can sell

capacity equivalent to its nameplate capacity times that percentage.  When PJM

applied ELCC to oil and gas resources, the capacity accreditation values for these

sources decreased from prior values, due to their historically poor performance

---

[19] *See* PJM Interconnection LLC, 186 FERC ¶ 61,080, at P 2 (2024) (citing PJM Resource Adequacy Planning, 2022 PJM Reserve Requirement Study (Oct. 4, 2022).

[20] *PJM Interconnection, L.L.C.*, 186 FERC ¶ 61,080 (2024) (approving PJM's proposal to adopt use of ELCC methodology for capacity accreditation).

during extreme winter weather.[21]  In other words, PJM concluded that oil and gas resources such as Eddystone should be deemed to contribute less to capacity requirements than it previously had assumed.

For each delivery year, PJM conducts a series of auctions to procure commitments from supply resources to provide capacity—to be available to generate power (or curtail power in the case of demand response) when needed by PJM as the system operator.  The primary event is the Base Residual Auction, typically held three years in advance of the delivery year.  In this auction, supply resources submit offers for the price at which they are willing to sell the quantity of capacity that reflects their ELCC.  Demand in the auction is represented by the Variable Resource Requirement Curve, which reflects the administratively determined price that, in PJM's judgment, consumers should be willing to pay to attract sufficient supply to the auction.  PJM constructs a supply curve from the sellers' offers. Where this supply curve crosses the demand curve determines the quantity of capacity that will be obligated for the delivery year, as well as the clearing price that will be paid to all sellers that submitted offers at or below that price level. Between the Base Residual Auction and the delivery year, PJM will conduct one or

---

[21] Ex. 5, Affidavit of Adam Keech on Behalf of PJM Interconnection LLC in *PJM Interconnection, L.L.C.*, FERC Accession No. 20231013-5157 (Oct. 13, 2023) (PJM's filing in the above docket) ¶ 9: "Winter Storm Elliott represents the fifth event where, 'cold weather-related generation outages jeopardized bulk power system reliability,'" (citing FERC, NERC, and Regional Entity Joint Staff Inquiry, December 2022 Winter Storm Elliott Grid Operations: Key Findings and Recommendations, Federal Energy Regulatory Commission, 3 (Sept. 21, 2023), https://www.ferc.gov/news-events/news/presentation-ferc-nerc-regional-entity-joint-inquiry-winter-storm-elliott.)

more incremental auctions that allow additional capacity to be procured, or released

if the load forecast declines relative to the three-year ahead forecast, and for

suppliers to be relieved of their obligations or take on new ones.

In addition to these market mechanisms, RPM also includes a reliability

backstop mechanism.[22]  As PJM's Senior VP of Markets recently described it, this

mechanism exists in part "to resolve reliability criteria violations caused by . . . lack

of sufficient capacity committed through the Reliability Pricing Model auctions" and

is "intended to guarantee that sufficient generation, transmission and demand

response solutions will be available to preserve system reliability."[23]

Load-serving entities in PJM are utilities or competitive retail suppliers that

have obligations to serve retail electricity consumers.  PJM requires these load-

serving entities to purchase an amount of capacity for each delivery year that

corresponds to their peak-load contribution—the amount of electricity they serve

consumers (the load) during specific times when demand is highest on PJM's

system.[24]  Load-serving entities have two options for demonstrating compliance—

they can either have capacity purchased on their behalf through the auction, or opt

out of participation in the auction by meeting 100% of their obligations through a

---

[22] *See* PJM Open Access Transmission Tariff, Att. DD, section 16 (Reliability Backstop), https://agreements.pjm.com/oatt/5130.

[23] Prefiled Statement of Adam Keech on Behalf of PJM Interconnection, L.L.C., FERC Docket No. AD25-7, at p. 6 n.7 (June 4, 2025), https://www.ferc.gov/media/adam-keech-pjm-vice-president-market-design-and-economics.

[24] PJM Reliability Assurance Agreement, Rate Schedule FERC No. 44, https://www.pjm.com/pjmfiles/directory/merged-tariffs/raa.pdf.

"Fixed Resource Requirement" plan.  Most load-serving entities in PJM, including those that serve load in Pennsylvania, choose the prior option.

PJM is responsible for aspects of reliability beyond resource adequacy.  For example, PJM maintains operational reliability of the system on a minute-to-minute basis through its use of security-constrained economic dispatch of generators and energy storage resources on its system.[25]  In addition to paying generators for their actual production of electricity in response to PJM's dispatch instructions, PJM also pays generators and storage providers for ancillary services.  These services include operating reserves that remain available on short notice to respond to disturbances on the system, such as other generators unexpectedly dropping offline.  Market participants utilize PJM's Markets Gateway software system to submit information and otherwise participate in PJM's energy and ancillary service markets.[26]

Another tool that PJM has to maintain reliability and reduce energy costs for consumers is interregional transmission with its neighboring grid regions.  As PJM's President recently explained, PJM's "strong interconnected ties with our neighbors have allowed us to facilitate exports to our neighbors in MISO

---

[25] PJM, Manual 11: Energy & Ancillary Services Market Operations, Revision 120, at 54 (2022), https://www.pjm.com/-/media/DotCom/documents/manuals/archive/m11/m11v120-energy-and-ancillary-services-market-operations-05-25-2022.pdf.  *See* PJM, Understanding the Differences Among PJM's Markets (2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/understanding-the-difference-among-pjms-markets.pdf.

[26] *See* PJM, Markets Gateway, https://www.pjm.com/markets-and-operations/etools/markets-gateway.aspx (last visited June 26, 2025).

[Midcontinent Independent System Operator], TVA [Tennessee Valley Authority], Duke Energy-Carolinas and the Southwest Power Pool (SPP) during tight conditions" and "also enables us to import energy from our neighbors when our system is stressed."[27]  PJM incorporates some benefits from these interregional ties into its resource adequacy planning, which reduces the amount of capacity it must procure internally and thus lowers costs for consumers.[28]

Moreover, to ensure the stability of the transmission system when generators deactivate, PJM requires generators to provide advance notice of such deactivations so that PJM can study the impacts and determine whether any system upgrades are needed to maintain the stability of the system upon deactivation.  In some cases, these upgrades won't be operational until after the generator's planned deactivation date, in which case PJM will seek to retain the generator to operate under specific conditions through a Part V agreement, commonly known as a reliability-must-run agreement ("RMR").  The Eddystone units were studied under those provisions, and in February 2024, PJM reported that it "did not identify any reliability violations resulting from the proposed deactivation of the Eddystone Generating Units #3&4" and stated that "[b]ecause there are no reliability

---

[27] Testimony of Manu Asthana, President and CEO, PJM Interconnection, Before the Subcomm. on Energy of the H. Comm. on Energy & Com. 3 (Mar. 25, 2025), https://docs.house.gov/meetings/IF/IF03/20250325/118040/HHRG-119-IF03-Wstate-AsthanaM-20250325.pdf.

[28] Adria Brooks, et al., Resource Adequacy Value of Interregional Transmission at 49-50 (June 2025), https://cleanenergygrid.org/wp-content/uploads/2025/06/250610_RAValueInterregionalTx_Corrections.pdf.

violations associated with the deactivation of this generator…the generating unit may deactivate on May 31, 2025, or sooner if desired."[29]

PJM states retain authority that strongly influences resource adequacy, including authority to approve and site new generation and energy storage projects, and to incentivize the development and utilization of particular types of resources.[30] While some PJM states have retained traditional vertically integrated utilities, others—such as Pennsylvania—have restructured their utilities so that they no longer own generation facilities, and have introduced retail choice to permit end use consumers to purchase power from a load-serving entity other than their utility.[31] Pennsylvania state utility regulators expressly rely on PJM's markets to ensure resource adequacy,[32] while also actively shaping those markets to prioritize

---

[29] Letter from PJM to Bryan C. Hanson, Constellation Re: Deactivation Notice for Eddystone Generation Units #3&4 at 1 (Feb. 27, 2024), https://www.pjm.com/-/media/DotCom/planning/gen-retire/deactivation-notices/pjm-response-letter-eddystone.pdf.

[30] *See* 16 U.S.C. § 824(b)(1) (reserving authority over generation facilities to the states); *see also Devon Power LLC et al.,* 109 FERC ¶ 61,154, P 47 (2004) ("Resource adequacy is a matter that has traditionally rested with the states, and it should continue to rest there. States have traditionally designated the entities that are responsible for procuring adequate capacity to serve loads within their respective jurisdictions.").

[31] Electricity Generation Customer Choice and Competition Act, Pa. Code Ch. 28. *See also*, Electric Choice, The Ultimate Guide to Pennsylvania Electricity Deregulation, https://www.electricchoice.com/blog/guide-deregulation-pennsylvania/#:~:text=Pennsylvania%20decided%20in%20favor%20of,save%20$2.5%20billion%20every%20year (last visited June 27, 2025).

[32] *See, e.g.,* Letter from Pennsylvania PUC to PJM Board of Managers 1, (July 7, 2021), https://www.pjm.com/-/media/DotCom/about-pjm/who-we-are/public-disclosures/20210706-pa-puc-letter-regarding-minimum-offer-price-rule.pdf ("Pennsylvania was one of the first restructured states in PJM that embraced the

24

affordability.[33]  Through a combination of market signals and state policies, Pennsylvania has added nearly 3.5 gigawatt ("GW") UCAP of capacity, net of retirements, since 2015—the most of any state in PJM.[34]

### C.  The Department's May 30, 2025 202(c) Order and PJM's June 13 Letter

On May 30, 2025, the Department issued the Order based on its "determin[ation] that an emergency exists in portions of the electricity grid operated by PJM due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes."  Ex. 1 at 1.  The Order provides a brief, general description of the "Emergency Situation" based primarily on PJM public statements and regulatory filings referring to a "growing resource adequacy concern" that PJM asserts will arise by the end of the decade due to exceptional load growth and a rate of new entry that is inadequate to replace resource

---

promise of competition in the wholesale generation market and then spent considerable time and effort developing a burgeoning retail electricity market built on the expectations and benefits of a properly functioning wholesale market."); *see also* Comments of the Pennsylvania Public Utility Commission, Centralized Capacity Markets in Regional Transmission Organizations and Independent System Operators, AD13-7-000 (Jan. 8, 2014), https://www.puc.pa.gov/General/pdf/FERC/DN_AD13-7-000.pdf.

[33] *See, e.g.,* Pa. PUC Dkt. No. M-2024-3051988 (hosting a technical conference and collecting extensive public comments regarding steps the PUC can take to ensure resource adequacy for retail customers), https://www.puc.pa.gov/filing-resources/issues-laws-regulations/technical-conference-on-resource-adequacy/; Pa. PUC, Technical Conference on Resource Adequacy, https://www.puc.pa.gov/filing-resources/issues-laws-regulations/technical-conference-on-resource-adequacy/ (last visited June 26, 2025).

[34] Prefiled Statement of Manu Asthana on Behalf of PJM Interconnection, L.L.C., at 9, Table 2, Meeting the Resource Adequacy Challenge in RTOs/ISOs, FERC Dkt. No. AD25-7 (May 20, 2025) (Acc. No. 20250520-5173).

retirements. *Id.* The "declared state of national energy emergency" is also cited as a basis for the Department's determination of an emergency. The Department asserts that the retirement of the Eddystone Units would "further decrease available dispatchable generation within PJM's service territory" and therefore exacerbate these general issues. *Id.* at 2. The Order was effective immediately, expiring at 5:03 pm ET on August 28, 2025. *Id.* at 3.

Based on this determination, the Department orders Constellation to take all measures necessary to ensure that the Eddystone Units are available to operate and orders PJM to take steps to employ economic dispatch for the Units. *Id.* The Order includes various reporting requirements and instructs PJM and Constellation to file tariff revisions or waivers necessary to effectuate the order. *Id.*

The Order also requires PJM, by June 15, 2025, to provide the Department "with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with the public interest." *Id.* PJM published the letter it provided to the Department on June 13, 2025.[35] That letter indicates that PJM has worked with Constellation to develop an Operations Memorandum setting out the circumstances in which Eddystone can be committed to run. In a summary of that Memorandum, PJM states that Constellation "will maintain active cost offers in Markets Gateway that

---

[35] Letter from Michael Bryson, PJM, to Secretary of Energy Christopher Wright, PJM Report in Compliance with Ordering Paragraph D of the Department of Energy's May 30, 2025 Order No. 202-25-4 (June 13, 2025), https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250613-doe-pjm-report-on-compliance-with-Eddystone-order-202-25-4.pdf.

reflects the prevailing costs . . . to operate on gas or oil for both Eddystone 3 and 4, unless either fuel is unavailable or if the units are on a Planned, Maintenance or Forced outage," but that "[t]he units will be shown as 'unavailable' until PJM operators direct the units" to operate "for reliability purposes."[36] Those purposes include: (1) supporting the PJM system operation within established thermal, voltage, and stability limits, when these needs "cannot otherwise be met with available economically dispatched generating resources;" (2) system restoration needs; and (3) a Capacity Emergency, during which "PJM determines that the resources scheduled for an operating day are not sufficient to maintain the appropriate reserve levels for PJM."[37]

PJM's June 13 letter to the Department expresses PJM's "understanding that the Eddystone Units have been available to operate, consistent with the DOE Order, since the order's issuance on May 30, 2025."[38] It also states that "PJM and [Constellation] have coordinated, pursuant to existing generation outage coordination practices and procedures, outages needed by the Eddystone Units to ensure their operational availability consistent with the public interest."[39] A Constellation's spokesperson has publicly stated that, "we are working quickly to

---

[36] PJM, Eddystone 3 and 4 Unit Reporting and Commitment Process (June 12, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/committees/oc/postings/20250612-eddystone-3-and-4-unit-reporting-and-commitment-process.pdf.

[37] *Id.*

[38] *Id.*

[39] *Id.* at 3.

retain necessary staff and perform necessary maintenance to allow for safe and reliable operations this summer and beyond."[40]

## V.    REQUEST FOR REHEARING

### A. The Order Exceeds the Department's Authority Because It Has Not, and Cannot, Demonstrate an Unexpected Emergency Under Section 202(c) Necessitating Continued Operation of Eddystone.

Section 202(c) confers an extraordinary power; it permits the Department to command action from market participants and to do so freed from core procedural safeguards, jurisdictional boundaries, and substantive limitations that undergird the rest of the Federal Power Act. *See* 16 U.S.C. § 824a(c). It comes as no surprise, then, that when Congress granted this power, Congress narrowly tailored its use to extraordinary circumstances. Simply, the Order here exceeds the Department's authority because this is not one of those extraordinary circumstances. There is no emergency within the meaning of Section 202(c).

The Order fails to meet the standards of Section 202(c) both because the Department does not demonstrate that any emergency currently exists and because the resource adequacy concerns it does describe are long-term concerns, that no one has even alleged, much less provided a credible projection, will ripen into actual supply shortages within the ninety-day term of the Order. As detailed *infra*, Section V.B, Section 202(c) provides the Department with a limited authority to

---

[40] Jon Hurdle, Aging Pennsylvania Power Plant to Keep Running after Trump Order on Eve of Shutdown, Pennsylvania Capital-Star (June 9, 2025), https://penncapital-star.com/energy-environment/aging-pennsylvania-power-plant-to-keep-running-after-trump-order-on-eve-of-shutdown/.

28

address immediate electric supply shortages to meet emergency conditions; it does not authorize the Department to address long-term energy system shifts by appointing itself the central planner and supplanting the decisions of participants in an organized electric market.  Yet here, even though the Department claims that the "Order is limited in duration to align with the anticipated emergency circumstances," Ex. 1 at 2, the Department offers no evidence of an emergency in the specified period.  The Order speaks only of "growing resource adequacy *concern*," resource adequacy constraints that "*could* exist," and the "increasing risk of reliability risk in *the coming years*."  Ex. 1 at 1 (emphasis added).

In fact, the results of the 2025-2026 Base Residual Auction demonstrate that the PJM grid has more than enough committed capacity to offer reliable service throughout Summer 2025 without the need for the Eddystone Units, and even if there were to be supply shortages, PJM has mechanisms to handle them.[41] Furthermore, PJM has rules and processes in place to ensure long-term reliability even as shifts occur in electric demand and resource availability, and has access to a number of both short-term and long-term tools that are better suited to address long-term resource adequacy concerns than an unlawful Section 202(c) Order.[42]

---

[41] Summer Outlook 2025, *supra* n. 4.

[42] PJM Interconnection, LLC, PJM Capacity Market: Promoting Future Reliability (2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/pjm-capacity-market-promoting-future-reliability-fact-sheet.pdf.

B. Section 202(c) Only Authorizes the Department to Respond to Specific, Imminent, Unexpected, and Temporary Events, Not to Mandate Generation Based on Longer-Term Reliability Concerns.

The plain language and structure of Section 202(c), the legislative history for the provision, the Federal Power Act overall, as well as case law interpreting Section 202(c), the Department's regulations, and its historic use of Section 202(c) all establish that an "emergency" under Section 202(c) must be sudden, unexpected, imminent, and specific.

1. Section 202's Text and Structure Establish that Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.

Section 202(c)'s text and context confirm that it provides only authority to address imminent, near-term, and exigent electricity supply shortfalls requiring immediate response; it does not permit the Department to act based merely on concerns over long-term reliability. Had Congress intended to vest regulatory authority over long-term reliability in Section 202(c), it would have stated so clearly. But it did not.[43]

The statute's text empowers the Department to act only upon "emergency." 16 U.S.C. § 824a(c). The statute itself does not define "emergency." At the time Congress enacted Section 202(c), Webster's New International Dictionary of the English Language (1930) defined "emergency" as a "*sudden* or *unexpected*

---

[43] Congress amended Section 202(c) in 2015, but it did not alter the description of conditions that trigger the Department's grant of authority to issue emergency orders; it only addressed occasions on which a Department order might produce a conflict with other laws. *See* H.R. Rep. No. 114-357 § 61002 (2015).

30

appearance or occurrence… An *unforeseen* occurrence or combination of circumstances which calls for *immediate* action or remedy; *pressing* necessity; exigency." (emphasis added).[44] Contemporary dictionaries similarly define "emergency" as demanding imminence: an emergency is "an *unforeseen* combination of circumstances or the resulting state that calls for *immediate* action."[45]

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency": the authority granted by Section 202(c) is, in the first instance, a wartime power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond Power & Light of City of Richmond, Ind. v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section

---

[44] *See also* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things unexpectedly arising, and urgently demanding immediate action" (emphasis added).

[45] *Emergency*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/emergency (last visited June 27, 2025) (emphasis added)); *See also* Benjamin Rolsma, The New Reliability Override, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").

The text's use of the present tense also underscores that focus on imminent and certain shortfalls: it empowers the Department to act only where "an emergency *exists*." 16 U.S.C. § 824a(c) (emphasis added). That near-term focus, along with the statute's strictly "temporary" authority, 16 U.S.C. § 824a(c), precludes use of Section 202(c) to pursue long-term policy goals, such as a preference for a particular fuel source. *Richmond Power & Light*, 574 at 615 (Section 202(c) "is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").

Section 202's overall structure further highlights Section 202(c)'s emphasis on imminent, near-term concerns. The preceding subsections 202(a) and (b) together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. 16 U.S.C. § 824a(a) (seeking "abundant supply of electric energy" by directing the federal government to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy") & § 824a(b) (allowing the federal government to order "physical connection . . . to sell energy or to exchange energy" upon application, and after an opportunity for hearing). The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an

32

instruction to establish a general framework meant to facilitate "coordination by voluntary action;" in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural and substantive requirements, when "interconnection cannot be secured by voluntary action;" and in subsection (c), "much broader" but "temporary" authority "to compel the connection of facilities and the generation, delivery, or interchange of energy during times of war or other emergency."  S. Rep. No. 74-621 at 49 (1935).

That tiered structure—relying on voluntary action for quotidian energy planning, specifying limited authority where that voluntary system fails, and allowing for "temporary" central command-and-control only in case of "emergency"—requires that Section 202(c) remain narrowly bounded to instances of an immediate and unavoidable "break-down in electric supply," *id.*, rather than mere want of more abundant supply in the future, *cf.* Ex. 1 at 2 (imposing responsibility on PJM "to ensure maximum reliability on its system").  Interpreting Section 202(c)'s "emergency" powers to encompass longer-term concerns—e.g., potential shortfalls years into the future—would unwind the careful balance of voluntary, market-driven action and federal power set out in subsections 202(a) and 202(b).  *See infra*, Section V.D.  Such an interpretation cannot be squared with the statutory text and structure.  *See Otter Tail Power Co. v. Fed. Power Comm.*, 429 F.2d 232, 233-34 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable future").

33

2. Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms that Section 202(c) Cannot be Expanded to Impose Requirements Related to Long-Term Reliability.

That Section 202(c) cannot be used to enforce the Department's view of long-term reliability needs is confirmed by Section 215 of the Federal Power Act—which specifically and directly delineates the scope of federal power to enforce mandatory long-term reliability requirements. 16 U.S.C. § 824o ("Section 215"). Congress added Section 215 to the Federal Power Act in 2005 precisely because the Act as it then existed—including Section 202(c)—did not provide the federal government with the power to enforce measures designed to ensure broad, long-term reliability. *See* 70 Fed. Reg. 53,117, 53,118 ("In 2001, President Bush proposed making electric Reliability Standards mandatory and enforceable," leading to enactment of Section 215 in 2005); Report of the National Energy Policy Development Group (May 2001) at p. 7-6[46] (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "[o]ne factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on *voluntary* compliance," and then recommending "legislation providing for enforcement" of reliability standards) (emphasis added); S. Rep. No. 109-78 at 48 (2005) (Section 215 "changes our current voluntary rules system to a mandatory rules system" for long-term reliability). *See Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005,

---

[46] https://www.nrc.gov/docs/ml0428/ml042800056.pdf.

34

"the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").

By enacting Section 215, Congress provided a comprehensive and carefully circumscribed scheme to empower the federal government to enforce long-term reliability requirements. That statutory scheme strikes a careful balance between state and federal authority, and between private, market-driven decisions and top-down control. Reliability standards are devised by NERC independent "of the users and owners and operators of the bulk-power system" but with "fair stakeholder representation." 16 U.S.C. § 824o(c)-(d). *See also id.* 824o(a)(3) (defining reliability standards as "a requirement … to provide for reliable operation of the bulk-power system"). FERC may approve or remand those standards (but not replace them with its own) and is required to "give due weight" to NERC's "technical expertise" while independently assessing effects on "competition." *Id.* § 824o(d)(2)-(4). Section 215 provides specified enforcement mechanisms and procedures for reliability standards. *Id.* § 824o(e). And it carefully preserves state authority over "the construction of additional generation" and in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards. *Id.* § 824o(i)-(j).

Interpreting Section 202(c) to permit the Department to mandate generation based on its declaration that non-imminent reliability concerns create an "emergency" would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state

35

power. Such a bypass would impermissibly "contradict Congress' clear intent as expressed in its more recent," reliability-specific "legislation," enacted "with the clear understanding" that the Department had "no authority" to address long-term reliability through Section 202(c). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 & 149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one section of the Federal Power Act "is strong evidence that [a separate section] confers no such authority on [agency]."). Congress has, in Section 215, directly established the mechanisms (and limitations) by which the federal government may compel action to ensure long-term electric-system reliability. In so doing, it has confirmed that the word "emergency," in Section 202(c), does not extend to long-term reliability concerns.

3. Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.

The Department's regulations demonstrate its own long-standing understanding that Section 202(c)'s authority is confined to imminent and unavoidable resource shortages, rather than long-term reliability concerns. The regulations define an emergency as "an *unexpected* inadequate supply of electric energy which may result from the *unexpected* outage or breakdown" of generating or transmission facilities—not a means of planning against distant expectations or risks. 10 C.F.R. § 205.371 (emphasis added). Emergencies "may result" from a number of events. *Id*. ("may result from the unexpected outage," "may be the result of weather conditions," "can result from a sudden increase in customer demand").

36

The use of the verb "result," defined as "arise as a consequence, effect, or conclusion,[47] suggests that the event triggering the emergency has already happened rather than that there is a speculation that it could occur.  Moreover, the events are characterized by those produced by "weather conditions, acts of God, or *unforeseen* occurrences not reasonably within the power of the affected 'entity' to prevent," *id.* (emphasis added), not an event that can be planned for because there is a forecasted risk.  Where the culprit is increased demand, it must be "a *sudden* increase in customer demand" producing a "*specific* inadequate power supply situation," *id.* (emphasis added), rather than long-term demand projections producing general reliability concerns.  The need for both specificity and certainty is repeated in the Department's regulations defining an inadequate energy supply: "A system may be considered to have" inadequate supply when "the projected energy deficiency... *will* cause the applicant [for a 202(c) Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it *is* unable to supply adequate electric service to its customers." 10 C.F.R. § 205.375 (emphasis added).

And while the regulations suggest that "inadequate planning or the failure to construct necessary facilities *can result* in an emergency," they recognize that the Department may not utilize a "continuing emergency order" to mandate long-term system planning.  10 C.F.R. § 205.371 (also recognizing that "where a shortage of

---

[47] *Result*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/result (last visited June 27, 2025).

electricity is projected due solely to the failure of parties to agree to terms, conditions, or other economic factors" there is no emergency "unless the inability to supply electric service is *imminent*") (emphasis added).  An emergency may exist where past planning failures produce an immediate, present-tense shortfall (that is where, a shortfall *results* from insufficient planning); the Department has no authority to commandeer long-term planning merely because it deems current plans inadequate to meet far-distant needs.  *See* 10 C.F.R. § 205.375 (requiring present inability to meet demand to demonstrate inadequate energy supply).  As the Department stated when it promulgated those regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems."  46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981).

4.  Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises.

Two courts have addressed the scope of authority under Section 202(c), and both determined that this Section applies only when there is a sudden, unexpected, imminent, and specific emergency.

*Richmond Power and Light of City of Richmond, Indiana v. FERC*, 574 F.2d 610 (D.C. Cir. 1978) arose out of the 1973 oil embargo.  The Federal Power Commission ("Commission") needed to decide how to respond to oil shortages, and decided to call for the voluntary transfer of electricity from non-oil power plants to areas of the country that relied heavily on oil, such as New England.  *Id.* at 613.  The New England Power Pool was not convinced that the voluntary program would

work and petitioned the Commission for a 202(c) order. *Id.* The Commission instead facilitated an agreement between state commissions and supplying utilities, which satisfied the New England Power Pool and it withdrew its petition. *Id.* A dissatisfied utility sought judicial review of the Commission's decision to allow the withdrawal of the Section 202(c) petition. *Id.* at 614.

The court easily upheld the Commission's decision not to invoke Section 202(c). *Id.* Though the oil embargo had ended, the utility argued that the "high cost and uncertain supply of imported oil" justified an emergency order. *Id.* The Commission countered that the voluntary program had worked, the New England Power Pool never interrupted service, and there was no need for a Section 202(c) order. *Id.* at 615. The court agreed with the Commission. *Id.*

Trying another tactic, the utility argued that "dependence on imported oil leaves this country with a *continuing* emergency." *Id.* (emphasis added). The court observed that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." *Id.* Interpreting this statutory language, the court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor." *Id.* Section 202(c) is not an appropriate means to implement long-term national policy to switch fuels. It is only a temporary fix for a temporary problem.

The Eighth Circuit has similarly held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970), a utility insisted that the only way for the Commission

to properly order the utility to connect to a municipal power provider was to issue a Section 202(c) order. Demand for electricity in the city had increased, and the peak load of the municipal power provider was getting to be so high that both of its two generators would likely need to be used simultaneously in the near future, "causing a possible loss of service should one malfunction during a peak period." *Id.* at 233-34. To avoid this possible loss of service, the Commission issued a Section 202(b) order, requiring the utility to connect the municipal power provider. *Id.* at 234. The utility argued that the Commission used the wrong section and should have used Section 202(c) instead. *Id.*

The court explained that Section 202(c) "enables the Commission to react to a war or national disaster" by ordering "immediate" interconnection during an "emergency." *Id.* (citing 16 U.S.C. § 824a(c)). For non-emergency situations, "[o]n the other hand, § 202(b) applies," including when there is a "crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission." *Id.* The court upheld the Commission's use of Section 202(b) instead of Section 202(c) because there was no immediate emergency.

The case law uniformly supports the interpretation that Section 202(c) can only be used in acute, short-term, urgent emergencies.

>   5. The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Long-Term Resource Adequacy.

The Department's consistent application of Section 202(c) further corroborates the urgency of the conditions necessary to invoke the provision. *See FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941) ("[J]ust as established

40

practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.").  The Department has only ever used Section 202(c) to address specific, imminent, and unexpected shortages—never to address longer-term reliability concerns or demand forecasts.  *See, e.g.,* Ex. 6, Department of Energy Order No. 202-22-4 (Dec. 24, 2022) (responding to ongoing severe winter storm producing immediate and "unusually high peak load" between December 23 and December 26); Ex. 7, Department of Energy Order 202-20-2 (Sept. 6, 2020) at 10-2 (responding to shortages produced by ongoing extreme heat and wildfires); *see also* Rolsma, 57 Conn. L. Rev. at 803-4 (describing "sparing[]" use of Section 202(c) outside of wartime shortages during the twentieth century).  The Department has also narrowly tailored the remedies in Section 202(c) orders to ensure that the orders only address the stated emergency, to limit the order to the minimum period necessary, and to mitigate violations of environmental requirements and impacts to the environment.  *See, e.g.*, Ex. 6, Department of Energy Order No. 202-22-4 (Dec. 24, 2022) at 4-7 (limiting order to the 3 days of peak load, directing PJM to exhaust all available resources beforehand, requiring detailed environmental reporting, notice to affected communities, and calculation of net revenue associated with actions violating environmental laws); Ex. 7, Department of Energy Order 202-20-2 (Sept. 6, 2020) at 3-4 (limiting order to the 7 days of peak load, directing CAISO to

41

exhaust all available resources beforehand, requiring detailed environmental reporting).

Public Interest Organizations are not aware of any instance in which the Department has utilized Section 202(c) to mandate generation the Department views as necessary to ensure long-term resource sufficiency, or to retain fuel sources that the Department believes beneficial, *Richmond Power and Light,* 574 F.2d at 616—and for good reason.

### C. There Is No Factual Basis Supporting the Department's Order.

The Department asserts that the Order is justified by "the declared state of national energy emergency" and "resource adequacy concerns." Ex. 1 at 2. However, the Department fails to demonstrate that either of these factors constitutes an emergency under Section 202(c). 16 U.S.C. § 824a(c). No agency can lean exclusively on a Presidential declaration of an emergency; emergency authority is circumscribed by the authority granted by Congress. Further, a broad, generic declaration of a national emergency is not sufficient on its own to justify the use of emergency powers under a statute with specific requirements. And the Department fails to provide evidence that there are such imminent resource adequacy shortfalls that an emergency exists pursuant to Section 202(c). The Department's suggestion that there is an emergency due to resource inadequacy is also belied by the robust portfolio of capacity resources available this summer.

1.  The Energy Emergency Executive Order does not provide a valid basis under Section 202(c).

The Order generally states that the availability of Eddystone is necessary considering "the declared state of national energy emergency," but fails to explain what state of emergency it refers to or cite any evidence supporting this claim. Without more, this statement of a national emergency is not specific enough to provide evidence of an emergency for purposes of Section 202(c). *See* 10 C.F.R. § 205.371 (defining emergency as a "*specific* inadequate power supply situation") (emphasis added). Even assuming the Order refers to the Energy Emergency EO, that Executive Order also does not provide a valid basis for an emergency under Section 202(c). To the extent that the Order is a stopgap to maintain Eddystone until the Department can produce its national methodology meant to address the alleged national energy emergency, that too is beyond the authority of Section 202(c). *See infra,* Section V.C.2.

If the Department's reference to a national energy emergency is meant to serve as evidence of an emergency as defined under Section 202(c), it is insufficient. An emergency under Section 202(c) must be "a *specific* inadequate power supply situation," 10 C.F.R. 205.371 (emphasis added), but the Energy Emergency EO only generically claims "[t]he energy … generation capacity of the United States [is] far too inadequate to meet our Nation's needs." The EO provides no evidence of inadequate generation nationwide, let alone in Pennsylvania specifically.[48] An

---

[48] Indeed, U.S. energy production and exports are currently at an all-time high. U.S. Energy Information Administration, U.S. primary energy production,

emergency under Section 202(c) also must be imminent. *See supra*, Section V.B. But the EO only generically claims that "this situation will dramatically deteriorate in *the near future*." As we demonstrate *infra*, Section V.C.3, there is sufficient generation for the claimed "emergency" period in Pennsylvania.

Indeed, unlike in previous 202(c) orders, the Department does not even claim there is an emergency specifically in Pennsylvania. Rather, in addition to citing the "national" emergency, the Order appears to describe resource concerns throughout PJM. But nowhere does the Department explain why a power plant retirement in a single state—Pennsylvania—supports the existence of an emergency in the whole region, let alone the whole country. We further demonstrate *infra*, Section V.C.3, that there is no 202(c) "emergency," and, in fact, sufficient generation in PJM.

Even if the declared national energy emergency were legitimate, a presidential declaration of an emergency does not unlock unlimited powers. *See Biden v. Nebraska*, 600 U.S. 477, 500-01 (2023) (presidential declaration of national emergency does not change the limitations on agency's emergency authority as written into statute). President Trump issued the Energy Emergency EO pursuant to authority from the National Emergencies Act.[49] Congress explained that the

---

consumption, and exports increased in 2024 (Jun. 20, 2025), https://www.eia.gov/todayinenergy/detail.php?id=65524.

[49] Under the National Emergencies Act, no emergency powers unlocked by a Presidential declaration of a national emergency "shall be exercised unless and until the President *specifies the provisions of law* under which he proposes that he, or other officers will act." 50 U.S.C. § 1631 (emphasis added). The Energy Emergency EO does not adhere to this requirement. EO 14,156 (Jan. 20, 2025) (generically directing agencies to "identify and exercise any lawful emergency

44

National Emergencies Act "is not intended to enlarge or add to Executive power. Rather, the statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers *conferred on him by other statutes*." S. Rep. No. 94-1168, 3 (1976), (emphasis added). Congress sometimes ties emergency authority to a president's declaration of a national emergency and sometimes to a determination by the head of an agency. The Federal Power Act contains both types of emergency authority: two provisions of the Federal Power Act provide the President with emergency authority (section 215A, 16 U.S.C. § 824o-1, and 16 U.S.C. § 809), but Section 202(c) requires that "the *Commission* determine[] that an emergency exists." 16 U.S.C. § 824a (emphasis added).[50] Thus, the burden is on the Department to demonstrate that there is an emergency pursuant to the narrow language of Section 202(c); simply pointing to the Energy Emergency EO without determining for itself that an emergency exists results in an arbitrary and capricious order.

2. The Department Failed to Produce Evidence of an Emergency.

None of the sources that the Department relies on in the Order provides evidence that a 202(c) emergency exists. The Order relies on four sources of evidence for its emergency declaration: (1) a March 2025 testimony of the President and CEO of PJM, (2) the FERC order accepting PJM's Reliability Resource

---

authorities available to them, as well as all other lawful authorities they may possess, to facilitate the … generation of domestic energy resources.").

[50] The Department has exercised certain powers under Section 202(c) since the DOE Organization Act of 1977. 42 U.S.C. § 7172.

Initiative, (3) PJM's 2023 report *Energy Transition in PJM,* and (4) PJM's 2025 Summer Outlook. Ex. 1 at 1. The Department misconstrues these sources and consequently its reliance on them is not reasoned decision-making. *See* 5 U.S.C. § 706(2)(A) (agency actions that are "arbitrary" or "capricious" are to be "set aside"). Even if there were longer-term risks of an energy supply shortage some number of years in the future, that would not constitute a legal basis for invoking Section 202(c).

First, the Department notes that "PJM has recently stated its system faces 'growing resource adequacy concern' due to load growth, the retirement of dispatchable resources, and other factors," citing testimony from PJM's current President, Manu Asthana, to the U.S. House of Representatives Committee on Energy and Commerce, and contends that retirement of the Eddystone Units will "exacerbate" these issues.[51] While President Asthana's testimony indeed describes an emerging—but not present—resource adequacy concern, the primary focus of his testimony was on how PJM is preparing to meet resource adequacy challenges that PJM forecasts may emerge later in the decade as a result of potential data center growth in the region.[52] According to President Asthana, PJM has instituted reforms to PJM's interconnection process that will permit new resources to come

---

[51] Ex. 1 at 1 (citing Testimony of Manu Asthana, President and CEO, PJM Interconnection, to the U.S. House of Representatives, Committee on Energy and Commerce, Subcommittee on Energy (Mar. 25, 2025), https://www.pjm.com/-/media/DotCom/library/reports-notices/testimony/2025/20250325-asthana-testimony-us-house-subcommittee-on-energy.pdf.).

[52] Testimony of Manu Asthana, at 1, 4.

online in the PJM region much more quickly than they have in recent years (though not as quickly as FERC Order 2023 would require), thus responding to capacity market price signals that incentivize that new entry.[53]  As President Asthana notes, these reforms include not only changes to PJM's interconnection tools and processes it employs, but also the introduction of an interconnection fast track for resources that PJM concludes will substantially contribute to resource adequacy (the Reliability Resource Initiative), and two pathways for new generation to be added at existing points of interconnection (capacity interconnection rights transfer and surplus interconnection service).[54]  He also describes changes that PJM has made to its capacity market to ensure that market prices accurately reflect available supply, concluding that "[c]ollectively, the various proposals and reforms that PJM have pursued are making a difference as they are rolled out and implemented."[55]  Specifically, he notes that "since the beginning of last year, 1,100 MW of existing generation chose to remain as supply resources in PJM after previously submitting a notice to retire," and expresses optimism that this process will continue given market reforms.[56]

A full review of President Asthana's testimony demonstrates the inappropriateness of 202(c) emergency action based on resource adequacy shortfalls that may arise in future years.  PJM has already identified actions it is taking

---

[53] *Id.* at 8.

[54] *Id.*

[55] *Id.* at 8-9.

[56] *Id.* at 11.

through its rates and practices overseen by FERC to address the same long-term resource adequacy concerns relied upon in the Order, and the Department neither suggests nor demonstrates that PJM's long-term market mechanisms will not be successful in addressing resource adequacy needs.

Indeed, Constellation itself takes a bullish view on the state of reliability in Pennsylvania as a result of PJM's markets:[57]

> Notably, investment in new generation resources is currently being proposed in Pennsylvania. Constellation has announced the relaunch of the renamed Crane Clean Energy Center ("CCEC") in Dauphin County, which will add approximately 835 MWs of carbon-free baseload generation to the grid. Likewise, just last month, Homer City Generation Station, the largest coal-burning facility in Pennsylvania before it was closed in 2023, announced plans to restart and increase its generating capacity through burning natural gas. In addition, 31,608 MW of new generation is proposed to be built in Pennsylvania, according to the PJM generation interconnection queue. In short, the PJM markets are working to ensure resource adequacy in Pennsylvania.

Second, the Order cites FERC's approval of the Reliability Resource Initiative filed by PJM to alleviate "the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry"[58]—a possibility that would only come to pass well after the 90-day period relevant to the Order. Curiously, the Order fails to discuss the results of the Reliability Resource Initiative published in May, which PJM intends will expedite interconnection for 9.3 GW of capacity, most of it thermal resources, by 2031—the vast majority of it by

---

[57] Comments of Constellation at 2, Pennsylvania Public Utility Commission Docket No. Docket No. M-2024-3051988, https://www.puc.pa.gov/pcdocs/1861961.pdf.

[58] Ex. 1 at 1 (citing PJM Interconnection LLC, 190 FERC ¶ 61,084 (Feb. 11, 2025)).

48

2030.[59]  On the time scale relevant to PJM's expressed concerns about a growing resource adequacy problem, the existence of the Reliability Resource Initiative demonstrates the effectiveness of existing tools to avoid an emergency arising. Suffice it to say, the Department's citation of an approved solution to a problem that would otherwise arise in several years does not constitute evidence of an emergency in the next 90 days as required for a Section 202(c) order.

Third, the Order cites PJM's February 2023 assessment, "Energy Transition in PJM: Resource Retirements, Replacements & Risks," commonly known as the "R4" report, in which "PJM highlights the increasing risk of reliability risk in the coming years due to the 'potential timing mismatch between resource retirements, load growth and the pace of new generation entry' under 'low new entry' scenarios for renewable generation."  Ex. 1 at 1.[60]  The problems with the Order's reliance on this 2023 assessment are manifold.

As the Department's statement makes plain, the February 2023 R4 Report describes only "increasing risk of reliability risk," *id.*, over a period of seven years, which falls far short of an emergency within the meaning of Section 202(c), which must be imminent and certain.  *See supra*, Section V.B., 10 C.F.R. 205.375, 205.371.

---

[59] Donnie Bielak, Reliability Resource Initiative Results Summary (May 6, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/committees/pc/2025/20250506/20250506-item-06---reliability-resource-initiative---summary-results.pdf.

[60] Citing PJM, Energy Transition in PJM: Resource Retirements, Replacements & Risks (Feb. 24, 2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

49

The potential risk of a risk of inadequacy does not meet these standards.

Furthermore, the February 2023 R4 Report's assessment of increasing risk is flawed on its own terms. The most fundamental problem is that PJM failed to account for the operation of its own capacity market in ensuring resource adequacy, by assuming that capacity prices would remain at their then-recent low levels even as reserve margins shrunk. As economist James F. Wilson explained in a critique published in May 2023, this ignores that the sloped demand curve utilized in the capacity auction prevents this very result—as supply becomes more scarce, prices increase dramatically, thus incentivizing more new entry and retention of existing generators.[61] Additional flaws with PJM's R4 Report that undermine its validity as a basis for the Order include:

- Ignoring reliability safety valve mechanisms in state policies to which PJM attributes anticipated retirements, which allow for delays in retirements in the case of reliability issues.[62]

- Overstating retirements that would result from certain U.S. Environmental Protection Agency rules affecting the power sector, by assuming that all facilities subject to these rules would retire rather than retrofit.[63]

- Presenting a low new entry scenario based on historic rates of new entry that occurred during a time period when the PJM capacity market was oversupplied and prices were low.[64]

---

[61] Ex. 8 James F. Wilson, Maintaining the PJM Region's Robust Reserve Margins A Critique of the PJM Report: Energy Transition in PJM: Resource Retirements, Replacements and Risks, 8 (May 2023)

[62] *Id.* at 10 fn. 36.

[63] *Id.*

[64] *Id.* at 12.

- Assuming without explanation that only one-third of the natural gas generation with a signed interconnection agreement would enter service, even while assuming that large numbers of existing thermal units would retire.[65]

- Assuming no increase in demand response resources, despite the increased capacity prices that would accompany declining reserve margins.[66]

- Overstating retirements that will result from state policies.[67]

The February 2023 R4 Report is also stale. As the PJM region now sees a level of supply that balances current demand, PJM capacity prices have skyrocketed substantially compared to the prices assumed in the R4 Report, which reflected the market's then-state of oversupply.[68] Specific unit retirements that PJM accounted for in the R4 analysis, such as those of Talen Energy's Brandon Shores and Wagner facilities in Maryland, have not occurred. These particular facilities, representing

[65] *Id.* at 12. *See also* PJM, Energy Transition in PJM: Resource Retirements, Replacements & Risks (Feb. 24, 2023) at 3, 10, https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx.

[66] *Id.*

[67] *See* Statement of President Christine Guhl-Sadovy of the New Jersey Board of Public Utilities, at 8-9, FERC Docket No. AD 25-7, (describing how PJM's R4 report overstated retirements in 2027 associated with New Jersey's greenhouse gas regulations and failed to correct this once it was pointed out by the New Jersey Board of Public Utilities).

[68] *Compare* PJM, 2023/2024 RPM Base Residual Auction Results, https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2023-2024/2023-2024-base-residual-auction-report.pdf *with* PJM 2025/2026 Base Residual Auction Results (Aug. 21, 2024), https://www.pjm.com/-/media/DotCom/committees-groups/committees/mrc/2024/20240821/20240821-item-08---2025-2026-base-residual-auction---presentation.pdf. *See also*, PJM, 2025/2026 Base Residual Auction Report (July 30, 2024), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2025-2026/2025-2026-base-residual-auction-report.pdf.

51

about 1.5 GW of capacity, will continue operating under RMR agreements through the end of the decade.[69]  And as noted above, PJM has taken steps intended to improve its processes to enable new resources to come online, which in combination with the higher prices, are already bearing fruit. None of these changes are reflected in the low new entry scenario described in the R4 Report and upon which the Order relies.

In addition to relying on stale evidence of low new entry, all of PJM's assessments of possible resource adequacy shortfalls later this decade depend on whether forecasted data center load growth materializes at the scale, and in the locations, that PJM currently anticipates.[70]  As PJM's Vice President of Market Design and Economics recently explained, "any technology that is early in its development cycle is uncertain.  Data centers are still relatively new, and there's uncertainty on how big their demand might be, and there's added uncertainty as to where they might ultimately be developed."[71]  PJM is evaluating ways to facilitate developers of data centers bringing their own supply to the market, incentivizing

---

[69] Talen Energy, FERC Approves Reliability Must Run Settlement Agreement for Units at Talen Energy's Brandon Shores and H.A. Wagner Power Plants  (May 1, 2025), https://ir.talenenergy.com/news-releases/news-release-details/ferc-approves-reliability-must-run-settlement-agreement-units. *See generally* FERC Docket No. ER24-1790 (Brandon Shores LLC submits tariff filing: RMR Arrangement).

[70] *See, e.g.,* Joe Bowring, Pre-Technical Conference Comments of the Independent Market Monitor for PJM at 3, FERC Docket No. AD25-7 (May 27 2025), https://www.ferc.gov/media/joe-bowring-monitoring-analytics-president-and-independent-market-monitor.

[71] Adam Keech, Prefiled Statement on Behalf of PJM Interconnection, L.L.C. at 7, FERC Docket No. AD25-7.

higher degrees of data center participation as a demand response resource, or allowing for lower-cost, faster interconnection by data centers that are willing to have their usage curtailed.[72]  A recent study showed that even a very small degree of data center load flexibility enables large amounts of data centers—18 GW in PJM—to be added to the system without increasing the system peak that is a major input to the resource adequacy analysis.[73]  Meanwhile, utilities and states are taking significant steps to require deposits and other commitments from large loads, such as data centers, to ensure that the load forecasts driving pessimism about PJM's long-term resource adequacy don't include speculative or duplicative projects.[74]

Fourth, the Department offers a single piece of evidence relating to near-term conditions—a PJM newsletter summarizing its outlook for the summer.  But it too does not demonstrate an emergency.  According to the Department, "PJM indicates that resource constraints could exist within the service territory under peak load conditions, stating that 'available generation capacity may fall short of required

---

[72] Tim Horger, Senior Director, Forward Market Operations & Performance Compliance, "Large Load Additions Workshop," PJM (May 9, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/workshops/llaw/2025/20250509/20250509-item-02---large-load-additions-workshop---presentation.pdf.

[73] Tyler H. Norris et al., Rethinking Load Growth: Assessing the Potential for Integration of Large Flexible Loads in US Power Systems 20, 22 (Duke Univ. Nicholas Inst. for Energy, Env't & Sustainability ed. 2025), https://nicholasinstitute.duke.edu/publications/rethinking-load-growth.

[74] Adam Keech, Prefiled Statement on Behalf of PJM Interconnection, L.L.C. at 7-8, FERC Docket No. AD25-7.

reserves in an extreme planning scenario."'[75]  As PJM further explains: "Demand response programs pay customers who have opted in to reduce their electricity use in times of system emergencies."[76]  The Department's brief quotation of this summer outlook article omits a key point that is prominent in PJM's article—that "[u]nder such circumstances, PJM would call on contracted demand response programs to meet its required reserve needs."[77]  PJM's plan to call on demand response is also noted in the article's subheading and first paragraph—it is not a subtle point.

The possibility that PJM might ask demand response resources to activate is not an "emergency" within the meaning of Section 202(c). That is exactly the point of such resources— they offer to curtail their use of power on demand in exchange for hefty payments.[78]  Instead of an emergency, it is indicative of routine analysis and planning to rely upon the most cost-effective resources available to the grid operator.  *See infra*, Section V.C.3.  As PJM's Vice President of Markets, Adam Keech, explains, demand response is important to "maintaining resource adequacy

---

[75] Order at 1 (quoting Summer Outlook 2025, *supra* n. 4).

[76] Summer Outlook 2025, *supra* n. 4.

[77] *Id.*

[78] *See, e.g., FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 269 (2016), *as revised* (Jan. 28, 2016) (explaining that market operators like PJM devised wholesale demand response programs, which "induce consumers to refrain from using … electricity during peak periods" for situations whenever "doing that costs less than adding more power" in order to "bring electricity supply and demand into balance at a lower price … [and] ease pressure on the grid, thus protecting against system failures").

both currently and in the future."[79]  He notes that "demand response accounted for approximately 4.5% of capacity that cleared" in the 2025/26 Base Residual Auction, and that "[i]f generation resources are unable to be developed economically to meet anticipated load growth in PJM, it will be critical to have flexible demand that is willing to curtail in order to maintain reliability."[80]  The Department's own regulations explicitly acknowledge that inadequate energy is an emergency only if the grid operator is unable to meet "normal peak load requirements based upon use of all of its otherwise available resources."  10 C.F.R. 205.375.  Thus, the Order arbitrarily ignores PJM's plan to rely upon demand response in the event that its generation resources are inadequate to maintain the required operating reserves during extreme load conditions this summer.

Finally, the Order mentions in the description of the emergency situation the Department's intent to consider Eddystone in the as-yet unpublished resource adequacy methodology the Department is developing pursuant to the Grid EO.  Ex. 1 at 2.  This context cannot be evidence of an emergency under Section 202(c) for the simple reason that the methodology does not yet exist.  And any reliance on the methodology, once it is published, as evidence to support the issuance of the Order will be impermissible *post hoc* rationale. *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 140 S. Ct. 1891, 1907 (2020) ("'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds

---

[79] Adam Keech, Prefiled Statement on Behalf of PJM Interconnection, L.L.C. at 5, FERC Docket No. AD25-7.

[80] *Id.* at 5-6.

that the agency invoked when it took the action.'").  Further, this context suggests that the Order in reality is merely a preliminary step in the long-term strategy to preserve fossil fuel generation under the guise of grid reliability concerns.  As discussed *infra*, Section V.C.4., regardless of this Administration's policy goals, the Department's actions must adhere to the Administrative Procedure Act's requirement of reasoned decision making as well as remain within the statutory limits Congress wrote into the Federal Power Act.

The Department's claims represent a blinkered and incorrect review of the evidence: while there is the possibility for energy demand growth over the coming years, and there has been an increase in generator retirements, PJM is equipped with the tools to address those system changes in a way that maintains resource adequacy and reliability, and indeed is already doing so.  Rather than recognizing this broader picture, the Department points to cherry-picked statements by PJM that if certain conditions arise—such as particular levels of load growth and low new entry of capacity resources—then, in several years' time, the PJM region would have reserve margins below its target if appropriate action were not taken to address those conditions.  The Department takes PJM's warnings of future risk that might arise out of context and ignores other mechanisms at work to address the longer-term risk and thereby prevent any energy shortfall from arising.

3.  PJM Has Sufficient Capacity Resources for Summer 2025 Without Eddystone.

The Base Residual Auction for the delivery year encompassing the period of emergency that the Department identifies in the Order—Delivery Year 2025-2026—

cleared more capacity than the Reliability Requirement.[81]  Specifically, the auction cleared 135,684 MW of unforced capacity, representing a 18.6% reserve margin—0.8 percentage points higher than the target reserve margin of 17.8%.[82]  Constellation did not offer the Eddystone Units into the auction, considering its June 1, 2025 deactivation date was accepted by PJM, and Constellation's 2023 notice that it would seek removal of its capacity resource status.[83]  Thus, the auction cleared more than sufficient resources for the 2025-2026 delivery year without Eddystone's capacity being included or otherwise counted on.  Clearing an amount of capacity close to, and indeed above, the Reliability Requirement is consistent with the capacity market's design objectives.[84]

Indeed, the auction-clearing results *understate* the quantity of resources available in the PJM region for at least two reasons.  The supply curve did not

---

[81] PJM, 2025/2026 Base Residual Auction Report 3 (July 30, 2024), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2025-2026/2025-2026-base-residual-auction-report.pdf.

[82] *Id.*  Two transmission-constrained areas that must import capacity cleared at the price cap for those areas, indicating that they had insufficient internal capacity to meet their internal demand for the delivery year.  These two areas–Baltimore Gas & Electric and Dominion–are in Maryland and Virginia, respectively, and would not be able to import any additional capacity even if it were available elsewhere in the region, due to the transmission constraints.

[83] *See supra*, Section IV.A.  Constellation is contemporaneously submitting a written request to PJM and the IMM for removal of capacity resource status beginning with the 2025/26 delivery year.

[84] *See* Kathleen Spees et al., Sixth Review of PJM's Variable Resource Requirement Curve for Planning Years 2028/29 through 2031/32, at 19 (Apr. 9, 2025), https://www.brattle.com/wp-content/uploads/2025/04/Sixth-Review-of-PJMs-Variable-Resource-Requirement-Curve.pdf ("By design, RPM aims to support long-term reliability by targeting a cleared volume of capacity resources consistent with the reliability requirement, the 1-in-10 reliability standard.").

include nearly 1.5 GW of capacity available in the Baltimore Gas & Electric zone that are committed to operate under RMR agreements during the 2025-2026 delivery year.[85]  FERC has since approved tariff revisions filed by PJM that will, in future auctions, account for the capacity value of RMR units with obligations to perform during capacity emergencies, like the units in the Baltimore Gas & Electric zone.[86]  In addition, approximately 1.6 GW of accredited wind, solar, and storage capacity did not offer into the auction for the 2025-2026 delivery year; these resources have capacity interconnection rights and will be available to provide energy, including during many of PJM's riskiest hours of this delivery year.[87]

NERC's 2025 Summer Reliability Assessment, published in May 2025, indicates that PJM has adequate anticipated resources for both normal and extreme summer load conditions, and that PJM anticipates calling upon demand response resources during any extreme high temperatures.[88]  It further notes that "PJM is forecasting 27% installed reserves (including expected committed demand

---

[85] *See* Maryland Office of People's Counsel, Bill and Rate Impacts of PJM's 2025/2026 Capacity Market Results & Reliability Must-Run Units in Maryland 6 (Aug. 2024), https://opc.maryland.gov/Portals/0/Files/Publications/RMR%20Bill%20and%20Rates%20Impact%20Report_2024-08-13%20Final%20corrected%208-29-24.pdf?ver=fHKa18_idtwi4Rm4OeK-7A%3d%3d.

[86] *See Order Accepting Tariff Revisions Subject to Condition, PJM Interconnection, L.L.C.*,190 FERC ¶ 61,088, at P 1 (2025).

[87] *See Extending the Capacity Must-Offer Requirement to All Generation Capacity Resources, PJM Interconnection, L.L.C.*, FERC Docket No. ER25-785-000 (2024), at P 7.

[88] NERC, 2025 Summer Reliability Assessment 5, 25 (May 2025), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2025.pdf.

response), which is above the target installed reserve margin of 17.7% necessary to meet the 1-day-in-10-years LOLE criterion."[89]

The heat wave that occurred June 23-26, 2025, and PJM's response thereto, demonstrate that the PJM system is working as it should to maintain grid reliability—and it would have worked as planned even without the Eddystone Units running.  On June 22, 2025, PJM projected that its forecasted load across PJM from June 23 through 26 would range from 148,500 to 161,000 MW.[90]  While these load forecasts are higher than PJM's summer forecast peak, they are lower than PJM's extreme planning scenario of more than 166,000 MW and lower than the 187,100 MW of total generation capacity and demand response that PJM has available this summer.[91]  Thus, PJM called on ordinary economic resources to respond to this event, but also had additional typical resources it could call on to address the peak forecasts, and still would have even without Eddystone operating.  PJM reached the last step before an emergency[92]—Pre-emergency Load Management Reduction, in other words, demand response.[93]  Ultimately, PJM hit a peak load of approximately

---

[89] *Id.* at 25.

[90] *June 23 Update: Maximum Generation Alert Issued for June 24*, PJM Inside Lines (June 19, 2025), https://insidelines.pjm.com/pjm-issues-hot-weather-alert-for-expected-heat-wave-june-22-25/.

[91] Summer Outlook 2025, *supra* n. 4.

[92] PJM, PJM Manual 13: Emergency Operations 20-21 (Feb. 20, 2025), https://www.pjm.com/-/media/DotCom/documents/manuals/m13.pdf.

[93] While this is an action under PJM's Capacity Emergency, *id.*, PJM's Operating Agreement explains that "[a] pre-emergency event is implemented when economic resources are not adequate to serve load and maintain reserves or maintain system reliability, and *prior to proceeding into emergency procedures.*"

160,000 MW on June 23 and 158,000 on June 24[94] and still had additional demand response available (at least 3,640 MW) that it could have relied on rather than running Eddystone's 820 maximum MW.[95]

This event was not an emergency as defined by Section 202(c) because it did not produce a "specific inadequate power supply situation," 10 C.F.R. § 205.371. And Department regulations define an inadequate energy supply as when "the projected energy deficiency... will cause the [utility] to be unable to meet its *normal peak load* requirements based upon *use of all of its otherwise available resources.*" 10 C.F.R. § 205.375 (emphasis added).  For this event, PJM kept net load below its summer seasonal peak load through relying on only some of its otherwise available resources.  The June 23-26 event demonstrates that PJM has sufficient capacity resources for summer 2025.

---

PJM, 8.5 Pre-Emergency Operations, Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. 516, https://www.pjm.com/library/governing-documents (emphasis added).  In fact, the purpose of pre-emergency Load Management Reduction is to "potentially avoid, or at least reduce the duration and breadth of, a system emergency."  PJM tariff filing, Revisions to the PJM OATT, OA & RAA, FERC Accession # 20131224-5000, at 8 (Dec. 24, 2013).

[94] https://www.gridstatus.io/live/pjm?date=2025-06-23to2025-06-25.

[95] PJM only issued a Pre-Emergency Load Management Reduction Action calling on only some of the available short and long capacity performance demand response (https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf#).  But PJM also has 3640 MW of quick demand response. James McAnany, PJM, 2025 Demand Response Operations Markets Activity Report (June 10, 2025), https://www.pjm.com/-/media/DotCom/markets-ops/dsr/2025-demand-response-activity-report.pdf (45.5% of total 25/26 demand response is quick).

4. The Order Is Based on a False Premise and Violates the Department's Duties Under the Administrative Procedure Act.

On its face, the Department's decision to require Eddystone to recommence and continue operations over the next 90 days is completely untethered from the statutory and regulatory requirements of Section 202(c). Given the incongruity of the record and the result, the Department's decision to require Eddystone to return to service shows itself to be nothing more than a brazen effort to prop up fossil fuel generation– to the detriment of PJM ratepayers and the surrounding community– by manufacturing an "emergency" and illegally abusing an important statutory safeguard. *See, e.g. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 649-54, (1952) (Jackson, J., concurring) ("[Our founding fathers] knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies.")[96]

---

[96] Administrative review does not require "exhibit[ing] a naiveté from which ordinary citizens are free," *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). That the Department's action is intended to support the White House's stated goals of keeping fossil fuel plants from retiring is evidenced by a wealth of publicly available information surrounding the Administration's policies and stated intent. *See, e.g., Agenda47: America Must Have the #1 Lowest Cost Energy and Electricity on Earth*, Trump-Vance 2025 (Sept. 7, 2023), https://www.donaldjtrump.com/agenda47/agenda47-america-must-have-the-1-lowest-cost-energy-and-electricity-on-earth; Jill Colvin & Bill Barrow, *Trump's Vow to Only be a Dictator on 'Day One' Follows Growing Worry over his Authoritarian Rhetoric*, Associated Press (Dec. 7, 2023, 4:58 PM), https://apnews.com/article/trump-hannity-dictator-authoritarian-presidential-election-f27e7e9d7c13fabbe3ae7dd7f1235c72 (President Trump indicated he was not concerned about statutory compliance when he stated repeatedly that he would "be a dictator" on Day One in order to "drill, drill, drill.").

Whatever the political aspirations of the Executive may be or its demands of its agency leaders, actions by the Department are still governed by the Administrative Procedure Act, which requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Administrative Procedure Act requires agencies to make a reasoned explanation for their actions by examining the relevant data and providing a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And because an agency's authority rests squarely within the four corners of Congress' delegation, agencies are not permitted to make decisions based on factors which Congress has not intended it to consider. *Id.*; *see also Amerijet Int', Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

The Department's use of Section 202(c) is thus arbitrary and capricious because it is not tied to the requirements of the statute and is instead a product of impermissible political influence beyond those requirements. *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248 (1971). As explained by the Supreme Court:

> The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better … [and] agencies must pursue their goals reasonably.

*Dep't of Com.*, 588 U.S. at 785.

## D. The Order Will Undermine Competitive Markets to the Detriment of Consumers and Reliability.

When viewed together with the Energy Emergency EO,[97] Grid EO, and the Department's nearly identical 202(c) order regarding the Campbell coal plant,[98] the Department advances an illegal command-and-control energy policy that effectively overrides the capacity and energy markets to force a private entity to continue operating an uneconomic unit they wished to decommission and for ratepayers to pick up the tab. Congress delegated to FERC the authority to regulate wholesale energy markets and interstate transmission and granted the Department only a narrow, backstop authority through Section 202(c). 16 U.S.C. § 824a(c). If left to stand, the Department's overbroad Order will forebode a fundamental undermining of competitive markets for energy, leading to a system that will deliver less reliability to consumers at greater cost.

### 1. Competitive Markets Have a Long History of Success.

For nearly a century, FERC's core responsibility under the Federal Power Act has been to ensure that rates, terms, and conditions employed by utilities for wholesale energy sales and transmission are just, reasonable, and not unduly discriminatory. 16 U.S.C. § 824d ("Section 205"). While the initial utility structure was vertically integrated such that generation, transmission, and distribution resources were all held by the same entity, advances in technology and statutory

---

[97] Exec. Order No. 14,156 Declaring a National Energy Emergency, 90 Fed. Reg. 8,433 (Jan, 20, 2025).

[98] Ex. 9 at 1-2, DOE Order No. 202-25-3 (May 23, 2025) (directing dispatch of the Campbell plant, which was scheduled to cease operations the following week).

63

changes led to the development of energy markets and merchant

generation.[99]  Further regulation by FERC in the 1990s with Order Nos. 888, 890,

and 2000 fostered the establishment of several independently operated RTOs, which

set up competitive markets that determine the prices for energy, capacity, and

ancillary services based on procurement and dispatch of least-cost resources.[100]  As

RTO markets expanded, many states deregulated their utility monopolies and

required them to join RTOs.  Generating resources in competitive RTOs are built

and retired by private investors in response to market price signals designed to

encourage new investment when supply is tight and to encourage the retirement of

facilities that are no longer competitive when capacity is plentiful.  RTOs now

account for approximately 2/3 of all electricity sales in the U.S. and have saved

consumers billions of dollars, increased reliability, and reduced environmental

harm.[101]

---

[99] *See, e.g.*, *Order Terminating Rulemaking Proceeding, Initiating New Proceeding, And Establishing Additional Procedures*, 162 FERC ¶ 61,012, PP 7-11 (2018); *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,639-31,645 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[100] Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 638-41 (1996), Order No. 890, FERC Stats. & Regs. ¶ 31,241, at 124-352 (1997), Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 99-130 (1999).

[101] *See, e.g.*, Judy Chang et al., The Brattle Group, Potential Benefits of a Regional Wholesale Power Market to North Carolina's Electricity Customers, 1, 3-7 (April 2019), https://www.brattle.com/wp-

As explained by FERC, its "support of competitive wholesale electricity markets has been grounded in the substantial and well-documented economic benefits that these markets provide to consumers."[102]  In addition to billions of dollars of consumer savings, FERC found that competitive markets protect consumers by "providing more supply options, encouraging new entry and innovation, spurring deployment of new technologies, promoting demand response and energy efficiency, improving operating performance, exerting downward pressure on costs, and shifting risk away from consumers."[103]

As part of its role in regulating markets, FERC has implemented Congressional mandates to ensure system reliability, including working with NERC to set industry standards for grid reliability;[104] coordination requirements for the

content/uploads/2021/05/16092_nc_wholesale_power_market_whitepaper_april_2019_final.pdf (discussing billions of dollars in estimated cost saving); Jennifer Chen & Devin Hartman, *Why wholesale market benefits are not always apparent in customer bills*, R Street (Nov. 10, 2021), https://www.rstreet.org/commentary/why-wholesale-market-benefits-are-not-always-apparent-in-customer-bills/ (same); Jeff St. John, *A Western US energy market would boost clean energy. Will it happen?*, Canary Media (Jun. 10, 2024), https://www.canarymedia.com/articles/utilities/a-western-us-energy-market-would-boost-clean-energy.-will-it-happen; John Tsoukalis et al., Assessment of Potential Market Reforms for South Carolina's Electricity Sector, at 6, 46, 77-78 (Apr. 27, 2019), https://www.scstatehouse.gov/CommitteeInfo/ElectricityMarketReformMeasuresStudyCommittee/2022-04-27%20-%20SC%20Electricity%20Market%20Reform_Brattle%20Report.pdf (discussing cost savings across regional wholesale markets).

[102] Order Terminating Rulemaking Proceeding, Initiating New Proceeding, and Establishing Additional Procedures, 162 FERC ¶ 61,012, P 11 (2018).

[103] *Id.* (citation omitted).

[104] PJM, NERC and Reliability (Jan. 5, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/nerc-and-reliability-fact-sheet.pdf.

natural gas and electricity market scheduling;[105] investigation and improvements

required in light of the grid's response to extreme weather events;[106] and reviewing

capacity accreditation processes to ensure that capacity markets generate reliable

results.[107]

    2.    Command and Control Orders Run Counter to Federal Power Act
        Requirements and Fundamental Market Principles.

Despite the decades of evidence that competitive energy markets deliver

reliable energy at least cost to consumers, as well as the extensive and constant

oversight of these markets by FERC, the Order operates under the implicit

---

*See also* PJM, PJM Ensures a Reliable Grid (Jan. 29, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/reliability-fact-sheet.pdf.

[105] PJM, PJM Promotes Gas/Electricity Industry Coordination (Jan. 29, 2025), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/fact-sheets/gas-electric-coordination-fact-sheet.pdf. *See also*, Order 787, 145 FERC ¶ 61,134 (2013); Order 809, 151 FERC ¶ 61,049 (2015).

[106] *See, e.g., Centralized Capacity Markets in Regional Transmission Organizations and Independent System Operators*, 149 FERC ¶ 61,145 (2014) (order addressing technical conferences on, among other things, the 2014 Polar Vortex); *Order Approving Extreme Cold Weather Reliability Standards EOP-011-3 and EOP-012-1 and Directing Modification of Reliability Standard EOP-012-1*, 182 FERC ¶ 61094 (2023);*Order Approving Extreme Cold Weather Reliability Standard EOP-012-2 and Directing Modification*, 187 FERC ¶ 61,204 (2024). *See also,* FERC, NERC and Regional Staff, Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott (Oct. 2023), https://www.ferc.gov/sites/default/files/2023-11/24_Winter-Storm_Elliot_1107_1300.pdf; FERC, NERC and Regional Staff, The February 2021 Cold Weather Outages in Texas and the South Central United States (Nov. 2021), https://www.nerc.com/pa/Stand/Project202107ExtremeColdWeatherDL/FERC%20Presentation-Phase%202.pdf; PJM, Winter Storm Elliott Event Analysis and Recommendation Report (2023), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io.

[107] *Id*.; *see also* Order Accepting Tariff Revisions Subject to Condition, 186 FERC ¶ 61,080 (2024).

assumption that capacity market results are not reliable, and that market-driven generator retirement is cause for alarm.  This is not the first time this President has sought to require preferential treatment for retiring resources he preferred for grid reliability.[108]  When the Department proposed to have a rule that would require tariff provisions designed to prevent the retirement of preferred resources, FERC rejected the proposal unanimously.[109]  FERC found that the allegations that potential retirements of particular resources would lead to grid reliability problems did not demonstrate that existing rules were unjust and unreasonable.[110]  Nor was there evidence from the RTOs that any particular generator retirement would be a threat to grid resilience.[111]  Moreover, FERC found that the proposal to pay cost-of-service rates for only certain types of resources "regardless of need or cost to the system" would not be just, reasonable, or unduly discriminatory.[112]

Similar to this prior effort, the Order proposes to force the Eddystone Units to run regardless of need or cost to the system.  The Order demands that PJM "take every step to employ economic dispatch," which it fails to define.  Ex. 1 at 3.  As discussed above in section IV., PJM dispatches generators based on the lowest

---

[108] *See, e.g.*, Casey Roberts, *FERC Rejects DOE's Dangerous Proposal to Shield Coal and Nuclear From Clean Energy Competition*, Sierra Club (Jan. 9, 2018), https://www.sierraclub.org/compass/2018/01/ferc-doe-coal-nukes-perry-subsidies

[109] Order Terminating Rulemaking Proceeding, Initiating New Proceeding, and Establishing Additional Procedures, 162 FERC ¶ 61,012 (2018).

[110] *Id.* at PP 15-16.

[111] *Id.*

[112] *Id.* at P 16.

marginal price.  The low historic utilization of Eddystone reflects that its costs to operate are so much higher than alternative resources that it isn't being dispatched enough of the time—even during times of peak load—to warrant keeping the unit online.  *See supra*, Section IV.B.  Constellation was well aware of PJM's load forecasts and the related high capacity prices when it opted to retire the Eddystone Units.  This indicates that Constellation either didn't see Eddystone becoming economic even in future scenarios and/or that it felt it could make more money by retiring the Eddystone Units and investing in other options that offered the ability to dispatch more frequently and earn a greater return on investment.  By forcing Eddystone to stay on the system despite this, the Department will raise prices for consumers by forcing them to pay for a resource that is unnecessary to meet PJM's Reliability Requirement for the current delivery year.  Keeping Eddystone online also forces Constellation to continue to invest its money in an aging and expensive unit instead of investing in newer, more profitable units.

Should the Order be extended, as the Department suggests it will be, the consequences will become further reaching.  Mandating that Eddystone remain online over a longer timeline forces PJM and Constellation to tie up the transmission capacity rights owned by the Eddystone Units that could otherwise be repurposed by Constellation for a new unit at the Eddystone site or put back into the system for allotment to new, more efficient resources waiting in PJM's

68

infamously years-delayed interconnection queue.[113]  In other words, the Order

forces Constellation to tie up an incredibly valuable transmission resource by

maintaining that transmission headroom for a resource that is no longer useful and

is unlikely to actually need to be used.  As such, this decision is the very opposite of

the bedrock principle of utility law that asset expenditures must be used and

useful.[114]  Moreover, it defeats the Administration's alleged concern that there are

more retirements than new resources coming on the system.  Ex. 1 at 1.  As

mentioned above, PJM has instituted new procedures for allowing resources needed

for reliability to advance to the front of the interconnection queue.  By tying up

unused transmission capacity at the Eddystone Units, it also prevents new, more

affordable and reliable resources already waiting to replace it from doing so.  While

extensions of the Order beyond the initial 90-days would almost certainly be

unlawful and unreasonable, the Department appears to be contemplating

---

[113] Joseph Rand et. al., Queued Up: 2024 Edition, *Lawrence Berkeley National Laboratory* (April 2024) at 35, https://emp.lbl.gov/sites/default/files/2024-04/Queued%20Up%202024%20Edition_R2.pdf (showing that PJM has the longest queue processing timelines in the U.S.); Synapse Energy Economics, Inc., Sabine Chavin et al., Tackling the PJM Electricity Cost Crisis (Apr. 2025), https://www.synapse-energy.com/sites/default/files/Evergreen%20PJM%20Queue%20Report%204.10.25_%20final%2024-145.pdf; Grid Strategies, Generator Interconnection Scorecard (Feb. 2024) https://gridstrategiesllc.com/wp-content/uploads/2024/03/AEI-2024-Generation-Interconnection-Scorecard.pdf (scoring PJM's overall interconnection a D-).

[114] *See* FERC, Energy Primer, at 55 (2024), https://www.ferc.gov/sites/default/files/2024-01/24_Energy-Markets-Primer_0117_DIGITAL_0.pdf; Jim Lazar, Electricity Regulation in the US: A Guide, Second Edition, at 91 (2016), https://www.raponline.org/wp-content/uploads/2023/09/rap-lazar-electricity-regulation-US-june-2016.pd.

extensions given the statement that "DOE plans to use [the Grid EO] methodology to further evaluate Eddystone Units 3 and 4." Ex. 1 at 2.

Finally, the longer-term impacts of the Department's strategy send signals that will disrupt market stability. Markets ultimately still depend on private investors, who will be less likely to invest billions of dollars in an energy system run according to personal whim rather than on market forces. The need for market stability across administrations and department heads is why Congress deliberately placed the authority for utility regulation—a matter so fundamentally central to the entire economy and well-being of the nation—in the hands of independent regulators with specialized expertise and only allowed the Department to intervene in true emergencies.[115] In usurping the role of FERC and RTO markets to regulate the energy markets so that the Department can prioritize resources it favors and thwart the development of those it dislikes, the ultimate message is for private investors not to invest. As noted by former FERC Commissioner Brownell, to do otherwise "will have a chilling effect on markets because investors will be unlikely to risk hundreds of billions of dollars on investments regulated by politically influenced non-transparent decisions."[116]

---

[115]*See generally*, Patrick M. Corrigan & Richard L. Revesz, *The Genesis of Independent Agencies*, 92 N.Y.U. L. Rev. 637 (2017).

[116] Herman K. Trabish, *Trump executive order threatens transmission, interconnection initiatives: former FERC commissioners*, Utility Dive (Mar. 26, 2025), https://www.utilitydive.com/news/trump-executive-order-agency-independence-ferc-transmission-interconnection-initiatives/742356/. *See also* Oskar Dye-Furstenberg, *The Hollow Energy Agenda of Trump's First Four Months*, Roosevelt Institute (May 29, 2025), https://rooseveltinstitute.org/blog/the-hollow-energy-agenda-of-trump/.

E.  **Even If There Were a Short-Term Need—There Is Not—the Order Does Not Comply with the Statutory Command to Set Terms That Best Meet the Emergency and Serve the Public Interest.**

1.  Section 202(c)(1) Only Authorizes the Department to Require Generation that Best Meets the Emergency and Serves the Public Interest.

Even if there were a Section 202(c) emergency, which as shown above there is not, Section 202(c)(1) requires the Department only impose requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest."  16 U.S.C. § 824a(c)(1).  The Department therefore must consider alternatives and choose the alternative that is most advantageous to meeting the emergency and serving the public interest as defined by the Federal Power Act.

The term "best" demands a comparative judgment that there are no better alternatives.  The word "best" is inherently a comparative term and means "that which is 'most advantageous.'"  *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (quoting Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved).  Consequently, the Department must, at minimum, consider alternatives and evaluate whether and to what extent a given alternative addresses the alleged emergency and serves the public interest, including deficiencies associated with each option.

Moreover, the Department must consider alternatives as part of exercising reasoned decision-making.  It need not consider every conceivable alternative, but it

71

must consider alternatives within the ambit of the existing policy as well as alternatives which are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (failure to consider alternative was arbitrary and capricious); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (must consider alternatives "within the ambit of the existing standard"); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("agency must consider and explain its rejection of reasonably obvious alternatives" (cleaned up)). Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (holding that agency's failure to consider the disclosure alternative raised by dissenting Commissioners and introduced by commenters violated the Administrative Procedure Act); *cf.* 10 C.F.R. § 205.370 (stating the Department's right "to cancel, modify, or otherwise change" an order). To be sure, the nature and extent to which the Department must consider alternatives depends on the emergency. An emergency that truly requires the Department to act within hours, for instance, would permit a more abbreviated consideration than an emergency for which the Department has days to decide. 16 U.S.C. § 824a(c) (directing the Department to exercise its judgment).

The Department's regulations and practice suggest relevant alternatives for its consideration. The regulations specify information the Department shall

72

consider in deciding to issue an order under Section 202(c), and require an applicant

for a 202(c) order to provide the information.  10 C.F.R. § 205.373.  The specified

information includes "conservation or load reduction actions," "efforts . . . to obtain

additional power through voluntary means," 10 C.F.R. § 205.373(g)–(h), and

"available imports, demand response, and identified behind-the-meter generation

resources selected to minimize an increase in emissions."  Ex. 6 at 4-5 (DOE Order

No. 202-22-4).

The statutory command to take only measures that serve the public interest

further constrains the Department's authority.  The public interest element

demands that the Department advance, or at least consider, the various policies of

the Federal Power Act.  *Cf. Wabash Valley Power Ass'n*, 268 F.3d at 1115

(interpreting the "consistent with the public interest" standard in Section 203 of the

Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747,

759 (1973) (discussing "public interest" standard in other provisions); *California v.*

*Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962).  Primary policies of the

Federal Power Act include protecting consumers against excessive prices;

maintaining competition to the maximum extent possible consistent with the public

interest; and encouraging the orderly development of plentiful supplies of electricity

at reasonable prices.  *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976)

(orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374

(1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*,

343 U.S. 414, 418 (1952) (excessive prices).  And because Section 202(c) expressly

73

protects environmental considerations, these are part of the public interest element too.  *See NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . . take meaning from the purposes of the regulatory legislation.").

    2.    The Order Does Not Contain a Reasoned Basis that Eddystone Best Meets the Claimed Emergency and Serves the Public Interest.

Even if the scenario the Order lays out were an emergency pursuant to Section 202(c), the Department has not explained why ordering Eddystone to be available to operate is the best means to meet that scenario.  Ex. 1 at 1 & n.2

The operational status of Eddystone suggests that it may be unable to meet purported emergencies.  Although a spokesperson for Constellation indicated recently that the units were in "ready" status, that statement also indicated a need to take steps to "retain necessary staff and perform necessary maintenance to allow for safe and reliable operations."[117]   And while the Eddystone Units did run during the June 23-26 heatwave, Unit 4 "went offline."[118]  These old, ready-to-retire Units are themselves likely to be unreliable.

Moreover, the Order also does not address readily available and obvious alternatives which, in point of fact, would better compensate for the supposed "resource adequacy issues" asserted (inaccurately) by the Order.  Ex. 1 at 1.  PJM's

---

[117] Jon Hurdle, *Aging Pennsylvania power plant to keep running after Trump order on eve of shutdown*, Pennsylvania Capital-Star (June 9, 2025), https://penncapital-star.com/energy-environment/aging-pennsylvania-power-plant-to-keep-running-after-trump-order-on-eve-of-shutdown/.

[118] PJM Interconnection, LLC, Compliance Report (June 24, 2025), https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250624-doe-compliance-report-for-eddystone-units-3-and-4.pdf.

own summer outlook predicts that even in the case of an all-time peak load, PJM

would be able to meet its required reserve needs through its existing programs.[119]

PJM has already contracted demand response programs—a lower cost means to

address grid reliability concerns—that can meet even a record-high summer

demand peak this year and will continue to be available, and even expanded, in the

coming years.[120]  Additionally, Public Interest Organizations have highlighted

above the robust transmission connectivity between PJM and neighboring regions,

which PJM has accessed on a regular basis to support the stability of its grid.  *See*

*supra*, Section IV.B.  This is consistent with the Department's long-standing

recognition that power pools and utility coordination "are a basic element in

resolving electric energy shortages."  46 Fed. Reg. at 39,985–86.  The Department

offers no reasonable basis to question the availability of resources from neighboring

regions.  But even if there were some barrier to transmission from those regions,

the Department has not (and likely could not) explain why the Order provides a

better means of ensuring resource sufficiency than addressing those barriers

directly through its power to require "interchange" and "transmission" of electric

energy from those neighboring regions.  16 U.S.C. § 824a(c)(1).  Finally, even if

---

[119] *See* Summer Outlook 2025, *supra* n. 4.

[120] *Id.* Commissioner Chang commended PJM's use of demand response in the June 23-26 heatwave. ("In particular, I do want to highlight the PJM's use of nearly 4,000 MW of demand response to reduce the peak load, their peak load, on Tuesday from what would have been the third highest peak load experienced on the PJM system. I see load flexibility as a key tool for grid operators to meet the challenges that we face and I commend PJM for the successful use of demand response during the system strain.") FERC Commission Meeting, June 2025 Open Meeting, https://youtu.be/eAHyYMKI_Yg.

preventing the retirement of existing facilities was the best means of addressing the alleged emergency, the Order does not address why maintaining the Eddystone Units over other retiring units is the best means.  Buchannan Units 1 and 2 are set to retire by July 1, 2025.[121]  These more modern combustion turbines, with a combined name plate generation of 88 MW, were constructed in 2002.  Not only are these units newer than Eddystone, but their recent annual generation has been at least six times as much GWh and the plant has run almost twice as efficiently.[122]

The Orders failure to include any consideration of these other alternatives. And the Order contains no reasoning demonstrating why Eddystone is the best alternative, or a better alternative than other options.  As such, the Order is unlawful.

### F. Because the Order Is Ambiguous, It Fails to Provide Fair Notice to the Public and Regulated Entities and Conflicts with Limitations on the Department's Authority.

The Order requires PJM and Constellation to "take all measures necessary to ensure that Eddystone Units are available to operate."  Ex. 1 at 3.  The Order further requires PJM to "take every step to employ economic dispatch of the units to minimize cost to ratepayers."  *Id.*  Those directions are so vague that neither the public nor the regulated entities have fair notice of the Department's actions, and so

---

[121] Letter from Jason P. Connel, VP Planning, PJM to Nathan Dixon, VP Buchanan Generation, LLC, *Deactivation Notice for Buchanan Unit 1 & Unit 2* (May 30, 2025) https://www.pjm.com/-/media/DotCom/planning/gen-retire/deactivation-notices/buchanan-unit-1-unit-2-pjm-response.pdf.

[122] *See* U.S. Energy Information Administration., Form EIA-923: Power Plant Operations Report (2023), https://www.eia.gov/electricity/data/eia923/.

imprecise as to conflict with the limitations on the Department's authority under Section 202(c).

The Department's direction to "ensure that Eddystone Units are available to operate" is impermissibly ambiguous and vague. Ex. 1 at 3. The Order does not explain, for instance, whether it requires (a) only that PJM and Constellation take measures so they are ready to send, receive, and respond to dispatch instructions to the extent capable with no other actions, or (b) that PJM and Constellation take additional measures that enlarge their capabilities to operate (like capital investments). It is also unclear whether PJM and Constellation are required to take measures to ensure that each of the units is equally "available to operate." *Id.* at 3.

Additionally, the Order's reference to "ratepayers" is impermissibly ambiguous and vague. *Id.* For instance, does the Order refer to ratepayers in the PJM wholesale energy markets, the PJM capacity market and ancillary services markets, bilateral markets, retail ratepayers, some combination of these ratepayers, or some other set of ratepayers? The Order also contains no geographic limit on the referenced ratepayers, such that it is not clear whether PJM is directed to minimize costs to ratepayers in Pennsylvania, across PJM, or some other area. It further contains no temporal limit, such that it is unclear whether PJM is directed to minimize cost to current ratepayers, future ratepayers, or both. Moreover, the Order contains no standards or guidance on how PJM is to reconcile or balance countervailing tensions, like minimization of costs to current and future ratepayers.

77

The ambiguities also make unclear the scope of activities and omissions coming within the effect of Section 202(c)(3), leaving the public and Public Interest Organizations in the dark as to what pollution is and is not allowed.

The above defects are fatal to the Order's validity. The Order does not give PJM and Constellation reasonably clear direction. And a reasonably prudent person—regardless of whether such person is familiar with the electric industry—cannot ascertain the Order's meaning. As such, the Order does not give fair notice of conduct that is forbidden or required, and it is therefore unlawful. *Fed. Commc'ns Comm'n v. Fox Telev. Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required"); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) ("an enactment is void for vagueness if its prohibitions are not clearly defined").

In addition, the ambiguities of the Order permit such a wide variety of actions and interpretations by PJM and Constellation that the Department has not met the statutory requirement to select only the activity that "*best* meet[s] the emergency and serves the public interest." 16 U.S.C. § 824a(c) (emphasis added). There can only be one "best" in the Department's judgment. Given the vagaries of the Order, many potential activities could be allowed, and the Department has not specified which activity is "best," much less explained why. As such, the Department fails to comply with Section 202(c)(1) and the Order is consequently arbitrary and capricious, an abuse of discretion, not in accordance with law, and

78

beyond the Department's statutory authority.  *Cf. Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 375 (1998).

### G. The Department's Order Fails to Provide the Conditions Necessary to Override Environmental Standards Under Section 202(c)(2).

The Order purports to authorize operations that may "conflict with environmental standards and requirements."  Ex. 1 at 2.  Where an order may produce such a conflict, Section 202(c)(2) requires the Department to "ensure:" (1) that it compels "generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest;" (2) that operations are "to the maximum extent practicable . . . consistent with any applicable Federal, State or local environmental law[s];" and (3) that it minimizes any adverse environmental impact, regardless of the facility's compliance (or non-compliance) with environmental standards.  16 U.S.C § 824a(c)(2).  The Order here violates all three of those statutory obligations—a failure with especially severe consequences given the pollution produced by the Eddystone Units.

First, the Order directly contradicts the Department's obligation to require generation "only during hours necessary to meet the emergency."  *Id.*  The Order instead states: "For the duration of this order, PJM is directed to take every step to employ *economic dispatch* of the units to *minimize cost* to ratepayers."  Ex. 1 at 3 (emphasis added).  *See also* Ex. 10[123]  (PJM stating that "Constellation will maintain active cost offers" on Markets Gateway to "operate on gas or oil for both

---

[123] Ex. 10 (PJM Reporting and Commitment Process).

Eddystone 3 and 4, unless either fuel is unavailable or if the units are on a Planned, Maintenance or Forced outage").  The "emergency" nominally described by the Order is "the potential loss of power to homes and local businesses in the areas that may be affected by curtailments," during the Order's 90-day span.  Ex. 1 at 2.  Even if the Department had substantiated that emergency (which it has not) the Federal Power Act would allow the Department to compel generation only when such losses would occur absent operation of the Eddystone Units. 16 U.S.C. 824a(c)(2); *see, e.g.*, Ex. 11 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by Department).  "Economic dispatch," in sharp contrast, requires "the lowest-cost resources [to] run first," in pursuit of "the lowest-cost energy available." *City of New Orleans v. FERC,* 67 F.3d 947, 948-49 (D.C. Cir. 1995)*; see also Fla. Power & Light Co. v. FERC,* 88 F.3d 1239, 1241 (D.C. Cir. 1996) (noting distinction between economic dispatch and reserve capacity rules).  PJM has, for the time being, accepted that it may only dispatch the units to address immediate reliability and capacity needs.[124]  But even that has proven not precise enough; on June 23 and 24, 2025, PJM allowed Eddystone to run[125] before relying on all of its demand response

---

[124] *Id.*

[125] *See* Compliance Report, *supra* n. 118; PJM Interconnection, LLC, Compliance Report (June 25, 2025), https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250625-pjm-report-in-compliance-w-ordering-paragraph-b-of-the-doe-20250530-order-no-202-25-4.pdf.  In fact, on June 24 Eddystone Unit 3 ran for 24 hours and Eddystone 4 ran for 20.  This appears to be beyond even the vague requirements of the Order.

resources.[126]  The fact that PJM had additional demand response resources

available to more than cover the day-ahead load forecast and in reality did have

excess demand response resources means that the emergency claimed by the

Order—"the potential loss of power to homes and local businesses"—was not in play

and therefore Eddystone should not have been run.  Moreover, any assurance by

PJM does not alter the Order's unlawful terms.  By directing PJM to dispatch the

plant along cost-based principles, rather than "only during hours necessary to meet

the emergency," the Department has violated Section 202(c)(2).  16 U.S.C. §

824a(c)(2).

Second, the Order fails to ensure that Eddystone operates, "to the maximum

extent practicable," in conformity with applicable environmental rules.  *Id.*  The

Order paraphrases the statutory text—that "operation of the Eddystone Units must

comply with applicable environmental requirements . . . to the maximum extent

feasible," but fails to specify *who* bears that responsibility or *what* such operation

entails.  Ex. 1 at 3.  It imposes no further conditions beyond requiring Constellation

to "pay fees or purchase offsets or allowances for emissions."  *Id.*  The direction to

"comply . . . to the maximum extent feasible" is, as a result, potentially

unenforceable; the Order provides no basis for the Department, or anyone else, to

determine whether the plant is in fact complying or who might face the

consequences of any failure to do so.  *See* Ex. 6 at 5–7 (DOE Order No. 202-22-4)

---

[126] *See* PJM Emergency Procedures, Postings, Effective from 06/23/2025 to 06/26/2025, https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf (calling on some but not all demand response).

(requiring, *inter alia,* reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators met their requirement to comply with environmental requirements to the maximum extent feasible).  As such, the Order does not meet the Department's statutory obligation to "*ensure*" the maximum feasible compliance with applicable environmental standards.  16 U.S.C. § 824a(c)(2) (emphasis added).

Third, the Order fails to provide any conditions at all to "minimize[] any adverse environmental impacts."  16 U.S.C. § 824a(c)(2).  That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards.  *Id.*  The Order fails, most importantly, to include measures, such as utilization of demand response resources, that would mitigate impacts when compliance with environmental standards proves impracticable.  Past orders have routinely included such measures.  *See, e.g.*, Ex. 11 at 2 (DOE Order No. 202-17-4 Summary of Findings) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practicably available resources," including available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 6 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to inform affected communities" of non-compliant operations).  At a minimum the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department

has no ability to "ensure" that adverse impacts are minimized. *See, e.g.*, Ex. 12 Department of Energy, Order No. 202-24-1, at 5 (Oct. 9, 2024) (requiring detailed data on emissions of pollutants). The Order here instead gestures towards "such additional information" as the Department may (or may not) "request[] . . . from time to time." Order at 3. That possibility of future, unspecified inquiry cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts. 16 U.S.C. § 824a(c)(2).

Failure to meet those conditions is especially critical because the Eddystone Units can be operated on either gas or oil. PJM and Constellation have both indicated that the units intend to use fuel oil, rather than gas, when economically favorable. Ex. 10 (PJM Reporting and Commitment Process). Allowing the units to utilize oil based solely on cost—especially absent a requirement to exhaust demand-response and other available resources prior to dispatching the units at all—does not minimize environmental impacts "to the maximum extent practicable." 16 U.S.C. 824a(c)(2). *See* Ex. 13 (stating that Eddystone Units may alter fuels based on "pricing changes).[127] Oil-fired generation results in higher emissions of both criteria pollutants and hazardous air pollutants. Ex. 4 (Eddystone Title V Permit) at 28, 50 (noting sulfur content of oil and higher NOx emissions from oil-fired generation); 68 Fed. Reg. 1660, 1678 (Jan. 13, 2003) (noting that switching from oil to natural gas "would reduce mercury, metallic [toxics], and inorganic" hazardous

---

[127] Constellation Energy, *Eddystone Generating Station*, https://www.constellationenergy.com/our-company/locations/location-sites/eddystone-generating-station.html (last visited June 27, 2025).

air pollutant emissions).  The months during which the Order operates do not pose a risk that natural gas will be unavailable, so even if an emergency requiring generation from the Eddystone Units existed—which it does not—gas-fired generation would be entirely practicable.  Ex. 14 (Natural gas may not be available to Eddystone Units "[w]hen there's a cold snap" or during "a polar vortex").[128]  The Order's failure to at least ensure that the Eddystone Units operate only on the least-polluting fuel available to them, even as it authorizes violation of governing environmental standards, violates the law.  16 USC § 824a(c)(2).  At a minimum, the Department should impose tighter limits on the dispatch of Eddystone.

### H. The Order and the Department's Continued Conduct Are Inconsistent with Departmental Procedure, Depriving the Public and the Public Interest Organizations of Fair Notice and an Adequate Record.

According to the Department's procedures, the agency will use "best efforts" to post filings on a specified website within 24 hours of receipt.[129]  The Department has received, and is supposed to receive, materials related to this proceeding that it has not posted.  On June 13, 2025, the Department received a letter from PJM reporting on its compliance with the 202(c) Order.[130]  The Public Interest

---

[128] Constellation Energy, *Natural Gas and Oil,* https://www.constellationenergy.com/our-work/what-we-do/generation/natural-gas-and-oil.html (last visited June 27, 2025).

[129] Ex. 2 DOE Rehearing Procedures, *supra* n. 5.

[130] Letter from Michael Bryson, PJM, to Secretary of Energy Christopher Wright, *PJM Report in Compliance with Ordering Paragraph D of the Department of Energy's May 30, 2025 Order No. 202-25-4* (June 13, 2025), https://www.pjm.com/-/media/DotCom/documents/other-fed-state/20250613-doe-pjm-report-on-compliance-with-Eddystone-order-202-25-4.pdf.

Organizations have been able to access this letter because PJM published the letter to its website.  The Department still has not met its obligation to publish this letter to its website.  The Department may have received additional materials.  The Order requires daily notifications on operations, p. 3 ¶ B, and such additional information regarding environmental impacts as the Department requests, p. 3 ¶ D.  None of those materials are posted on the Department's 202(c) website.[131]

The Department must follow its own procedures.  *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1524 (D.C. Cir. 1994).  The Department's failure to follow its procedures deprives the public and Public Interest Organizations of fair notice and an adequate record.  *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 249 (2d Cir. 1977).

## VI.    REQUEST FOR STAY

Public Interest Organizations further move the Department for a stay of the Order until the conclusion of judicial review.  18 C.F.R. § 385.212.[132]  The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires."  5 U.S.C. § 705.  In

---

[131] The Department still has not posted filings for other recent 202(c) orders, either.  *See e.g.,* U.S. Dep't of Energy, *Federal Power Act Section 202(c) Midcontinent Independent System Operator (MISO),* https://www.energy.gov/ceser/federal-power-act-section-202c-midcontinent-independent-system-operator-miso (last visited June 27, 2025) (the Department received at least two requests for rehearing of the Campbell 202(c) order that it has not posted).

[132] Pursuant to FPA Section 313 and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department Order. 16 U.S.C. § 825*l*(c), 18 C.F.R. § 385.713(e).

deciding whether to grant a request for stay, agencies consider: (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 434, 436 (2009); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g., Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,020, at P 41 (2023); *ISO New Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987-88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at p. 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at p. 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th at 990-91. Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an

86

injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

### A. Intervenors Are Irreparably Harmed by the Order.

Here, a stay is necessary to ensure that Eddystone does not continue with activities that are already causing irreparable harm to Public Interest Organizations, their members, and the public as a result of the Order.[133]

Operating the Eddystone Units, which burn oil and natural gas, results in emissions of dangerous air pollutants, including sulfur dioxide ("SO2"), nitrogen oxides ("NOX"), particulate matter ("PM"), and carbon dioxide ("CO2") that would not otherwise have occurred but for the Order blocking the deactivation of the Eddystone Units.[134] These pollutants cause and exacerbate respiratory problems, cardiovascular issues, and other health conditions. These impacts are accentuated by Eddystone's location in an area already disproportionately overburdened by heavily polluting industrial sources and toxic waste sites.[135]

The Order also causes irreparable harm by imposing costs on PJM ratepayers that would not otherwise be borne and will not be recoverable through litigation. Constellation is complying with the Order and is seeking cost recovery through

---

[133] The Eddystone Units have in fact operated as a result of the Order. *See, e.g.,* Compliance Report, *supra* n. 118.

[134] *Id.*

[135] *See supra*, Section IV.A.

FERC.[136]  If that request is granted, costs will be borne by PJM ratepayers, and the Department does not identify any clear recourse for a refund in the event the Order is declared unlawful.  In forcing ratepayers to reopen and operate an uneconomic, unreliable, and obsolete resource that was already approved for closure, the Order also jeopardizes the diversification of generating resources the Department itself has said increases grid reliability and will inherently and unjustifiably add to ratepayer costs.[137]   As there is no clear recourse to recovering these costs from the Department should Public Interest Organizations prevail in their challenge, a stay pending judicial review is necessary to protect ratepayers from unwarranted energy cost increases-especially at a time when energy prices are already on the rise.[138]

### B.  A Stay Would Not Result in Harm to Any Other Interested Parties.

No other interested parties would be harmed by a stay.  The issuance of a stay would not harm end-use electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity.  *See supra*, Section V.C.3.  Furthermore, because Constellation and PJM had both already planned for the closure of the Eddystone Units, a stay would only have the

---

[136] *See* Letter from David E. Mills, Chair, PJM Board, to PJM Members and Stakeholders (June 26, 2025), 20250626-pjm-board-letter-re-results-of-the-cifp-process-for-doe-202-c-order-for-eddystone-units-3-and-4.pdf.

[137] *See* U.S. Dep't of Energy, Energy Reliability and Resilience, https://www.energy.gov/eere/energy-reliability-and-resilience (last visited June 26, 2025).

[138] *See* Mitchell Terpstra, *2024 News Release: PJM Capacity Auction Prices Skyrocket*, Energy Choice Blog (Oct. 2, 2024), https://electricityrates.com/resources/pjm-capacity-auction-spike/.

effect of relieving them of the administrative, compliance, and planning burdens imposed by the Order. *See, e.g.,* Ex. 1 at 2-3. On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

### C. A Stay is in the Public Interest.

There is no public interest served by the Order, and a stay will only benefit the public. First, the Order exceeds the Department's authority; it has provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would justify the Eddystone Units' continued operation. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, a stay would protect the broader public—beyond Public Interest Organizations and their members—from the costs and additional pollution produced by unnecessary operation of the Eddystone Units.

## VII.    CONCLUSION

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention; grant rehearing and rescind the Order (and any renewals of the Order); and stay the Order.

*/s/ Caroline Reiser*
Caroline Reiser
Simi Bhat
Gavin McCabe
Natural Resources Defense Council
1152 15th Street NW, Suite 300

Washington, DC 20005
creiser@nrdc.org
sbhat@nrdc.org
gmccabe@nrdc.org
(202) 717-8341

*/s/ Ted Kelly*
Ted Kelly
Tomás Carbonell
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
tekelly@edf.org
tcarbonell@edf.org
(202) 387-3500

Jessica O'Neill
PennFuture
1429 Walnut Street, Suite 701
Philadelphia, PA  19102
oneill@pennfuture.org

*/s/ Francis W. Sturges, Jr.*
Francis W. Sturges, Jr.
Danielle Fidler
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
fsturges@catf.us
dfidler@catf.us
(617) 624-0234
*Counsel for Citizens for Pennsylvania's Future*

*/s/ Tyson Slocum*
Tyson Slocum
Public Citizen, Inc.
215 Pennsylvania Ave SE
Washington, DC  20003
(202) 454-5191
tslocum@citizen.org

*/s/ Gregory E. Wannier*
Gregory E. Wannier

90

Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste 1300
Oakland, CA 94612
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
(415) 977-5646

# Exhibit C

# UNITED STATES OF AMERICA
## Department of Energy
Washington, DC 20585

PJM Interconnection, L.L.C.                                    Order No. 202-25-4A
and Constellation Energy Corporation
Regarding the Eddystone Generating Station

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(August 1, 2025)

Rehearing has been timely requested of the Department of Energy's order issued on May 30, 2025, in the above-captioned matter.[1] Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

_____
Chris Wright
Secretary of Energy

---

[1] *PJM Interconnection, L.L.C., and Constellation Energy Corp.*, Order No. 202-25-4 (2025) (regarding the Eddystone Generating Station).

[2] 16 U.S.C. § 825*l*(a).

[3] 16 U.S.C. § 825*l*(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).