## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ILLINOIS OFFICE OF ATTORNEY GENERAL, MARYLAND OFFICE OF PEOPLE'S COUNSEL, *AND* NEW JERSEY DIVISION OF RATE COUNSEL<br>*Petitioners*<br><br>v.<br><br>CHRIS WRIGHT, in his official capacity as Secretary of Energy, United States Department of Energy; UNITED STATES DEPARTMENT OF ENERGY<br>*Respondents*. | Amended Petition for Review<br><br><br>CASE NO. 25-1193 |

## AMMENDED PETITION FOR REVIEW

Pursuant to Section 313(b) of the Federal Power Act ("FPA"), 16 U.S.C. § 825*l*(b) and Fed. R. App. P. 15(a), the Illinois Office of the Attorney General, Maryland Office of People's Counsel, and New Jersey Division of Rate Counsel (collectively, "Joint Consumer Advocates") timely petitioned this Court for review of orders issued by the United States Department of Energy ("DOE" or the "Department").[1]

---

[1] Petition for Review, *Ill. Office of Att'y Gen., et. al. v. DOE*, No. 25-1193 (D.C. Cir., Sept. 25, 2025, ECF No. 2).

The orders are as follows:

1. *PJM Interconnection 202(c)*, DOE Order 202-25-4, United States Department of Energy (May 30, 2025) ("Eddystone 1 Order", filed as Exhibit C hereto).

2. *PJM Interconnection 202(c)*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, DOE Order 202-25-4a, United States Department of Energy (Aug. 1, 2025) (the "August 2025 Notice", filed as Exhibit B hereto).

Joint Consumer Advocates now file this amended petition for review to include for judicial review the Department's reasoned rehearing order, which substantively addressed the issues on rehearing:

1. *PJM Interconnection 202(c)*, Order Addressing Arguments Raised on Rehearing, DOE Order 202-25-4b, United States Department of Energy (Jan. 10, 2026) (the "January 2026 Order", filed as Exhibit A hereto).

Joint Consumer Advocates file this amended petition for review in lieu of a new petition for review in this Court because the January 2026 Order only clarifies and amends the denial of rehearing in the August 2025 Notice. Joint Consumer Advocates further respectfully request inclusion of the January 2026 order in the Certified Index to the Administrative Record.

Respectfully submitted,

**MARYLAND OFFICE OF PEOPLE'S COUNSEL**

DAVID S. LAPP
PEOPLE'S COUNSEL

/s/ William F. Fields
William Fields
Deputy People's Counsel

Alexis H. Lewis
Assistant People's Counsel

Davids.lapp@maryland.gov
William.fields@maryland.gov
Alexis.lewis@maryland.gov
Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, Maryland 21202
(410) 767-8150

**NEW JERSEY DIVISION OF RATE COUNSEL**
Brian O. Lipman, Esq., Director

 /s/David Wand
T. David Wand, Esq.
Deputy Rate Counsel

New Jersey Division of Rate Counsel
140 East Front Street, 4th Floor
P.O. Box 003
Trenton, NJ 08625
Phone: (609) 984-1460
blipman@rpa.nj.gov
dwand@rpa.nj.gov
rglover@rpa.nj.gov
dlayugan@rpa.nj.gov

**ILLINOIS OFFICE OF THE ATTORNEY GENERAL**

/s/      Jason E. James
Jason E. James
Assistant Attorney General

Illinois Office of the Attorney General
Kimberly Janas
Counsel to the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
jason.james@ilag.gov
kimberly.janas@ilag.gov
Ph: (217) 843-0322

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026, I electronically filed the foregoing

using the Court's CM/ECF system. All parties to this case are registered CM/ECF

users, and service is accomplished via the CM/ECF system pursuant to Fed. R.

App. P. 25.

Respectfully submitted,

**MARYLAND OFFICE OF PEOPLE'S COUNSEL**

David S. Lapp
People's Counsel
William F. Fields
Deputy People's Counsel

/s/ Alexis H. Lewis

Alexis H. Lewis
Assistant People's Counsel
alexis.lewis@maryland.gov
Office of People's Counsel
6 St. Paul Street, Suite 2102
Baltimore, Maryland 21202
(410) 767-8172

January 26, 2026

# EXHIBIT A

# ORDER 202-25-4B

UNITED STATES OF AMERICA
DEPARTMENT OF ENERGY

Order No. 202-25-4B

ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued January 10, 2026)

1.    On May 30, 2025, pursuant to section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy Organization Act,[2] the Secretary of Energy (Secretary) issued an order determining that "an emergency exists in portions of the electricity grid operated by PJM Interconnection (PJM) due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes."[3]  In the Emergency Order, the Secretary determined that the continued operation of Eddystone Units 3 and 4 (Eddystone Units) "is necessary to best meet the emergency and serve the public interest for purposes of FPA section 202(c)."[4]  On June 27, 2025, requests for rehearing were separately filed by the Joint Consumer Advocates (JCAs)[5] and the Public Interest Organizations (PIOs).[6]

2.    On August 1, 2025, the Department of Energy (DOE) issued a notice of denial of rehearing by operation of law and providing for further consideration (DOE Notice).[7]

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] Department of Energy Order No. 202-25-4 (May 30, 2025) (Emergency Order).

[4] *Id.* at 2.

[5] Maryland Office of People's Counsel, the Delaware Division of the Public Advocate, New Jersey Division of Rate Counsel, Illinois Attorney General, and the Citizens Utility Board of Illinois refer to themselves collectively as Joint Consumer Advocates.

[6] Natural Resources Defense Council, Citizens for Pennsylvania's Future, Environmental Defense Fund, Sierra Club, and Public Citizen refer to themselves collectively as Public Interest Organizations.

[7] Department of Energy Order No. 202-25-4A (Aug. 1, 2025).

However, as provided in section 202(c) and 313(a) of the FPA,[8] DOE is modifying the discussion in the Emergency Order and continues to reach the same result in this Order, as discussed below.[9]

## I.  **Background**

3.      In the Emergency Order, the Secretary determined that "an emergency exists in portions of the electricity grid operated by [PJM] due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes."[10]  The Secretary therefore directed PJM and Constellation Energy, the owner of the Eddystone Generating Station, to "take all measures necessary to ensure that [the] Eddystone Units are available to operate."[11]

4.      The Emergency Order provided substantial support for the Secretary's emergency determination.  The Emergency Order explained that PJM indicated in its Summer Outlook 2025 that "available generation capacity may fall short of required reserves in an extreme planning scenario."[12]  The Emergency Order further observed that PJM, in its February 2023 assessment, "*Energy Transition in PJM: Resource Retirements, Replacements & Risks*," specifically highlighted an increased "risk of reliability in the coming years due to the 'potential timing mismatch between resource retirements, load growth and the pace of new generation entry' under 'low new entry' scenarios for renewable generation."[13]  The Emergency Order also noted that PJM recently filed revisions to its open access

---

[8] 16 U.S.C. § 824a(c); 16 U.S.C. § 825*l*(a).  In the context of FPA section 202(c) orders, DOE interprets FPA section 313's references to "the Commission" to mean DOE.

[9] *See Allegheny Def. Project v. FERC*, 964 F.3d 1, 16-17 (D.C. Cir. 2020).  DOE is not changing the outcome of the Emergency Order.  *See Smith Lake Improvement & Stakeholders Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2014).

[10] Emergency Order at 1.

[11] *Id.* at 3, Ordering Paragraph A.

[12] *Id.* at 1 (quoting *PJM Summer Outlook 2025: Adequate Resources Available for Summer Amid Growing Risk*, PJM Inside Lines (May 9, 2025) (PJM Summer Outlook 2025), https://insidelines.pjm.com/pjm-summer-outlook-2025-adequate-resources-available-for-summer-amid-growing-risk/).

[13] *Id.* (citing *Energy Transition in PJM: Resource Retirements, Replacements & Risks*, PJM, at 1 (Feb. 24, 2023) (2023 4R Report), https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

transmission tariff with the Federal Energy Regulatory Commission (FERC) to address near-term resource adequacy concerns, which FERC accepted because it found "the proposal reasonably addresses the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry."[14]  The Emergency Order also noted recent congressional testimony, in which PJM's President and CEO warned of "'a growing resource adequacy concern' due to a combination of load growth, the retirement of dispatchable resources, and other factors" causing reliability risks.[15]  The CEO presented data indicating that existing dispatchable fossil-based generator retirement is outpacing new resource construction.[16]

5.     In the Emergency Order, the Secretary determined that continued dispatch of the Eddystone Units is necessary to best meet the emergency and serve the public interest for purposes of FPA section 202(c).[17]  The Emergency Order explained that this determination is based on the potential load stress due to resource adequacy concerns and the potential loss of power to homes and local businesses in the areas that may be affected by curtailments, as well as the potential shortage of electric energy and facilities for the generation of electric energy.[18]  The Emergency Order is limited in duration to align with the emergency circumstances.[19]   In the Emergency Order, in recognition of potential conflict with environmental standards and requirements and consistent with FPA section 202(c), the Secretary authorized only the necessary additional generation on specified conditions.[20]

---

[14] *Id.* (citing *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084, at P 14 (2025) (PJM RRI Order) (accepting PJM's Reliability Resource Initiative (RRI) to permit the addition of up to 50 additional generation projects to PJM's interconnection queue)).

[15] *Id.* (citing *Keeping the Lights On: Examining the State of Regional Reliability: Hearing Before the Subcomm. on Energy of the H. Comm. on Energy & Com.*, 119th Cong. (Mar. 25, 2025) (written testimony of Manu Asthana, President and CEO of PJM Interconnection) (Asthana Test.), at 4-5, https://www.pjm.com/-/media/DotCom/library/reports-notices/testimony/2025/20250325-asthana-testimony-us-house-subcommittee-on-energy.pdf).

[16] *Id.* (referencing Asthana Test. at 4-5, Figures 3 & 4).

[17] *Id.* at 2.

[18] *Id.*

[19] *Id.*

[20] *Id.*

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

## II.     Discussion

### 1.     The Secretary's Authority to Determine the Existence of an "Emergency"

6.     JCAs and PIOs each raise similar arguments that the Emergency Order fails to meet the legal definition of an "emergency" within the meaning of FPA section 202(c).[21]  JCAs and PIOs both contend that an "emergency" contemplated by section 202(c) is one that is sudden, unexpected, and requires immediate action.[22]  According to JCAs, the Emergency Order does not introduce facts that would satisfy this definition.[23]  Similarly, PIOs argue that the Emergency Order does not offer "evidence of an emergency in the specified period," and instead discusses "growing resource adequacy concern" "in the coming years."[24]

7.     In addition, JCAs and PIOs rely on the cases *Richmond Power & Light of Richmond v. FERC*, 574 F.2d 610 (D.C. Cir. 1978), and *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970), for the proposition that courts have interpreted section 202(c) narrowly to apply only to temporary emergencies requiring an imminent response.[25]

### DOE's Determination

8.     The Secretary has the authority under FPA section 202(c) to determine that an emergency exists, and exercise his judgment to address such an emergency.  The statute's plain text grants the Secretary authority to respond to threats to the Nation's electric infrastructure.  Specifically, the Secretary "*shall* have authority" to act "*whenever* the [Secretary] determines that an emergency exists."[26]  Next, the statute sets forth three different categories of emergency where section 202(c) action is permissible.  An emergency may exist "by reason of [1] a sudden increase in the demand for electric energy,

---

[21] *See* JCA Pet. at 19-24; PIO Pet. at 28-33.

[22] *See, e.g.*, JCA Pet. at 20-21; PIO Pet. at 30-33.

[23] *See* JCA Pet. at 19-30.

[24] PIO Pet. at 29 (emphases omitted) (citing Emergency Order at 1).

[25] *See* JCA Pet. at 20; PIO Pet. at 38-40.

[26] 16 U.S.C. § 824a(c)(1) (emphases added).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

or [2] a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or [3] other causes."[27]

9.    Pursuant to section 202(c)(1), the Secretary has the authority to determine the existence of a statutory emergency, "either upon [his] own motion or upon complaint, with or without notice, hearing, or report."  Beyond providing exemplar categories of where an "emergency exists," the statute is silent on any additional requirements that must be satisfied.  Here, as is evident from the face of the Emergency Order, and as is consistent with section 202(c)'s text and prior DOE practice,[28] the Secretary exercised his authority under section 202(c) and determined, in his statutory discretion and substantive expertise, that "an emergency exists in portions of the electricity grid operated by [PJM] due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes."[29]

10.    The argument that the Secretary can act only when a shortage of electricity is "imminent" makes no sense in the context of his statutory authority under section 202(c).  The Secretary may act to address any "shortage of . . . facilities for the generation . . . of electric energy."[30]  If the Secretary were required to wait until a blackout is "imminent" before addressing a shortage of generation facilities, his ability to take meaningful action under section 202(c) to prevent the blackout would be undermined.  Section 202(c) must be interpreted in the context of the electric energy industry.  It can take months, and even years, to remedy a shortage of facilities for the generation of electric energy once a shortage is identified.  This fact is squarely recognized in the Department's implementing regulations for FPA section 202(c), in effect since 1981, which defines the term "emergency" to include "extended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities."[31]  Furthermore, the

---

[27] *Id.* (brackets added); *see also* H.R. Rep. No 113-86, at 2 (2013) (House Committee on Energy and Commerce Report on then-proposed amendment to section 202(c), which observed that "[r]eliability-related emergencies are not limited to bad weather, natural disasters, or terrorist attacks").

[28] *See, e.g.*, *Puget Sound Power & Light Co.*, 6 F.P.C. 320 (1947) (WL 1048) (in which the Federal Power Commission (FPC, the predecessor of DOE) utilized FPA section 202(c) to prevent an anticipated power shortage despite noting that the current power supply was adequate).

[29] Emergency Order at 1.

[30] 16 U.S.C. § 824a(c)(1).

[31] 10 C.F.R. § 205.371; *accord Emergency Interconnection of Electric Facilities and the Transfer of Electricity to Alleviate an Emergency Shortage of Electric Power*, 46

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

definition of "emergency" contained in DOE's regulations at 10 C.F.R. § 205.371—which generally provide guidance to applicants seeking section 202(c) relief—does not supersede the statutory discretion section 202(c) affords to the Secretary to *sua sponte* "determine[] that an emergency exists." Accordingly, the Secretary's emergency determination is entirely consistent with the governing statutory requirements in section 202(c) and the DOE's regulations.

11.    The dictionary definitions cited by JCAs[32] and PIOs[33] are not persuasive. Those dictionary definitions cannot limit the discretion Congress expressly delegated to the Secretary in section 202(c).

12.    The arguments made by JCAs and PIOs based on the *Otter Tail Power* and *Richmond Power & Light* decisions likewise are misguided.[34] *Otter Tail Power* did not limit the Secretary's section 202(c) discretion or the meaning of "emergency" because the court held that section 202(c) *did not apply* to the case.[35] Instead, *Otter Tail Power* involved section 202(b) of the FPA and not an "emergency" within the meaning of section 202(c).[36] In *Richmond Power & Light*, the Court of Appeals for the D.C. Circuit merely held that the Federal Power Commission (FPC) did not abuse its discretion in *declining* to invoke its emergency powers under section 202(c).[37] The court determined that the FPC had discretion to choose a temporary, voluntary program rather than issue an order pursuant to section 202(c), as the circumstance, in the FPC's discretion, did not warrant the use of emergency authority.[38]

13.    A more relevant decision is *Board of Trade of Chicago v. Commodity Futures Trading Commission*.[39] In that case, the Court of Appeals for the Seventh Circuit

---

Fed. Reg. 39984-01 (Aug. 6, 1981).

[32] JCA Pet. at 20 n.31.

[33] PIO Pet. at 30-31.

[34] *See, e.g.*, JCA Pet. at 20; PIO Pet. at 38-40.

[35] *See* 429 F.2d at 234.

[36] *See id.* (rejecting petitioner's contention that "any proceedings in the instant case must be dealt with in compliance with § 202(c)").

[37] *See* 574 F.2d at 615.

[38] *Id.* at 614-15.

[39] *Board of Trade of Chicago v. Commodity Futures Trading Comm'n*, 605 F.2d

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

recognized the broad powers of the Commodity Futures Trading Commission (CFTC) to issue emergency actions under section 8a(9) of the Commodity Exchange Act (7 U.S.C. § 12a(9)).[40]   Through section 8a(9), the CFTC issued an emergency order for the Board of Trade to suspend trading in certain wheat futures contracts, citing transportation and warehouse shortages and potential market manipulation.[41]   In response, the Board of Trade sought an injunction against the order, arguing that no emergency existed.[42]   The district court granted a preliminary injunction, and the CFTC appealed.[43]   In its decision to vacate and remand the district court's preliminary injunction, the Seventh Circuit concluded that Congress intended to grant the CFTC discretion in making emergency determinations under the Commodity Exchange Act.[44]   The court reasoned: "Congress recognized that regulation of the volatile futures markets could be accomplished effectively only through the use of an expert Commission, that situations could occur suddenly for which the traditional enforcement powers would be an inadequate response, and that therefore the Commission should have emergency powers, the exercise of which is committed to the expertise and discretion of the Commission."[45]   In addition, "[t]he fact that the Commission is authorized by Congress to take emergency action is, in itself, a suggestion of Congressional intent to commit such actions to the Commission's discretion."[46]   Given the similarities between FPA section 202(c) and section 8a(9) of the Commodity Exchange Act, the *Board of Trade* decision confirms the conclusion that Congress intended to grant the Secretary broad discretion in section 202(c) to determine when his emergency powers should be applied to protect the public interest.[47]

14.     In sum, the Secretary acted within his authority to determine the existence of an emergency, and the statutory meaning of "emergency" has been satisfied here.   In its 90-year history, no court has questioned the Secretary's (or, prior to its dissolution in 1977,

---

1016, 1025 (7th Cir. 1979).

[40] *Id.*

[41] *See id.* at 1018.

[42] *Id.* at 1019.

[43] *Id.* at 1019-20.

[44] *Id.* at 1023-25.

[45] *Id.* at 1025.

[46] *Id.* at 1023.

[47] *See id.* at 1023-25.

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

the FPC's)[48] judgment in this respect.  The absence of such circumstances underscores the Secretary's authority as expressly delegated in the statute.

### 2.    The Secretary's Authority to Require the Eddystone Units to Continue to Operate

15.    JCAs argue that the Emergency Order impermissibly exceeds the Secretary's statutory authority under FPA section 202(c) in various respects.[49]  For instance, JCAs argue that the Emergency Order exceeds the Secretary's authority because it concerns resource adequacy issues that are unrelated to the asserted emergency and reserved to the states and FERC under other provisions of the FPA.[50]

16.    Similarly, PIOs contend that in enacting FPA section 215,[51] Congress established a "circumscribed scheme" of federal action for addressing long-term reliability concerns in careful balance with the states, federal regulators, and other stakeholders.[52]  PIOs assert that DOE's use of section 202(c) to address long-term reliability concerns (and not, as PIOs say, imminent threats) would effectively bypass the framework Congress provided under section 215.[53]

### DOE's Determination

17.    There is no dispute that the Secretary has the statutory authority under FPA section 202(c) to (1) determine that an emergency exists, and then (2) exercise his judgment to address that emergency.  Rather, JCAs and PIOs claim that the Secretary exceeded that authority in certain respects.  As explained below, JCAs' and PIOs' claims have no merit.

18.    FPA section 201(b)(1) specifically reserves authority over "facilities used for the generation of electric energy" for the states "*except as specifically provided* in this subchapter."[54]  Section 202(c) constitutes one such exception.  It grants the Secretary the

---

[48] The FPC was dissolved in 1977, and the FPC's functions were split between FERC and DOE, with the Secretary retaining FPA section 202(c) power.

[49] *See* JCA Pet. at 21-23.

[50] *Id.*

[51] 16 U.S.C. § 824o.

[52] PIO Pet. 34-36.

[53] *Id.*

[54] 16 U.S.C. § 824(b)(1) (emphasis added).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

"authority, either upon [the Secretary's] own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in [the Secretary's] judgment will best meet the emergency and serve the public interest."[55] Congress thus purposely provided discretion in section 202(c) to require change to the operation of the U.S. electricity system to meet the emergency, including changes to the operations of electric generation facilities.

19.    JCAs and PIOs attempt to avoid this clear grant of authority by arguing that the Emergency Order addresses issues unrelated to emergencies and instead concerns the issue of resource adequacy and long-term reliability.[56]  But placing a different label on the Secretary's action cannot change the fact that actions taken in the Emergency Order fall squarely within the authority granted by section 202(c).  By its terms, section 202(c) may be invoked to address a potential "shortage of electric energy or of facilities for the generation or transmission of electric energy," which is exactly the situation that led to the issuance of the Emergency Order.  The Secretary also is authorized to "require by order . . . such generation . . . of electric energy as in [the Secretary's] judgment will best meet the emergency and serve the public interest,"[57] which is exactly the action the Emergency Order requires.  Moreover, DOE's regulations specifically provide that "[e]xtended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities can result in an emergency as contemplated in these regulations."[58]  As such, this provision reinforces that section 202(c) may be used to address long-term structural problems, not simply imminent and unexpected events – which is precisely what the Secretary did with the Emergency Order.  DOE regulations thus implement the broad grant of discretion section 202(c) affords to the Secretary to "determine[] that an emergency exists."[59]

20.    Contrary to the assertions of JCAs and PIOs, the Secretary is not taking action to address matters otherwise delegated to the states or FERC, and nor is he exceeding his statutory authority under section 202(c).  Specifically, due to "inadequate planning" and "the failure to construct necessary facilities,"[60] the Secretary took action to address the

---

[55] 16 U.S.C. § 824a(c)(1).

[56] *See* JCA Pet. § III; PIO Pet. § V.B.2.

[57] 16 U.S.C. § 824a(c)(1).

[58] 10 C.F.R. § 205.371.

[59] 16 U.S.C. § 824a(c)(1).

[60] 10 C.F.R. § 205.371 ("Extended periods of insufficient power supply as a result of inadequate planning or the failure to construct necessary facilities can result in an

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

emergency in PJM.  As described in the Emergency Order, PJM's resource crisis arises, among other reasons, from the mismatch between resource retirements, such as the Eddystone Units, and heightened demand, including due to the sudden development of large data centers in PJM's service region.[61]  This demand "is clearly outpacing the rate of construction of new resources,"[62] which typically require multiple years before coming online.[63]  If not for the Emergency Order, the Eddystone Units would have been retired on May 31, 2025, further decreasing the available dispatchable generation within PJM and deepening the reliability crisis.  The emergency action taken thus best preserves the reliability of the grid until new generation resources can be added and is entirely consistent with the governing statutory requirements in section 202(c) and its implementing regulations.

### 3.    The Factual Basis to Support the Secretary's Emergency Determination

21.    JCAs and PIOs raise similar objections that there is no factual basis to support the Emergency Order, and that the Secretary is required to submit substantial evidence in support of his emergency determination.[64]  In particular, JCAs and PIOs assert that the March 2025 congressional testimony by PJM's President and CEO, cited in the Emergency Order, does not show the existence of an emergency.[65]  Similarly, JCAs and PIOs contend that the Emergency Order's discussion of (1) PJM's 2023 4R Report,[66] (2) PJM's Summer Outlook 2025,[67] and (3) the FERC order accepting PJM's Reliability Resource Initiative

---

emergency as contemplated in these regulations.").

[61] *See, e.g.*, Emergency Order at 1-2; *see also* Asthana Test. at 4 (further noting increases in demand in PJM from the transportation and heating sectors, as well as industrial growth).

[62] Asthana Test. at 4.

[63] *See, e.g.*, Emergency Order at 1 (noting "delayed new entry" of generation facilities as contributing to "the possibility of a resource adequacy shortfall" (citation omitted)).

[64] *See* JCA Pet. at 25-30; PIO Pet. § V(C).

[65] *See* JCA Pet. at 25; PIO Pet. at 46-48.

[66] *See* JCA Pet. at 25-28; PIO Pet. at 49-53.

[67] *See* JCA Pet. at 28-30; PIO Pet. at 53-55.

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

(RRI) filing,[68] each are inadequate evidence that an emergency exists in the PJM region. According to JCAs and PIOs, the evidence actually shows that PJM has sufficient capacity resources, even absent generation from Eddystone.[69]

22.    PIOs further assert that the President's Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid" (EO 14262),[70] and Executive Order 14156, "Declaring a National Energy Emergency" (EO 14156),[71] are also not sufficient evidence of an emergency within the meaning of section 202(c).[72]

## DOE's Determination

23.    The exigencies that section 202(c) is designed to address necessarily require that the Secretary's determination is informed by the facts available at the time and by his sound expert judgment as to what situations constitute an emergency.  The statute expressly states that no notice, hearing, or report is required prior to issuance of a section 202(c) order.  This confirms that the Secretary is authorized to exercise his section 202(c) authority expeditiously and unfettered in responding to emergency situations.

24.    In any event, the Secretary's determination that an emergency exists is supported by substantial factual evidence and the exercise of the Secretary's judgment.  As discussed above, the Emergency Order identified the ongoing emergency in the PJM region "due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes," and the "emergency nature of the potential load stress" due to "resource adequacy concerns," and that "the potential loss of power to homes and local businesses in the areas that may be affected by curtailments, present[s] a risk to public health and safety."[73]  The Emergency Order also explained that "[u]pcoming retirements, including

---

[68] *See* PIO Pet. at 48-49.

[69] *See* JCA Pet. at 29-30; PIO Pet. at 56-60.

[70] Exec. Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (Strengthening the Reliability and Security of the United States Electric Grid), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-the-reliability-and-security-of-the-united-states-electric-grid/.

[71] Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

[72] PIO Pet. at 42-45, 55-56.

[73] Emergency Order at 1-2.

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

the planned retirement of Unit 3 and Unit 4 of the Eddystone Generating Station . . . will exacerbate these resource adequacy issues."[74]    Consistent with his emergency determination, the Secretary thus ordered PJM and Constellation Energy to take all measures necessary to ensure that the Eddystone Units are available to operate.[75]

25.    As noted above, the Secretary's determination was based on several different facts discussed in the Emergency Order. *First*, in congressional testimony submitted on March 25, 2025, Mr. Manu Asthana, PJM's president and CEO, explained that PJM faces a "growing resource adequacy concern . . . impacting a significant part of our country" due to load growth, the retirement of dispatchable resources, and other factors, such as "the development of large data centers in the PJM service area."[76]    Data submitted by Mr. Asthana indicates that PJM anticipates growing reliability risk from increasing electricity demand, generator retirement outpacing new resource construction, and the inherent characteristics of existing resources in PJM's interconnection queue.[77]    Contrary to JCAs' and PIOs' assertions that PJM has taken steps to adequately address these challenges, Mr. Asthana's testimony explained that supply conditions within PJM are still tightening notwithstanding various reforms instituted by PJM to bring new generation online and prevent the retirement of existing units.[78]    Moreover, Mr. Asthana noted that PJM "encourage[s] all generation owners who have signaled an intent to retire their units to reconsider their decision to support resource adequacy and grid reliability."[79]    On these points, DOE further notes a July 2025 report prepared by the Council of Economic Advisers entitled, *The Economic Benefits of Unleashing American Energy* (CEA Report).[80] The CEA Report highlighted rapid energy demand increases due to data centers,[81] while

---

[74] *Id.* at 1.

[75] *See id.* at 2-3.

[76] Asthana Test. at 4-5.

[77] *Id.*

[78] *Id.* at 9-10.

[79] *Id.* at 10.

[80] *The Economic Benefits of Unleashing American Energy*, Council of Economic Advisers (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/The-Economic-Benefits-of-Unleashing-American-Energy.pdf.

[81] *Id.* at 2-6.

- 12 -

noting that "utilities can delay retirement of existing baseload capacity until a sufficient amount of reliable new generation and storage capacity comes online."[82]

26.    *Second*, in its 2023 4R Report, PJM highlighted increasing reliability risks in the coming years due to the "potential timing mismatch between resource retirements, load growth and the pace of new generation entry" under "low new entry" scenarios for renewable generation.[83]  For instance, PJM warned that 40 GW of thermal generation are at risk of retirement by 2030,[84] and that while there is additional renewable generation in the queue, the historical rate of completion for renewable projects is approximately five percent.[85]

27.    *Third*, in December 2024, PJM filed tariff revisions for RRI with FERC.[86]  PJM again cautioned that its "resource adequacy concerns are increasing at an extraordinary pace,"[87] being "driven in large part by significant load growth caused by, among other things, large data centers."[88]  PJM's preliminary analysis indicated "substantial increases [in load additions] since the 2024 forecast" for both summer and winter seasons.[89]  In a February 2025 order, FERC accepted the revisions, finding that they reasonably addressed "the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry."[90]  PJM's summer outlook published in May 2025 reiterated that resource constraints could exist within its service territory under

---

[82] *Id.* at 8-9.

[83] 2023 4R Report at 1.

[84] *Id.* at 2.

[85] *Id.*

[86] PJM Interconnection, L.L.C., *Tariff Revisions for Reliability Resource Initiative*, FERC Docket No. ER25-712 (Dec. 13, 2024).

[87] *Id.* at 10.

[88] *Id.*

[89] *Id.* at 11-12, Figures 3 & 4.

[90] *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,084, at P 14 (2025).  *See also PJM Interconnection, L.L.C.*, 192 FERC ¶ 61,085 (2025) (*Order Addressing Arguments Raised on Rehearing and Clarification*).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

peak load conditions, stating that "available generation capacity may fall short of required reserves in an extreme planning scenario."[91]

28.     The evidence discussed in the Emergency Order demonstrated capacity concerns within the PJM region, with increasing tightening due to continued load growth, premature retirements, and uncertain new entries.   The Secretary exercised his discretion in determining that these conditions constituted an emergency necessitating section 202(c) action.   As noted above, JCAs and PIOs maintain that this evidence does not show the existence of an imminent emergency.   But if the Secretary had allowed the planned retirement of the Eddystone Units, then those generating units would have never been available to address the ongoing emergency in the PJM region.   In other words, the Secretary was required to act before the shortage actually occurred.   Moreover, contrary to the contentions of JCAs and PIOs, the conditions that actually existed in the summer following issuance of the Emergency Order further confirm the ongoing emergency and sudden increased threats to energy reliability.   Accordingly, based on the evidence available, the Secretary reasonably exercised his judgment and issued the Emergency Order.

29.     The evidence subsequently available further confirms the Secretary's exercise of authority in issuing the Emergency Order. According to U.S. Environmental Protection Agency data, the Eddystone Units generated more than 17,000 MWhs during the month of June and nearly 6,000 MWhs during the month of July.[92]  Moreover, during a period of hot weather from June 22 to June 26, Unit 3 ran for a total of 80 hours and Unit 4 ran for a total of 76 hours.[93]  Likewise, during another hot weather period from July 27 to July 30, Unit 3 ran for 53 hours and Unit 4 ran 21 hours.[94]  PJM issued Hot Weather Alerts and/or Maximum Generation Alerts (EEAs) covering a total of 20 days, including days in June,

---

[91] PJM Summer Outlook 2025.

[92] *See Custom Data Download, EPA CAMPD* (Clean Air Markets Program Data), https://campd.epa.gov/data/custom-data-download (search criteria Emissions >> Daily >> Unit (default) >> Apply >> Time Period >> "June 22, 2025 to June 26, 2025" and "July 27, 2025 to July 31, 2025" >> Preview Data >> Download (search date Jan. 2, 2026).

[93] *Id.*

[94] *Id.*

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

July, and August.[95]  Indeed, PJM has issued more EEAs in 2025 than it has over the prior nine years combined.[96]

30.     In addition, the Secretary issued the Emergency Order in the context of and pursuant to the President's executive actions declaring a national energy emergency and ordering DOE to take action to ameliorate the "unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and an increase in domestic manufacturing."[97]  As the President explained in EO 14262, this significant increase in electricity demand, "coupled with existing capacity challenges, places a significant strain on our Nation's electric grid."[98]  Significantly, Executive Order 14262 specifically ordered the Secretary to draw upon "all mechanisms available under applicable law, *including section 202(c) of the Federal Power Act*, to ensure any generation resource identified as critical within an at-risk region is appropriately retained as an available generation resource within the at-risk region."[99]  The President ordered the Secretary to "develop a uniform methodology for analyzing current and anticipated reserve margins for all regions of the bulk power system regulated by [FERC] and [] utilize this methodology to identify current and anticipated regions with reserve margins below acceptable thresholds as identified by the Secretary of Energy."[100]  PIOs' argument that DOE had not adopted this methodology when it issued the Emergency Order is inapposite.[101]  The President did not require this methodology for implementation of section 202(c).  And the Emergency Order did not purport to rely upon this methodology in determining the existence of an emergency; by contrast, the Secretary stated expressly that "DOE *plans* to use this methodology to *further evaluate* Eddystone Units 3 and 4."[102]

---

[95] *See* PJM Emergency Procedures Postings for the period between June 1 and August 31, *Emergency Procedures*, https://emergencyprocedures.pjm.com/ep/pages/dashboard.jsf (search range set to: effective from 06/01/2025 until 08/31/2025).

[96] *Expansion of Provisional Service*, at 2, PJM Planning Committee (Sept. 9, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/committees/pc/2025/20250909/20250909-item-04---expansion-of-provisional-services.pdf.

[97] EO 14262 § 1; *see also* Emergency Order at 2 (discussing EO 14262).

[98] EO 14262 § 1.

[99] *Id.* § 3(c) (emphasis added).

[100] *Id.* § 3(b).

[101] PIO Pet. at 55-56.

[102] Emergency Order at 2 (emphasis added).

- 15 -

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

The executive orders informed the Secretary's decision and action, in addition to the other factors outlined in the Emergency Order and this Order.

31.    The Emergency Order also cited the declared state of national energy emergency established in EO 14156.[103]  In declaring such emergency, including pursuant to the National Emergencies Act,[104] the President specifically ordered the heads of executive departments to "identify and exercise any lawful emergency authorities available to them . . . to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources."[105]  One such "lawful emergency authorit[y]" is the Secretary's section 202(c) power.  PIOs' criticisms of the President's declaration of a national energy emergency in EO 14156 are irrelevant to the Secretary's decision to issue the Emergency Order.[106]  Moreover, PIOs' assertion[107] that the national emergency described in EO 14156 is not "specific enough" to demonstrate the existence of an emergency within the meaning of section 202(c) misses the mark.  As discussed above, in the Emergency Order, the Secretary determined an emergency exists in the PJM region and undertook lawful action pursuant to his existing emergency authority under section 202(c).

32.    Additionally, PJM itself, a grid operator, immediately expressed its support for the Emergency Order.  In a May 31, 2025 press release, PJM stated that it had "repeatedly documented and voiced its concerns over the growing risk of a supply and demand imbalance driven by the confluence of generator retirements and demand growth.  Such an imbalance could have serious ramifications for reliability and affordability for consumers."[108]  PJM continued, "[i]n light of these concerns, PJM supports the [Emergency Order], issued May 30, pursuant to Section 202(c) of the Federal Power Act,

---

[103] *Id.* at 3.

[104] 50 U.S.C. § 1601 *et seq.*

[105] EO 14156 § 2.

[106] *See* PIO Pet. at 43-45.

[107] *Id.* at 43.

[108] *PJM Statement on the U.S. Department of Energy 202(c) Order of May 30*, PJM (May 31, 2025) (PJM Statement), https://www.pjm.com/-/media/DotCom/about-pjm/newsroom/2025-releases/20250531-doe-202c-statement-to-defer-retirements-of-certain-generators.pdf.

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

to defer the retirements of certain generators operating in PJM's footprint, which spans all or part of 13 states and the District of Columbia."[109]

33.     In addition, on December 17, 2025, PJM held its 2027/2028 Base Residual Auction, the market construct used to secure capacity resources from electricity generators to meet forecasted demand in the PJM region for the 2027/2028 delivery year.[110]  Significantly, the auction results demonstrate that the emergency in the PJM region is deepening even faster than anticipated.[111]  The 134,479 MW of resources procured through the auction, plus the additional 11,299 MW for regions under the Fixed Resource Requirement (FRR) (a total of 145,777 MW), is short of PJM's reliability requirement by 6,623 MW.[112]  As PJM explained, this means "that the committed supply is less than what would be required to meet the one-event-in-10-year reliability standard of a 20% reserve margin."[113]  PJM further noted that the auction result "leaves no doubt that data centers' demand for electricity continues to far outstrip new supply," and "[t]he supply-and-demand imbalance that PJM and much of the nation are currently experiencing requires action on multiple fronts, including speeding the entry of new generation onto the system, maintaining and maximizing existing generation, and finding ways to increase the flexibility of system demand."[114]  One of the key mitigating measures PJM highlighted for addressing this shortage is "the potential for generators with announced retirements to continue operating."[115]

---

[109] *Id.*

[110] *2027/2028 Base Residual Auction Report*, PJM (Dec. 17, 2025) (2027/2028 BRA Report), https://www.pjm.com/-/media/DotCom/markets-ops/rpm/rpm-auction-info/2027-2028/2027-2028-bra-report.pdf; *see also PJM Auction Procures 134,479 MW of Generation Resources*, PJM Inside Lines (Dec. 17, 2025) (2027/2028 BRA Press Release), https://insidelines.pjm.com/pjm-auction-procures-134479-mw-of-generation-resources/.

[111] *See* 2027/2028 BRA Press Release.

[112] *Id.*

[113] *Id.*

[114] *Id.* (internal quotation marks and citation omitted).

[115] *Id.*

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

### 4.    Whether the Emergency Order Interferes with Competitive Markets

34.    PIOs contend that the Emergency Order impermissibly undermines competitive markets to the detriment of consumers and reliability.[116]  Specifically, PIOs argue that the Emergency Order, EO 14156 and EO 14262, and DOE Order No. 202-25-3[117] together advance an unlawful energy policy that overrides capacity and energy markets to force private entities to continue operating uneconomic units they would otherwise decommission.[118]  Lastly, PIOs allege that DOE's actions have destabilized the market by interrupting the reallocation of transmission and capacity rights, preventing the addition of new generation resources, and deterring outside investment.[119]

### DOE's Determination

35.    PIOs' assertions are incorrect.  The Secretary determined that an emergency exists and ordered the remedy that "will best meet the emergency and serve the public interest."[120]  The statute contains no requirement for the Secretary to consider in the face of an emergency the impacts of his order on competitive markets.  The statute expressly delegates the decision on the appropriate remedy to the Secretary's "judgment" (similar to the express delegation to "determine[] that an emergency exists").[121]  Indeed, as discussed above, PJM itself has expressed support for the order "to defer the retirements" of the Eddystone Units, referencing the "growing risk of a supply and demand imbalance" that poses "serious ramifications for reliability and affordability for consumers."[122]

36.    PIOs' assertion that the Emergency Order will destabilize the market is likewise unfounded.  When DOE referred rate issues arising from the Emergency Order to FERC,[123]

---

[116] PIO Pet. § V(D).

[117] Order No. 202-25-3 applies to the J.H. Campbell plant within the Midcontinent Independent System Operator's (MISO) territory.

[118] PIO Pet. at 63.

[119] *Id.* at 68-70.

[120] 16 U.S.C. § 824a(c)(1).

[121] *Id.*

[122] PJM Statement, *supra* n.108.

[123] *See* 10 C.F.R. § 205.376.

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

it specified that the Eddystone Units were not to be counted as capacity resources.[124]  This ensures that the Emergency Order will not "destabilize" the market or otherwise interfere with the development of new generation.

37.    As noted above, operational data from this summer confirms that the Eddystone Units generated more than 17,000 MWhs during the month of June and nearly 6,000 MWhs during the month of July.[125]  Moreover, during a period of hot weather from June 22 to June 26, Unit 3 ran for a total of 80 hours and Unit 4 ran for a total of 76 hours.[126]  Likewise, during another hot weather period from July 27 to July 30, Unit 3 ran for 53 hours and Unit 4 ran 21 hours.[127]  The actual dispatch of the Eddystone Units during the summer heatwave underscores that this generation was required to maintain reliability in PJM.  Contrary to PIOs' contentions, the Secretary's action in dispatching the Eddystone Units is increasing reliability and affordability for consumers.

## 5.    Best and Appropriate Means for Addressing the Emergency

38.    PIOs argue that the Eddystone Units are neither the best nor an appropriate means of alleviating the capacity shortfall addressed by the Emergency Order.[128]  In particular, PIOs argue that DOE was required to consider alternatives and evaluate other possible methods for addressing the emergency, which PIOs argue the Emergency Order failed to do.[129]

39.    PIOs argue that DOE is required to consider the various policies of the FPA or the strictures of the Administrative Procedure Act.[130]  For example, PIOs argue that the Emergency Order fails to provide a reasoned basis for its determination that additional

---

[124] U.S. Dep't of Energy, Referral to the Fed. Energy Reg. Comm'n, Docket No. AD25-15-000 (filed June 17, 2025) (DOE Referral Letter).

[125] *See Custom Data Download, EPA CAMPD* (Clean Air Markets Program Data), https://campd.epa.gov/data/custom-data-download (search criteria Emissions >> Daily >> Unit (default) >> Apply >> Time Period >> "June 22, 2025 to June 26, 2025" and "July 27, 2025 to July 31, 2025" >> Preview Data >> Download (search date Jan. 2, 2026).

[126] *Id.*

[127] *Id.*

[128] PIO Pet. § V(E).

[129] *Id.* at 71-72.

[130] *Id.* at 61-62, 73.

- 19 -

dispatch of the Eddystone Units is necessary to best meet the emergency.[131] PIOs further contend that the Emergency Order does not address how the Eddystone Units can meet the emergency and suggest that the Eddystone Units are unfit for the use specified.[132]

## DOE's Determination

40.     The Secretary, in issuing the Emergency Order, adhered to the process established in FPA section 202(c) in exercising his judgment in directing PJM to undertake specific actions as to the Eddystone Units.[133] There is no dispute that the Secretary, as the presidentially-appointed and Senate-confirmed head of the Department of Energy,[134] is the appropriate individual to determine the existence of an emergency within the meaning of section 202(c) and exercise "[the Secretary's] judgment" as to what remedy will "best meet the emergency and serve the public interest."[135] As discussed above, the Secretary exercised his discretion in responding to an emergency pursuant to an express delegation of authority under section 202(c). Further, as explained below, there is no basis to grant rehearing to review the Secretary's exercise of his judgment in prescribing the required response to the emergency.

41.     As noted above, section 202(c)(1) affords the Secretary discretion as to what remedy "will best meet the emergency and serve the public interest."[136] The statute expressly delegates the decision on the appropriate remedy to the Secretary's "judgment" (similar to the express delegation to "determine[] that an emergency exists").[137] The statute does not contain any requirement to consider and evaluate in writing any alternative means for addressing the emergency.[138] Here, the Secretary exercised his judgment in determining

---

[131] *Id.* at 74-76.

[132] *Id.* at 74 (citing Emergency Order at 1); *see also id.* at 76.

[133] *See generally* Emergency Order.

[134] *See* 42 U.S.C. § 7131.

[135] 16 U.S.C. § 824a(c)(1).

[136] *Id.*

[137] *Id.*

[138] PIOs' assertion (at 72-73) that the Secretary must consider a wide range of possible means of addressing an emergency relies on a DOE regulation that sets forth rules for *applications* for emergency orders. 10 C.F.R. § 205.373. That regulation is not applicable here because the Secretary issued the Emergency Order upon his own initiative. PIOs' argument that emergency orders issued pursuant to section 202(c) must *further*

- 20 -

that "operational availability and economic dispatch of [the Eddystone Units] is necessary to best meet the emergency and serve the public interest for purposes of FPA section 202(c)."[139]  It is indisputable that the Eddystone Units are well positioned, as has been demonstrated by their dispatch during the summer heatwave, to address the "potential shortage of electric energy, shortage of facilities for the generation of electric energy, and other causes in the region."[140]  Moreover, the Eddystone Units are not only well positioned in the heart of PJM's service territory, but are also dual-fuel units capable of operating in the summer as well as in extreme winter conditions.

42.    PIOs have now identified alternatives they deem to be better and more appropriate solutions to the emergency.  But this after the fact analysis is irrelevant.  Section 202(c)(1) authorizes the Secretary to determine the existence of an emergency and to order the means to address such a statutory emergency.  It does not require the Secretary to engage in a lengthy weighing of options or explanation of the Secretary's actions prior to issuing the emergency order.  Indeed, such a process would defeat the very purpose of the emergency power to act expeditiously and within the judgment of the Secretary.

### 6.    Potential Environmental Impacts

43.    PIOs contend the Emergency Order fails to comply with section 202(c)(2)'s requirement to ensure that any order "to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts."[141]  In particular, PIOs argue that the Emergency Order's instruction to employ economic dispatch violates DOE's obligation to ensure generation of electric energy only during hours necessary to meet the emergency and serve the public interest.[142]

44.    Moreover, PIOs claim that the Emergency Order lacks sufficiently detailed dispatch and reporting instructions, which they claim are necessary because the Eddystone Units

---

numerous specific public interest factors is similarly misplaced.  *See* PIO Pet. at 71-74.  The Secretary determined that the issuance of the Emergency Order served the public interest by, among other things, helping to prevent the loss of power to homes and local businesses.

[139] Emergency Order at 2.

[140] *Id.*

[141] PIO Pet. at 79 (citing 16 U.S.C. § 824a(c)(2)).

[142] *Id.* at 79-80 (citing Emergency Order at 3).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

can be run on either oil or natural gas.[143]  Lastly, PIOs argue that the Emergency Order does not specify who bears the responsibility for operation of the Eddystone Units or include mitigation measures to alleviate environmental impacts, and therefore does not ensure conformity with environmental regulations "to the maximum extent practicable."[144]

## DOE's Determination

45.     Section 202(c)(2) requires the Secretary to ensure that any section 202(c) order that may result in a conflict with a requirement of any environmental law or regulation to the "maximum extent practicable, [be] consistent with any applicable . . . environmental law or regulation and minimize[] any adverse environmental impacts."  In addition, Section 202(c)(2) requires the Secretary to ensure that any section 202(c) order that may result in a conflict with a requirement of any environmental law or regulation be limited to the "hours necessary to meet the emergency and serve the public interest[.]"

46.     PIOs argue that employment of economic dispatch does not adequately limit operating hours of the Eddystone Units.[145]  However, the Emergency Order also states that to "minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters determined by PJM for reliability purposes."[146]  As PJM reported, Constellation will maintain active cost-based offers for the Eddystone Units, unless either fuel (gas or oil) is unavailable or the units are on an outage, and PJM operators will only dispatch the units to address specified reliability needs.[147]

47.     PIOs' argument that the Emergency Order does not identify conditions to minimize any adverse environmental impact is similarly misplaced.[148]  The Emergency Order requires that "[a]ll operation of the Eddystone Units must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and

---

[143] *See id.* at 83-84.

[144] *Id.* at 81.

[145] PIO Pet. at 79-80.

[146] Emergency Order at 3.

[147] *Eddystone 3 and 4 Unit Reporting and Commitment Process*, PJM, https://www.pjm.com/-/media/DotCom/committees-groups/committees/oc/postings/2025 0612-eddystone-3-and-4-unit-reporting-and-commitment-process.pdf (emphasis added).

[148] *See* PIO Pet. at 82-84.

- 22 -

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

recordkeeping requirements, to the maximum extent feasible,"[149] and requires daily reporting from PJM on "whether the Eddystone Units have operated in compliance with the allowances contained in this Order."[150]   These reporting requirements provide a mechanism for DOE to obtain information concerning any adverse environmental impacts of the emergency operations, and DOE may modify the Emergency Order to require additional actions as the Secretary deems appropriate within his judgment and in view of the asserted emergency.

48.     PIOs argue that certain measures, such as use of imports, demand response resources, and behind-the-meter generation, would mitigate environmental impacts when compliance with environmental standards proves impractical.[151]   These conditions, however, are not required by statute and would not necessarily minimize adverse environmental impacts.   Congress did not prescribe in section 202(c) how DOE was to fulfill its obligation to comply with environmental laws and regulations.   Moreover, Congress recognized, by including the phrase "to the maximum extent practicable," that emergency circumstances would at times make compliance with all Federal, state, and local environmental requirements and minimization of all potential adverse environmental impacts infeasible.   The phrase provides the Secretary with discretion in fulfilling his obligations under section 202(c).   Accordingly, the Emergency Order's limits on duration and the conditions that authorize only the additional generation necessary and require the operation of the Eddystone Units to comply with environmental laws to the extent feasible, as well as the reporting requirements that allow DOE to monitor PJM's compliance with the Emergency Order and the environmental impacts such that DOE could take additional action as the Secretary deems appropriate, were sufficient to satisfy the Secretary's obligation under section 202(c)(2).

## 7.     The Emergency Order is Ambiguous and Vague

49.     PIOs contend that the Emergency Order is impermissibly vague.   PIOs claim that the Emergency Order does not explain whether it requires PJM and Constellation Energy simply to ensure that the Eddystone Units are ready to respond to dispatch instructions, or whether they are to enlarge the capabilities of the Eddystone Units.[152]   PIOs also state that

---

[149] Emergency Order at 3, Ordering Paragraph C.

[150] *Id.*, Ordering Paragraph B.

[151] PIO Pet. at 82-83.

[152] PIO Pet. at 77.

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

it is unclear whether PJM and Constellation Energy are required to take measures to ensure that each of the units is equally available to operate.[153]

### DOE's Determination

50.     Nothing in the Emergency Order requires PJM or Constellation to "enlarge the capabilities" of the Eddystone Units.[154]     The Emergency Order directs PJM and Constellation Energy to "take all measures necessary to ensure that [the] Eddystone Units are available to operate."[155]     That directive explicitly applies to both Eddystone Units.

### 8.     Deprivation of Fair Notice and Adequate Record

51.     PIOs claim that DOE has failed to follow DOE's own procedures to post filings on DOE's 202(c) website within twenty-four hours of receipt, depriving the public of fair notice and a meaningful opportunity to comment.[156]     According to PIOs, DOE has not posted materials related to the Emergency Order that it has received, such as a letter it received from PJM on June 13, 2025 reporting on compliance with the 202(c) order.[157] PIOs also argue that DOE's failure to follow these procedures violates established administrative law principles that agencies must adhere to their own rules to ensure transparency and due process.[158]

### DOE's Determination

52.     The subject of the letter PIOs reference was a compliance letter PJM submitted pursuant to the Emergency Order, Ordering Paragraph D: "By June 15, 2025, PJM is directed to provide [DOE] . . . with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with the public interest."     The letter also discussed certain rate issues that DOE referred to FERC by its own letter.[159]     Moreover, the materials identified by PIOs were submitted to

---

[153] *Id.*

[154] *See id.*

[155] Emergency Order at 3, Ordering Paragraph A.

[156] PIO Pet. at 84-85.

[157] *Id.*

[158] *Id.* at 85.

[159] *See* DOE Referral Letter, *supra* n.124.  In this letter, DOE quoted portions of the

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

DOE after the Emergency Order was issued and, as a result, had no bearing on the issuance of the Emergency Order. DOE further notes that the June 13, 2025 letter from PJM to the Secretary is publicly available on PJM's website.[160] As PIOs' knowledge of the letter reflects, PIOs had the opportunity to review and respond to the Emergency Order, and PIOs present no actual prejudice from the matters now raised. As such any purported error of DOE was harmless.

## III.     **Procedural Issues**

### 1.     **PIOs' Request for Stay**

53.     PIOs move for a stay of the Emergency Order pending resolution of judicial review.[161] In support of their request, PIOs contend that (i) absent a stay, they will be irreparably harmed by the Emergency Order, (ii) a stay will not harm any other interested parties, and (iii) the public interest favors a stay.[162]

### **DOE's Determination**

---

June 13, 2025 compliance report from PJM in which PJM stated:

> PJM and [Constellation] agree that the Facility will be compensated at a rate that is equivalent to the Deactivation Avoidable Cost Credit ("DACC"), determined in accordance with relevant provisions of Tariff, Part V, Sections 114, 115, 116, 118 and 118A (the "DACC Terms"), provided, however, that PJM's payment obligation shall be contingent on [Commission] approval of a cost allocation methodology that allows PJM to collect [Constellation's] compensation from market participants. PJM also understands that it is [Constellation's] intent to make an informational filing with the [Commission], which is not subject to approval, offering additional information about the rate. *Id.* at 1-2.

[160] *See* Letter from PJM Senior Vice President, Operations, Michael Bryson, to Secretary Christopher Wright (June 13, 2025) (regarding "PJM Report in Compliance with Ordering Paragraph D of [the Emergency Order]"), https://www.pjm.com/-/media/DotCom/committees-groups/cifp-doe-ca/postings/cifp-doe-pjm-report-on-compliance-with-eddystone.pdf.

[161] PIO Pet. § VI.

[162] *Id.* at 86-89.

- 25 -

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

54.    In considering a request for a stay, agencies consider (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay serves the public interest.[163]

55.    By its terms, the Emergency Order terminated on August 28, 2025.[164] Consequently, the stay request is now moot.  PIOs also fail to present any evidence of substantial and irreparable harm.

56.    In any case, DOE finds that a stay is not warranted here based on a broader consideration of the equities at issue.  A stay would have substantially harmed other parties and therefore would not have been within the public interest.  Specifically, the Emergency Order was issued to address a shortage of electric energy and a shortage of facilities for the generation of electric energy in portions of the electric grid operated by PJM.  As discussed above, this determination is based on the potential stress load due to resource adequacy concerns and the potential loss of power to homes and local businesses that may be affected by curtailments or outages, which presents a risk to public health and safety.  Imposition of a stay would also harm those citizens residing in the region who would face potentially critical electric energy shortages, and therefore the stay would have been contrary to the public interest.  The balance of equities thus favors denial of a stay.

### 2.    Motions to Intervene

57.    On June 27, 2025, JCAs and PIOs each filed separate motions to intervene and requests for rehearing.  JCAs and PIOs each cite various alleged interests which may be affected by the outcome of this proceeding.[165]

### DOE's Determination

58.    The motions to intervene in this administrative proceeding are hereby permissively granted for JCAs and PIOs, but DOE takes no position on whether they are "aggrieved" parties for purposes of FPA section 313.[166]

---

[163] *See Nken v. Holder*, 556 U.S. 418, 434-36 (2009); *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 291 (2024).

[164] Emergency Order at 3, Ordering Paragraph G.

[165] PIO Pet. § III; JCA Pet. at 2-6.

[166] *See* 16 U.S.C. § 825*l*(b) ("Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the

- 26 -

* * * * *

The Emergency Order is hereby modified upon the issuance of this Order and the result sustained, as discussed in the body of this Order.

Issued at 5:44pm on this 10th day of January 2026.

_____
Chris Wright
Secretary of Energy

---

United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.").

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov

# EXHIBIT B

# NOTICE (202-25-4A)

**UNITED STATES OF AMERICA**
**Department of Energy**

Washington, DC 20585

PJM Interconnection, L.L.C.
and Constellation Energy Corporation                                    Order No. 202-25-4A
Regarding the Eddystone Generating Station

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(August 1, 2025)

Rehearing has been timely requested of the Department of Energy's order issued on May 30, 2025, in the above-captioned matter.[1] Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

As provided in 16 U.S.C. § 825l(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

_____
Chris Wright
Secretary of Energy

---

[1] *PJM Interconnection, L.L.C., and Constellation Energy Corp.*, Order No. 202-25-4 (2025) (regarding the Eddystone Generating Station).

[2] 16 U.S.C. § 825l(a).

[3] 16 U.S.C. § 825l(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).

# EXHIBIT C

# ORDER (202-25-4)

## Order No. 202-25-4

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA), 16 U.S.C. § 824a(c), and section 301(b) of the Department of Energy Organization Act, 42 U.S.C. § 7151(b), and for the reasons set forth below, I hereby determine that an emergency exists in portions of the electricity grid operated by PJM Interconnection (PJM) due to a shortage of facilities for the generation of electric energy, resource adequacy concerns, and other causes, and that issuance of this Order will meet the emergency and serve the public interest.

### Emergency Situation

PJM has recently stated its system faces "growing resource adequacy concern" due to load growth, the retirement of dispatchable resources, and other factors.[1] Upcoming retirements, including the planned retirement of Unit 3 and Unit 4 of the Eddystone Generating Station in Eddystone, Pennsylvania, will exacerbate these resource adequacy issues.

PJM indicates that resource constraints could exist within the service territory under peak load conditions, stating that "available generation capacity may fall short of required reserves in an extreme planning scenario."[2] In its February 2023 assessment "*Energy Transition in PJM: Resource Retirements, Replacements & Risks,*" PJM highlights the increasing risk of reliability risk in the coming years due to the "potential timing mismatch between resource retirements, load growth and the pace of new generation entry" under "low new entry" scenarios for renewable generation.[3]

In December 2024, PJM filed revisions with the Federal Energy Regulatory Commission (FERC) to Part VII of its Open Access Transmission Tariff, known as the Reliability Resource Initiative (RRI), to address near-term resource adequacy concerns. In a February 2025 order, FERC accepted the revisions and found "the possibility of a resource adequacy shortfall driven by significant load growth, premature retirements, and delayed new entry."[4] In March 2025 congressional testimony, PJM found "a growing resource adequacy concern" due to a combination of load growth, the retirement of dispatchable resources, and other factors.[5] Through 2030, PJM anticipates reliability risk from increasing electricity demand, generator retirement outpacing new resource construction, and characteristics of resources in PJM's interconnection queue.[6]

---

[1] https://www.pjm.com/-/media/DotCom/library/reports-notices/testimony/2025/20250325-asthana-testimony-us-house-subcommittee-on-energy.pdf
[2] https://insidelines.pjm.com/pjm-summer-outlook-2025-adequate-resources-available-for-summer-amid-growing-risk/
[3] https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/energy-transition-in-pjm-resource-retirements-replacements-and-risks.ashx
[4] https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250211-3120
[5] https://www.pjm.com/-/media/DotCom/library/reports-notices/testimony/2025/20250325-asthana-testimony-us-house-subcommittee-on-energy.pdf
[6] Ibid.

Constellation Energy owns the Eddystone Generating Station, which includes Unit 3 and Unit 4, each of which has a nameplate capacity of 380 MW. Units 3 and 4 have a planned retirement date of May 31, 2025. The retirement of these units would further decrease available dispatchable generation within PJM's service territory.

Pursuant to Executive Order 14262, *Strengthening the Reliability and Security of the United States Electric Grid* (EO 14262), DOE is developing a methodology to identify current and anticipated reserve margins for all regions of the bulk-power system regulated by the Federal Energy Regulatory Commission. EO 14262 requires this methodology to be published by July 7, 2025, and be used to establish a protocol to identify which generation resources within a region are critical to system reliability and prevent identified generation resources from leaving the bulk-power system. DOE plans to use this methodology to further evaluate Eddystone Units 3 and 4.

*ORDER*

Given the emergency nature of resource adequacy concerns, the declared state of national energy emergency, the responsibility of PJM to ensure maximum reliability on its system, and the ability of PJM to identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, operational availability and economic dispatch of the aforementioned Eddystone Units 3 and 4 (Eddystone Units) is necessary to best meet the emergency and serve the public interest for purposes of FPA section 202(c). This determination is based on, among other things:

- The emergency nature of the potential load stress due to aforementioned resource adequacy concerns, and the potential loss of power to homes and local businesses in the areas that may be affected by curtailments, presenting a risk to public health and safety.
- The potential shortage of electric energy, shortage of facilities for the generation of electric energy, and other causes in the region support the need for the Eddystone Units to contribute to system reliability.
- PJM's responsibility to ensure maximum reliability on its system, and, with the authority granted in this Order, its ability to identify and dispatch generation, including the Eddystone Units, necessary to meet the load demands.

This Order is limited in duration to align with the anticipated emergency circumstances. Because the additional generation may result in a conflict with environmental standards and requirements, I am authorizing only the necessary additional generation on the conditions contained in this Order, with reporting requirements as described below.

FPA section 202(c)(2) requires the Secretary of Energy to ensure that any 202(c) order that may result in a conflict with a requirement of any environmental law be limited to the "hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable," be consistent with any applicable environmental law and minimize any adverse

2

environmental impacts. To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters determined by PJM for reliability purposes.

Based on my determination of an emergency set forth above, I hereby order:

A.  From the time this Order is issued on May 30, 2025, PJM and Constellation Energy shall take all measures necessary to ensure that Eddystone Units are available to operate. For the duration of this order, PJM is directed to take every step to employ economic dispatch of the units to minimize cost to ratepayers. Following conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices. Constellation Energy is directed to comply with all orders from PJM related to the availability and dispatch of the Eddystone Units.

B.  To minimize adverse environmental impacts, this Order limits operation of dispatched units through the expiration of the Order. PJM shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Eddystone Units have operated in compliance with the allowances contained in this Order.

C.  All operation of the Eddystone Units must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D.  By June 15, 2025, PJM is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Eddystone Units consistent with the public interest. PJM shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E.  In addition, PJM and Constellation Energy are directed to file with the Federal Energy Regulatory Commission any tariff revisions or waivers necessary to effectuate this order. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F.  This Order shall not preclude the need for the Eddystone Units to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G.  This Order shall be effective upon its issuance, and shall expire at 5:03 PM EDT on August 28, 2025, with the exception of the reporting requirements in paragraph D.

H.  Issued in Simi Valley, California, at 5:03 PM Eastern Daylight Time on this 30th day of May 2025.

_____

Chris Wright

Secretary of Energy

4